ROSE LEDA EHLER (State Bar No. 296523)
Rose.Ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687 3702

KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
SKYLAR B. GROVE (State Bar No. 310707)
Skylar.Grove@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Facsimile:   (415) 512-4077

Attorneys for Plaintiff
National Fire Protection Association, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., | **CASE NO. 2:21-cv-05262** |
| Plaintiff, | **COMPLAINT FOR COPYRIGHT INFRINGEMENT** |
| v. | |
| UPCODES, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

COMPLAINT

Plaintiff National Fire Protection Association, Inc. ("Plaintiff" or "NFPA"), through its undersigned counsel, brings this Complaint against UpCodes, Inc. ("UpCodes") for infringing NFPA's exclusive rights under the Copyright Act (17 U.S.C. § 101 *et seq.*).  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b).  NFPA alleges, on personal knowledge as to itself and information and belief as to others, as follows:

## INTRODUCTION

1.      UpCodes, which has its Principal Executive Office in this District, is building a business from the mass commercial exploitation of NFPA's copyrighted standards ("Works").  UpCodes markets its online services to the architecture, engineering, and construction ("AEC") industries.  It attracts AEC professionals with free access and the ability to print and download NFPA's Works and the works of others.  UpCodes did not seek a license to use NFPA's Works to build its business.  UpCodes just helped itself to NFPA's Works without incurring or contributing to the substantial costs NFPA incurs in creating and revising those Works.  UpCodes' infringing conduct threatens irreparable harm to NFPA and the public.

2.      NFPA is a self-funded, nonprofit (501(c)(3)), nongovernmental voluntary consensus standards body ("VCSB") (a type of standards development organization ("SDO")).  NFPA creates and disseminates voluntary consensus standards on a wide range of subjects, including building, design, equipment, and installation, that protect the public from the dangers and loss that may result from fire, faulty electrical wiring, and many other hazards.  NFPA's ability to create and revise such standards, and to invest in the development and creation of new standards, is critically dependent upon its ability to be paid by the people who use those standards, namely, the tradespeople and businesses in the AEC and other industries who use the Works in the course of their profit-making businesses.

3.    NFPA exercises its exclusive rights as a copyright owner by selling physical copies of its Works; licensing rights to third-parties who include those Works in their offerings and make authorized derivative works for distribution; and offering a recently launched subscription service that provides digital access to a library of standards with additional features that facilitate professionals' use of NFPA's Works.  NFPA also recognizes that members of the public who do not utilize its Works in their business may be interested in what they say.  For 15 years, NFPA has posted copies of its Works for free online viewing, meaning that any member of the public who wants to know what the Works say can easily access and review those Works.

4.    UpCodes makes money from distributing NFPA's works to the same businesses and tradespeople who pay NFPA and its licensees for the use of NFPA's Works.  But UpCodes competes with an unfair advantage:  UpCodes does not have a license and pays NFPA nothing for the rights it exploits.

5.    UpCodes employs a "freemium" business strategy that is popular among startups and through which UpCodes displays and distributes NFPA's Works on its website to end users without charge.  UpCodes thereby facilitates its users' downloading, printing, and further distributing NFPA's Works.  The "free" tier directly advances UpCodes' financial interest by increasing its base of users and therefore its marketshare and ability to attract investment.  UpCodes then "upsells" those users to a "premium" tier, where users pay UpCodes monthly subscription fees.  The premium tier includes all the same unauthorized exploitation of NFPA's Works as on the free tier, along with additional features, including the creation and distribution of unauthorized and infringing derivative versions of NFPA's Works.

6.    UpCodes' strategy of building a business based on copyright infringement is working.  According to recent press accounts, UpCodes has close to a half-million monthly active users (and growing), and recently raised more than $3 million in equity funding.

7.      UpCodes apparently believes it can exploit NFPA's Works without paying for them because a district court in another Judicial District recently denied summary judgment to a *different* organization, the International Code Council, Inc. ("ICC"), relating to different works and involving different precedent that is uniquely applicable to ICC's "model codes."  *See ICC v. UpCodes*, 2020 WL 2750636 (S.D.N.Y. 2020).  NFPA respectfully submits that decision was in error, but in all events, that court's bases for its order are neither binding nor persuasive in this Court.  NFPA's Works are protected by copyright regardless of whether or when a governmental entity may rely on those Works through a process known as incorporation by reference ("IBR").  The decisions and actions of the Legislative, Executive, and Judicial Branches, as well as 125 years of history, confirm that NFPA's Works retain their protection under copyright.

8.      The Legislative and Executive Branches have endorsed the public-private IBR partnership and the continuation of copyright protection for organizations like NFPA.  The system strikes a careful balance among the interests of copyright owners, governments, and the public at large.

9.      Specifically, in 1995, Congress enacted the National Technology Transfer and Advancement Act ("NTTAA").  Congress directed that "all Federal agencies and departments *shall use technical standards that are developed or adopted by voluntary consensus standards bodies ...* as a means to carry out policy objectives or activities."  NTTAA, Pub. L. No. 104-113 § 12(d) (emphasis added).  As part of the NTTAA, Congress created and empowered the National Institute of Standards and Technology ("NIST") (under the Department of Commerce):

> to facilitate standards-related information sharing and cooperation between Federal agencies and to coordinate the use by Federal agencies of private sector standards, emphasizing where possible the use of standards developed by private, consensus organizations.

15 U.S.C. § 272(b)(3).  NIST, in turn, has issued guidance through an IBR Handbook, which instructs federal agencies to "balance" considerations, including

1   "work[ing] with copyright owners to further the goals of both transparency and
2   public-private collaboration."  *See* Office of the Fed. Register ("OFR"), IBR
3   Handbook 8–9 (2018), https://www.archives.gov/files/federal-
4   register/write/handbook/ibr.pdf.  The OFR has also specifically stated that VCSB
5   standards "should not lose their copyright" as a result of IBR and rejected proposals
6   to the contrary.

7       10.    Likewise, the Office of Management and Budget ("OMB") has
8   recognized that the IBR system yields significant public benefits:  voluntary
9   consensus standards are high quality, uniform, and developed through a rigorous
10  process without the risks of industry capture.  OMB, Circular A-119 (2016),
11  https://www.nist.gov/system/files/revised_circular_a-119_as_of_01-22-2016.pdf.
12  And, the standards are developed without any cost to cash-strapped bodies at all
13  levels of government.  *Id.* at 14, 18.  OMB has also recognized the importance of
14  preserving copyright owners' rights as part of this balance, and has directed that
15  federal agencies "*must observe and protect the rights of the copyright holder* and
16  any other similar obligations" when they IBR any part of a standard.  *Id.* at 22
17  (emphasis added).

18      11.    The Judicial Branch has also confirmed that IBR does not by itself
19  divest copyright, both as a matter of statutory interpretation and the policy interests
20  at stake.  In particular, the Ninth Circuit, in *Practice Management Information Corp.*
21  *v. American Medical Ass'n* ("*AMA*"), 121 F.3d 516 (9th Cir. 1997), *amended*, 133
22  F.3d 1140 (1998), rejected the claim of a party in UpCodes' position that a federal
23  agency's incorporation of a private party's copyrighted coding system divested the
24  underlying copyright.

25      12.    For over 125 years, NFPA has served the role of publishing and
26  disseminating standards for the private sector.  The government has decided to build
27  on that success—benefiting from the quality of those resource-intensive Works and
28

1 avoiding the costs of creating its own standards—and not to undermine the
2 incentives and ability for VCSBs like NFPA to create and revise standards.

3    13.    UpCodes' liability for copyright infringement is clear, as is the
4 irreparable harm to NFPA, including harm to the development of a legitimate
5 market for its standards, its licensing relationships, and its overall mission.
6 Preservation of the status quo requires enjoining UpCodes from offering NFPA's
7 standards during the pendency of this litigation (and ultimately, permanently).
8 NFPA brings this lawsuit for injunctive relief and damages to protect both its
9 copyrights and the public interests at stake.

10                              **THE PARTIES**

11    14.    Plaintiff NFPA is a Massachusetts nonprofit corporation with its
12 principal place of business located at One Batterymarch Park, Quincy,
13 Massachusetts 02169.

14    15.    Defendant UpCodes is a Delaware corporation with its principal place
15 of business in this District, at 340 South Lemon Avenue, #9050, Walnut, California
16 91789.  UpCodes' street address of its principal executive office, UpCodes' mailing
17 address, and the address for its CEO, Secretary, and CFO are at the same location in
18 Walnut, California.  On February 15, 2021, UpCodes filed a Statement of
19 Information with the California Secretary of State signed by "SR" (i.e., Scott
20 Reynolds) certifying that this information is true and correct.

21                       **JURISDICTION AND VENUE**

22    16.    This is an action for infringement and contributory infringement of
23 federally registered copyrights in violation of 17 U.S.C. § 501.

24    17.    This Court has subject matter jurisdiction over this Complaint pursuant
25 to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b).

26    18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and
27 1400(a) because UpCodes resides in and/or may be found in this District, and
28 because the claims alleged herein arose in substantial part in this District.

**BACKGROUND FACTS**

**NFPA And The Creation Of Its Copyrighted Works**

19.    NFPA is a nonprofit organization, founded in 1896 and born of the need to have consistent installation standards for fire prevention across industries. Different standards created confusion and undermined the goal of fire safety. Government did not solve this problem; NFPA did.  Various organizations came together to found NFPA, and in just one year, NFPA published the first edition of the *National Electrical Code*.

20.    Today, NFPA publishes more than 300 standards, including NFPA 70, the *National Electrical Code* ("NEC"), the world's leading standard for electrical safety, and NFPA 101, the *Life Safety Code*, a widely used standard for building construction, protection and occupancy features that minimize the effects of fire and related hazard on human life.

21.    NFPA's standards are independent, state-of-the-art, and of the highest quality.  NFPA creates standards using the "voluntary consensus" process, which is coordinated and accredited by the American National Standards Institute ("ANSI"), a nonprofit, nongovernmental membership organization.  NFPA is ANSI accredited, meaning that its standards development process meets ANSI's requirements for openness, balance, consensus, due process, and the allowance of neutral oversight and public notice and comment.  The voluntary consensus process ensures that all interested parties have an opportunity to participate in a standard's development. The result is a private-public partnership in the truest sense:  NFPA brings together industry, non-profits, consumer groups, academics, members of the public, and officials to facilitate a process that then benefits each stakeholder and the public.

22.    NFPA's rigorous and open standards development process requires NFPA to expend substantial resources on standards development.  The process does not cost the public or participants a fee.  Rather, NFPA pays for salary and benefits for its administrative, editorial, and expert staff who facilitate the development; for

office space and meeting facilities for the more than 260 Technical Committees who participate in NFPA's standards development processes; and for outreach and education efforts, information technology, and other costs of development.

23.    For example, NFPA invests significant resources in the development of each new edition of the NEC. For the current edition (2020; work on the 2023 NEC is ongoing), the preparation of the first draft report involved consideration of over 3,800 proposed language changes including those from the public. A total of 515 Technical Committee members on 18 Code-Making Panels and a Correlating Committee were supported by more than 35 NFPA staff members. The Panels and Committee held concurrent, multi-day committee meetings for a total of seventy-four meeting days. The first draft was finalized by a four-day meeting of the Correlating Committee, assisted by three NFPA staff members. The preparation of the second draft report involved consideration of over 1,900 public comments, and 64 Committee meetings over a two-week period, assisted by at least 35 NFPA staff members. There were two more multi-day Correlating Committee meetings prior to the issuance of the NEC. In addition, there have been numerous conference calls, task group meetings, online seminars, and other interactions among Committee Members and NFPA staff.

24.    NFPA owns the copyrights in its published standards. Attached as **Exhibit A** is a list of the twelve NFPA Works (along with dates and identifying numbers for their corresponding certificates of copyright registration) that UpCodes is currently exploiting without authorization.[1]

---

[1] To the extent UpCodes adds more of NFPA's Works to its service, this Complaint shall incorporate any future added Works as if listed herein. At present, UpCodes' website indicates its intentions to add at least three more of NFPA's standards, which are also listed on Exhibit A: NFPA 1 (2021); NFPA 13 (2019); NFPA 101 (2021).

25.     The primary consumers of NFPA Works are professionals and tradespeople from the AEC industry—professionals such as electricians, architects, general contractors and subcontractors, and electrical equipment manufacturers— who utilize these standards in the course of their business.  These professionals access NFPA's Works through purchased physical copies, enterprise licenses, or NFPA's more recently launched subscription services, such as NFPA LiNK.



**Digital Access to Codes and Standards with NFPA LiNK™**

Go by the book without the book. Introducing NFPA LiNK™, providing digital access to NFPA® codes and standards, at your fingertips. Utilize dynamic search functionality, bookmarking, and the ability to share and collaborate with others to save time, and get the job done right. See a full list of codes and standards in NFPA LiNK™. Individual subscriptions start as low as $9.99/month.

Sign Me Up Today

*See* https://www.nfpa.org/link.

26.     Since 2006, NFPA has also ensured that the public has access to any current and newly published standards, including those that are incorporated by reference, by making those standards available on NFPA's website for free online reading.  NFPA encourages other organizations and even governments to link to these standards available on its website.

27.     NFPA funds its standards development activities, and much of its other mission-driven work, primarily with the revenue obtained from exercising its exclusive rights as the copyright owner of those Works.  NFPA sells physical copies to professionals in the AEC industries (the NEC is about $100 and other standards are less).  NFPA also licenses its Works to other publishers and organizations to make and sell copies or derivative works therefrom, such as checklists.

28.    NFPA also offers access to its Works through digital subscription services, including NFPA LiNK (https://www.nfpa.org/link).  This subscription service permits users to have digital access to a library of NFPA Works, and utilize the Works in different ways, such as through advanced and dynamic search tools to help users locate provisions of relevance to those users across NFPA's different Works; expert commentary and visual aids; tools that allow users to bookmark and annotate provisions of the Works; tools that allow users to group various provisions of the Works together in a saved collection for a project; and tools that allow users to collaborate and share information with colleagues.



*See* https://www.nfpa.org/link.  NFPA views the success of this new subscription offering as crucial to its business and its public-safety mission in the digital era.

29.     NFPA does not authorize copying or distribution of the Works without a license.  The alternative—widespread and uncontrolled dissemination of those standards—risks destroying the public-private partnership that makes those standards possible in the first place.

**UpCodes And Its Infringing Activities**

30.     UpCodes is a for-profit corporation.

31.     UpCodes' target market is *also* the tradespeople and other professionals from the AEC industries who are NFPA's customers.  Even on its "free" tier, UpCodes makes clear its intended audience is comprised of professionals who use standards in their business rather than people motivated by curiosity or political activism about what the standards say.  UpCodes' home page states:  "UpCodes helps the AEC industry deliver code compliant buildings.  We provide tools to manage building codes, avoid project delays, and clarify requirements."

32.     Under the heading "TRUSTED BY INDUSTRY LEADERS," UpCodes' website prominently features AEC companies that apparently use its services, including well-known construction companies, such as Clark Construction and Fluor, and well-known architectural firms, such as SOM and Stantec.

33.     UpCodes markets its service directly to these and other participants in the AEC industries.  UpCodes' marketing emphasizes its goal of building and selling online tools that such professionals may use in the course of their business. For example, UpCodes highlights "workflows" for various professionals, including General Contractors.  UpCodes explains how it can help the construction industry through "[m]ore accurate pre-construction services," which allow professionals to "[s]tay on time and on budget," and "[w]ork from up-to date [sic] code."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24  *See* https://up.codes/workflows/general_contractor.  UpCodes has similar marketing

25  "workflows" for architects, subcontractors, code consultants, owners, and others.

26          34.     To grow its business, UpCodes employs a "freemium" model, i.e., one

27  that provides a free service to attract users and then promotes the paid "premium"

28

1 | version of that service.  What UpCodes makes available for "free" and for a price is
2 | the unauthorized exploitation of NFPA's Works.  Here's how UpCodes operates:

3 |      35.    Anyone who visits UpCodes' service is prompted to "FIND YOUR
4 | CODES" as the very first, and most prominent link:



14 | *See* https://up.codes/.

15 |      36.    Clicking on "FIND YOUR CODES" does *not* take the user to a
16 | particular jurisdiction.  It instead takes the user to a list of *publishers* whose
17 | copyrighted standards UpCodes makes available on its service.  Where, as with
18 | NFPA, the publisher has released multiple volumes of the same standard, UpCodes
19 | lists those different versions by publication year.  The current UpCodes list includes
20 | twelve NFPA standards and three more that UpCodes appears to be in process of
21 | uploading.

*See* https://up.codes/codes/general (red box added).

37.     Once the user selects the title and publication year, UpCodes takes the user to a roster of jurisdictions that it says have incorporated the standard by reference.  The user does not have to select a jurisdiction in which they reside. Rather, the user can see which jurisdictions are purported to have incorporated the

1 standard with or without amendment.  And the user can then click through to the

2 UpCodes-reproduced copies of NFPA's Work.

3      38.    Take, for example, the 2020 NEC, NFPA's most recent version of that

4 Work.  Users can access and navigate through the entire text of the Introduction and

5 Chapters 1 through 9, article-by-article.  UpCodes says that it only posts "the law,"

6 but its offerings include substantially all of the Works, including text that has no

7 binding force even in those jurisdictions that have incorporated the Works by

8 reference.  For example, UpCodes copies and posts the section of the introduction to

9 the NEC that explains what is *not covered* by the standard.  UpCodes also copies

10 and posts both the explanations of and the text of permissive rules and explanatory

11 material, such as informational notes.  *See* Introduction art. 90.5(C).  "Such notes

12 are informational only and are not enforceable as requirements of this *Code*."  *Id.*

13 UpCodes posts them anyway.

**(E) Grounded Conductors of Multiconductor Cables**

The insulated grounded conductor(s) in a multiconductor cable shall be identified by a continuous white or gray outer finish or by three continuous white or gray stripes on other than green insulation along its entire length. For conductors that are 4 AWG or larger in cables, identification of the grounded conductor shall be permitted to comply with 200.6(B). For multiconductor flat cable with conductors that are 4 AWG or larger, an external ridge shall be permitted to identify the grounded conductor.

*Exception No. 1: Conductors within multiconductor cables shall be permitted to be re-identified at their terminations at the time of installation by a distinctive white or gray marking or other equally effective means.*

*Exception No. 2: The grounded conductor of a multiconductor varnished-cloth-insulated cable shall be permitted to be identified at its terminations at the time of installation by a distinctive white marking or other equally effective means.*

Informational Note: The color gray may have been used in the past as an ungrounded conductor. Care should be taken when working on existing systems.

*See* https://up.codes/viewer/colorado/nfpa-70-2020/chapter/2/wiring-and-protection#200 (red box added).

39.    In addition to full access, UpCodes' free offering permits a user to print (or download as a PDF) substantially all of the Works.  Accordingly, anyone—even anonymously—can then print and redistribute substantially all of the NEC with just a few simple clicks.



40.    Because UpCodes employs a "freemium" model, these offerings of free access to, and the ability to download, print, and re-distribute substantially all of the posted Works, are intended to attract users to UpCodes' service.  Once those users are on the site, UpCodes attempts to convince them to pay for a subscription.  The premium service offers additional features, such as searching across standards, annotations, making "projects," bookmarking, sharing across users, and other derivative works like diagrams.  Users of UpCodes' "free" service encounter persistent reminders to start a 2-week free trial of the premium service and see frequent "pop-ups" of advertisements for the premium service.  Attempting to use any premium feature, such as bookmarking, prompts the user to subscribe:



*See* https://up.codes/bookmarks.

41.     UpCodes' model appears to be working.  In March, UpCodes announced that it had raised $3.36 million, bringing its total raised thus far to $4.15 million.  Those reports stated that UpCodes had grown to 500,000 monthly active users, a substantial increase from even the amount then stated on its website of 400,000 such users.

42.     UpCodes has also been clear regarding what it plans to do with this additional fundraising—it is going to grow, including by adding more standards.  In a Twitter post, UpCodes stated:  "Excited to announce that we've raised more funds. We'll be doubling or tripling our team this year which means more features and more codes," punctuated with a rocket emoji.

*See* https://twitter.com/upcodes/status/1371564968470933506.

**UpCodes Threatens NFPA With Irreparable Harm**

43.    For most of its existence, UpCodes did not post NFPA standards.  That changed within the last few months.  UpCodes now provides NFPA's Works to the same AEC tradespeople and businesses that otherwise would pay NFPA (or its licensees) for copies of its standards or subscriptions to NFPA LiNK.  UpCodes is growing.  NFPA faces irreparable harm as a result.

44.    First, and most urgently, UpCodes is interfering with and threatening the development of the emerging market for NFPA's own subscription service, NFPA LiNK.  UpCodes offers substantially similar features and the same NFPA standards as NFPA LiNK but competes on unfair terms because it has not had to incur the costs and risks associated with developing the standards that are the lifeblood of UpCodes' free and premium tiers of service.  UpCodes offers NFPA's content for free, and that free access subsidizes the cost of the premium tier.  If AEC

professionals are led to believe that UpCodes is a legitimate alternative to NFPA LiNK, NFPA will lose potential subscribers.

45.     Second, UpCodes' unauthorized conduct threatens the value of NFPA's licenses and its goodwill and relationship with licensees. If NFPA's licensees or their customers could obtain the same material from UpCodes in digital format, without cost, and without restrictions on further dissemination, they will not want to pay NFPA for the rights to offer its standards in connection with their products and services. NFPA has already heard about UpCodes from licensees. UpCodes thus interferes with and undermines NFPA's goodwill with its licensees, who may question why they are negotiating contracts, paying license fees, and abiding by license terms when UpCodes is offering the same (or more) content without paying anything or agreeing to any such terms. Licensees depend on NFPA, as the copyright owner, to enforce its rights and protect the legitimate market for the Works.

46.     Third, UpCodes fundamentally and unlawfully undermines the market for NFPA's Works. UpCodes markets its service as a market substitute, not just for NFPA's subscription service but also for the sale of physical copies of NFPA's standards, which remains a critical source of NFPA's lawful revenue for the sale of copies of its Works. A corresponding reduction in revenue threatens NFPA's ability to maintain its existing voluntary consensus standards development and revision processes at their level of investment and quality. If NFPA cannot do that important work, standards may not keep up with technological advancements to address fire, electrical and related hazards. This failure would result in a lower level of overall public safety.

**UpCodes Harms The Public Interest**

47.     NFPA is part of a much larger public-private partnership that UpCodes directly undermines.

48.     In general, IBR happens when a legislature or agency refers to a privately authored standard in the section of a statute or regulation.  Governmental bodies may, if they choose to do so, IBR some or all of a published standard into their regulatory requirements.

49.     IBR yields significant public benefits.  As the OMB has explained, voluntary consensus standards are high quality, uniform, and developed through a rigorous process without the risks of industry capture.  Circular A-119 at p. 16.  And, the standards are developed without any cost to cash-strapped bodies at all levels of government.  *See id.* at pp. 14, 18.

50.     The U.S. Congress has not only approved the IBR process but mandated it:  "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities."  NTTAA, Pub. L. No. 104-113 § 12(d), 110 Stat. 775, codified at 15 U.S.C. § 272.

51.     NFPA does not stop officials from relying on its important Works.  But neither do these officials take credit for or claim to be the creators of NFPA's Works.  Quite the opposite: Congress and the Executive Branch have repeatedly recognized and endorsed reliance on *copyrighted* standards, without usurping the rights of the copyright owners.

52.     As noted above, Congress created NIST to coordinate the government's involvement in standards development and IBR and has directed federal agencies to work with VCSBs to make standards available while being mindful of the copyright interests at stake.  The OFR, in the context of rejecting a requirement that the government publish incorporated standards on their sites for printing, downloading and redistribution (all of which UpCodes does), rejected the same arguments UpCodes has advanced and explained that "when the Federal government references copyrighted works, those works should not lose their copyright."  Incorporation by Reference, 79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014).

53.     In sum, UpCodes' infringement is clear, and the private and public interests in respecting NFPA's copyrights are manifest.  An injunction is required to stop UpCodes from profiting at the expense of NFPA and public safety.

## FIRST CAUSE OF ACTION

### (Direct Copyright Infringement, 17 U.S.C. §§ 106(1), (2), (3), (5))

54.     NFPA incorporates herein by reference each and every averment contained in paragraphs 1 through 53 inclusive.

55.     NFPA owns registered copyrights for the Works.

56.     UpCodes does not have NFPA's authorization to exercise any of its exclusive rights in the Works, including the rights to reproduce, distribute, publicly display, or make derivative works based upon NFPA's Works.  UpCodes makes unauthorized exploitation, and therefore infringes NFPA's exclusive rights, in four respects:

> a.     Reproduction Right, § 106(1):  UpCodes digitally reproduces large portions of NFPA's Works on the UpCodes services.

> b.     Derivative Works Right, § 106(2):  UpCodes recasts NFPA's Works into different formats, including through compilations of chapters, charts and other materials, and text with user annotations created on the UpCodes site.

> c.     Distribution Right, § 106(3):  UpCodes distributes NFPA's Works by uploading them to the site where UpCodes' users download, print, and further distribute copies.

> d.     Public Display Right, § 106(5):  UpCodes displays the Works online.

57.     The infringement of each of NFPA's Works constitutes a separate act of copyright infringement.

58.     UpCodes' acts of infringement are willful, in disregard of and with indifference to NFPA's rights.

59.    As a direct and proximate result of the infringements by UpCodes, NFPA is entitled to damages and UpCodes' profits in amounts to be proven at trial.

60.    Alternatively, at its election, NFPA is entitled to statutory damages, up to the maximum amount of $150,000 per statutory award by virtue of UpCodes' willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

61.    NFPA further is entitled to recover its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

62.    As a direct and proximate result of the foregoing acts and conduct, NFPA has sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, UpCodes will continue to infringe NFPA's rights in its Works.  NFPA is entitled to injunctive relief under 17 U.S.C. § 502.

## SECOND CAUSE OF ACTION

### (Indirect Copyright Infringement, 17 U.S.C. §§ 106(1), (2), (3), (5))

63.    NFPA incorporates herein by reference each and every averment contained in paragraphs 1 through 62 inclusive.

64.    UpCodes knowingly distributes and publicly displays unlawful copies of NFPA's Works with the intent to induce, enable, facilitate and/or materially contribute to others' making unauthorized copies, distributing, displaying and/or making derivative works of NFPA's Works.

65.    UpCodes' acts of infringement are willful, in disregard of and with indifference to NFPA's rights.

66.    As a direct and proximate result of the infringements by UpCodes, NFPA is entitled to damages and UpCodes' profits in amounts to be proven at trial.

67.    Alternatively, at its election, NFPA is entitled to statutory damages, up to the maximum amount of $150,000 per statutory award by virtue of UpCodes'

COMPLAINT

1  willful infringement, or for such other amounts as may be proper under 17 U.S.C.

2  § 504.

3       68.    NFPA further is entitled to recover its attorneys' fees and full costs

4  pursuant to 17 U.S.C. § 505.

5       69.    As a direct and proximate result of the foregoing acts and conduct,

6  NFPA has sustained and will continue to sustain substantial, immediate and

7  irreparable injury, for which there is no adequate remedy at law.  Unless enjoined

8  and restrained by this Court, UpCodes will continue to engage in the foregoing acts

9  and conduct.  NFPA is entitled to injunctive relief under 17 U.S.C. § 502.

10  **PRAYER FOR RELIEF**

11       WHEREFORE, NFPA prays for judgment against UpCodes and against all of

12  its affiliates, agents, servants, employees, partners and all persons in active concert

13  or participation with them, for the following relief:

14       1.    For NFPA's damages and UpCodes' profits in such amount as may be

15  found; alternatively, at NFPA's election, for maximum statutory damages; or for

16  such other amounts as may be proper pursuant to 17 U.S.C. § 504(c).

17       2.    For preliminary and permanent injunctions enjoining UpCodes, and all

18  persons acting in concert or participation with it, from reproducing, distributing,

19  displaying, creating derivative works based on, or otherwise infringing in any

20  manner, any copyrighted work owned or controlled by NFPA (including without

21  limitation any Work).

22       3.    For prejudgment interest according to law.

23       4.    For NFPA's attorneys' fees and full costs incurred in this action

24  pursuant to 17 U.S.C. § 505.

25       5.    For all such further and additional relief, in law or in equity, to which

26  NFPA may be entitled or which the Court deems just and proper.

27  **<u>DEMAND FOR JURY TRIAL</u>**

28  NFPA demands a trial by jury on all issues triable by jury.

1  DATED:  June 29, 2021                    MUNGER, TOLLES & OLSON LLP

2

3

4                                           By:      /s/ Kelly M. Klaus
                                                    KELLY M. KLAUS
5                                           Attorneys for Plaintiff
                                            NATIONAL FIRE PROTECTION
6                                           ASSOCIATION, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28