1  ROSE LEDA EHLER (State Bar No. 296523)
   Rose.Ehler@mto.com
2  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, 50th Floor
3  Los Angeles, CA 90071-3426
   Telephone:   (213) 683-9100
4  Facsimile:   (213) 687 3702

5  KELLY M. KLAUS (State Bar No. 161091)
   Kelly.Klaus@mto.com
6  SKYLAR B. GROVE (State Bar No. 310707)
   Skylar.Grove@mto.com
7  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, 27th Floor
8  San Francisco, California 94105-2907
   Telephone:   (415) 512-4000
9  Facsimile:   (415) 512-4077

10  Attorneys for Plaintiff
    National Fire Protection Association, Inc.

11

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15

| | |
|---|---|
| 16  NATIONAL FIRE PROTECTION ASSOCIATION, INC., | Case No. 2:21-cv-05262-DSF (Ex) |
| 17                    Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 18          v. | |
| 19  UPCODES, INC., | |
| 20                    Defendant. | Dale S. Fischer United States District Judge |
| 21 | |
| 22 | Date:   Monday, August 9, 2021 Time:   1:30 pm Crtrm.: 7D |
| 23 | |
| 24 | Filed concurrently herewith: (1)   Declaration of James Pauley (2)   Declaration of Kelly Klaus (3)   [Proposed] Order |
| 25 | |
| 26 | |

27

28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 9, 2021, at 1:30pm, before United States District Judge Dale S. Fischer, in Courtroom 7D of the United States District Court for the Central District of California, located at 350 W 1st Street, Los Angeles, CA 90012, Plaintiff National Fire Protection Association, Inc. ("NFPA" or "Plaintiff"[1]) will and hereby does move for a Preliminary Injunction restraining Defendant UpCodes, Inc. ("UpCodes" or "Defendant") and all of its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privity with any of them, from infringing by any means, directly or indirectly, NFPA's exclusive rights under § 106 of the Copyright Act ("Copyright Act"), 17 U.S.C. § 106,[2] including by reproducing, distributing, or displaying NFPA's copyrighted standards (the "Copyrighted Works" or "Works"), or creating derivative works thereof.

This Motion is made on the following grounds as explained in the accompanying Memorandum of Points and Authorities and supporting papers:

1. NFPA is likely to succeed on the merits because the evidence establishes that UpCodes directly infringes NFPA's exclusive rights under § 106 by copying, distributing, publicly displaying, and making derivative works of NFPA's Copyrighted Works.

2. UpCodes cannot show a likelihood of success on any of the affirmative defenses it will raise.

3. A preliminary injunction will preserve the status quo of UpCodes not making unauthorized appropriation of NFPA's Copyrighted Works. Further, absent a preliminary injunction, NFPA will suffer irreparable harm to its business,

---

[1] Abbreviations defined in this Notice are also used in the Memorandum of Points and Authorities.

[2] Unless otherwise noted, all section citations in this brief are to Title 17 U.S.C.

including irreparable harm to the emerging market for NFPA's digital subscription service and to NFPA's relationships and goodwill with its licensees.  The balance of equities tips decidedly in NFPA's favor.  And an injunction is in the public interest.

This Motion is based upon this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declaration of James Pauley ("Pauley Decl.") and exhibits thereto; the Declaration of Kelly M. Klaus ("Klaus Decl.") and exhibits thereto; all documents on file in this action; and such further or additional evidence or argument as may be presented before or at the time of the hearing on this Motion.

Pursuant to Local Rule 7-3, this preliminary injunction motion is exempt from a pre-filing conference of counsel.  Nevertheless, NFPA's counsel notified UpCodes of its intention to file this motion and invited a discussion regarding potential pre-motion discovery and a briefing schedule.  Neither UpCodes nor any counsel for it has responded to NFPA.  Klaus Decl. ¶¶ 2 & 23, Ex. U.

DATED:  July 9, 2021                       MUNGER, TOLLES & OLSON LLP


By:  ___/s/ Kelly M. Klaus___
          KELLY M. KLAUS

Attorneys for Plaintiff
NATIONAL FIRE PROTECTION
ASSOCIATION, INC.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................ 1

FACTUAL BACKGROUND ............................................................... 2

   A.   NFPA And Its Copyrighted Standards ...................................... 2

      1.   NFPA's History And Process For Developing Standards ........... 2

      2.   NFPA's Investment In And Revenue From Its Standards .......... 5

   B.   UpCodes' Appropriation Of NFPA's Works ............................ 5

      1.   UpCodes' Business Is Built On Unauthorized Exploitation Of Other Parties' Works ............................. 5

      2.   UpCodes Added NFPA's Works And Now Competes Directly And Unfairly With NFPA ............................. 7

ARGUMENT .................................................................................... 9

I.   NFPA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .................................................................................. 9

   A.   NFPA Owns Or Controls Valid Copyrights In The Works ................... 9

   B.   UpCodes Violates Numerous Of NFPA's Exclusive Rights ............... 10

   C.   UpCodes' Anticipated Affirmative Defenses Are Meritless ............... 10

      1.   NFPA Does Not Lose Its Copyrights When Governmental Bodies IBR Its Standards ............................. 11

           (a)   The Copyright Act And Other Congressional And Administrative Actions Show IBR Does Not Divest Copyright ............................. 11

           (b)   Under Ninth Circuit Precedent, IBR Does Not Terminate Copyright Protection For Privately Developed Standards ............................. 13

      2.   UpCodes Cannot Show Its Affirmative Defense Of Fair Use Is Likely To Succeed ............................. 18

           (a)   UpCodes Makes Commercial, Non-Transformative Use Of NFPA's Works ............................. 18

           (b)   The Nature Of NFPA's Works Does Not Support Fair Use ............................. 19

           (c)   UpCodes' Extensive Copying Of NFPA's Works Weighs Against Fair Use ............................. 19

**TABLE OF CONTENTS**
**(Continued)**

**Page**

       (d)    UpCodes' Appropriation Of The Works Usurps NFPA's Markets ................................................................. 20

II.    NFPA WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION ....................................................................... 21

III.   THE BALANCE OF HARDSHIPS TIPS DECISIVELY FOR NFPA .......... 24

IV.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ........... 24

V.    MINIMAL SECURITY SHOULD BE REQUIRED .................................... 25

CONCLUSION ............................................................................................ 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ............................................................... 10

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*,
  No. 13-CV-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017),
  *rev'd in part, vacated in part on other grounds*, 896 F.3d 437 (D.C.
  Cir. 2018) ............................................................................................... 24

*American Society for Testing & Materials v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018) ................................................... 17, 19, 20

*Authors Guild, Inc. v. Google Inc.*,
  954 F. Supp. 2d 282 (S.D.N.Y. 2013), *aff'd*, 804 F.3d 202 (2d Cir.
  2015) ....................................................................................................... 10

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) .................................................................... 20

*Banks v. Manchester*,
  128 U.S. 244 (1888) ................................................................................ 14

*Building Officials & Code Admin. v. Code Tech., Inc.*,
  628 F.2d 730 (1st Cir. 1980) ................................................................... 17

*Cadence Design Sys., Inc. v. Avant! Corp.*,
  125 F.3d 824 (9th Cir. 1997) ................................................................... 24

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .................................................................... 18, 20, 21

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) .................................................................... 21

*CCC Information Services, Inc. v. Maclean Hunter Market Reports,
  Inc. (CCC)*,
  44 F.3d 61 (2d Cir. 1994) ............................................................ 15, 17, 25

1

**<u>TABLE OF AUTHORITIES</u>**
(Continued)

2

**Page(s)**

3

*Columbia Pictures Indus., Inc. v. Galindo*,
4
    No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347 (C.D. Cal. May
    11, 2020) ............................................................................................. 23

5

*Disney Enters., Inc. v. VidAngel, Inc.*,
6
    869 F.3d 848 (9th Cir. 2017) ...................................................... 9, 11, 18

7

*Fox News Network, LLC v. TVEyes, Inc.*,
8
    883 F.3d 169 (2d Cir. 2018) ............................................................ 18, 19

9

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
10
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ......................................... 23, 24

11

*Georgia v. Public.Resource.Org, Inc.*,
12
    140 S. Ct. 1498 (2020) ................................................................... 14, 16

13

*GoTo.com, Inc. v. Walt Disney Co.*,
14
    202 F.3d 1199 (9th Cir. 2000) ............................................................ 21

15

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
16
    No. 17 Civ. 6261 (VM), 2020 WL 2750636 (S.D.N.Y. May 27,
    2020) ....................................................................................... 7, 16, 20

17

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
18
    322 F.3d 26 (1st Cir. 2003) ................................................................. 17

19

*Leadsinger, Inc. v. BMG Music Publ'g*,
20
    512 F.3d 522 (9th Cir. 2008) ......................................................... 18, 20

21

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
22
    312 F.3d 94 (2d Cir. 2002) .................................................................. 22

23

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
24
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) .............................................. 22

25

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .................................................................. 21

26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
27
    508 F.3d 1146 (9th Cir. 2007) ......................................................... 9, 10

28

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir.
   1998) ............................................................................................2, passim

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ........................................................... 22, 23

*Satava v. Lowry*,
   323 F.3d 805 (9th Cir. 2003) ............................................................... 15

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
   689 F.3d 29 (1st Cir. 2012) ................................................................. 21

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014) ............................................................. 18, 19

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) ............................................................... 24

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ............................................................... 9

*Veeck v. Southern Building Code Congress International, Inc.*,
   293 F.3d 791 (5th Cir. 2002) ......................................................... 16, 17

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
   824 F. Supp. 2d 1003 (C.D. Cal. 2011) .................................... 22, 23, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................... 9

*Worldwide Church of God v. Phila. Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ............................................................. 18

**FEDERAL STATUTES**

17 U.S.C. § 101 .................................................................................. 10, 11

17 U.S.C. § 102(a) ................................................................................... 11

17 U.S.C. § 105(a) ................................................................................... 11

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

17 U.S.C. § 106 .................................................................................. 10

17 U.S.C. § 106(1) ............................................................................. 10

17 U.S.C. § 106(2) ............................................................................. 10

17 U.S.C. § 106(3) ........................................................................ 10, 19

17 U.S.C. § 106(5) ............................................................................. 10

17 U.S.C. § 107(1) ............................................................................. 18

17 U.S.C. § 107(2) ............................................................................. 19

17 U.S.C. § 107(4) ............................................................................. 20

17 U.S.C. § 117(c) ............................................................................. 24

17 U.S.C. § 410(c) ............................................................................... 9

National Technology Transfer and Advancement Act of 1995, Pub. L.
   No. 104-113 § 12(d), 110 Stat. 775 (codified at 15 U.S.C. § 272) ................. 4, 12

**STATE STATUTES**

Minnesota Statutes, § 326B.35 ............................................................ 3

**FEDERAL REGULATIONS**

79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014) ........................................ 13

**STATE REGULATIONS**

Minn. R. 1315.0200(1a) ...................................................................... 3

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 8 ............................................................... 11

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476 (1976) ...................................................... 11, 12

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**OTHER AUTHORITIES**

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
    5.06[C] (1996) ................................................................................ 14

National Research Council, *Standards, Conformity Assessment, and
Trade into the 21st Century* vii (National Academy Press 1995),
*available at* https://www.nap.edu/read/4921/chapter/1 ...................... 12

Vineet Kumar, *Making Freemium Work*, Harv. Bus. Rev. (2014),
    https://hbr.org/2014/05/making-freemium-work ................................... 6

# INTRODUCTION

UpCodes is a for-profit enterprise that is building a business based on the mass commercial exploitation of NFPA's Copyrighted Works without a license. UpCodes could have sought permission from NFPA, or even sought a declaratory judgment.  Instead UpCodes usurped NFPA's rights in the Works.  Its conduct upends the status quo and should be preliminarily enjoined.

NFPA is a non-profit, non-governmental, standards development organization devoted to saving lives and reducing loss from fire, electrical, and related hazards. NFPA furthers this mission by creating and disseminating voluntary consensus standards on subjects like building, design, equipment, and installation related to fire safety.  Like any other copyright owner, NFPA tries to recover the substantial investments of creating the Copyrighted Works, and invests in new and updated Works, by charging those who consume them (tradespeople and businesses who use the Works in their profit-making businesses) for the exercise of its exclusive rights. NFPA sells physical copies of its standards; licenses rights to third parties who make derivative works; and recently launched a subscription service that provides digital access to a library of its standards with additional features that facilitate their professional use.  NFPA recognizes that members of the public who do not utilize its Works in their business may be interested in what they say—for 15 years, NFPA has posted copies of its Works for free online viewing.

UpCodes tries to make money from the same businesses and tradespeople who pay for NFPA's Copyrighted Works.  It does this by copying and posting, without authorization, substantial portions of NFPA's Works and trying to "upsell" its users to a paid "premium" service that allows for further copying and distribution of everything UpCodes appropriates.  UpCodes is not trying to educate the public or provoke debate about changing NFPA's standards.  It is trying to make itself and its investors rich.  And its strategy is working:  according to recent press accounts,

UpCodes has a user base of a half-million users (and growing), and it is raising millions of dollars in equity funding.

UpCodes concedes that copyright protects the Works when they are created, but contends the copyright is lost and a Work enters the public domain whenever any governmental entity incorporates it by reference ("IBR").  But Congress, which has the sole constitutional power to set the rules of copyright, has not said that IBR relegates a copyrighted standard to the public domain.  On the contrary, Congress and the relevant Executive Branch bodies have recognized that continued copyright protection for IBR'd standards is critical to maintain the significant public safety benefits that the public-private partnership of standards development yields.  The Ninth Circuit, too, has held that a government's reference to privately developed standards as setting a legal baseline does not divest copyright in those standards. *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998).

UpCodes' liability is clear as is the immediate, irreparable harm that UpCodes' copying causes NFPA to suffer.  UpCodes' conduct harms the public interest, which is served by respecting the copyright.  The status quo pending trial is for UpCodes to refrain from infringing NFPA's copyrights, as was the case for the first five years of UpCodes' existence.  The requested injunction will preserve that status quo.

## FACTUAL BACKGROUND

### A.    NFPA And Its Copyrighted Standards

#### 1.    NFPA's History And Process For Developing Standards

NFPA is a nonprofit organization, founded in 1896 out of the need to have consistent installation standards for fire prevention across industry.  Pauley Decl. ¶ 3.  NFPA solved for industry the problems created by inconsistencies and inefficiencies arising out of multiple, varying standards for the same installations. *Id.*  Today, NFPA publishes more than 300 standards, including the National

Electrical Code® ("NEC"), the world's leading standard for electrical safety. *Id.* ¶¶ 4, 7. NPFA serves professionals across the architectural, engineering, and construction ("AEC") industries. *Id.* ¶ 9.

NFPA's standards are independent, state-of-the-art, and of the highest quality. *Id.* ¶¶ 4-5, 15-19, 25-28. NFPA is known as a Voluntary Consensus Standards Body ("VCSB"), abiding by the "voluntary consensus" process, which accounts for the best available research and input from a wide variety of stakeholders, including members of the public, consumer groups, industry, academics, government representatives, and others. *Id.* ¶¶ 15, 17. NFPA's standards provide guidance, instructions, and best practices to prevent the occurrence of disasters, manage their impact, and protect human life and property. *Id.* ¶ 5.

Recognizing the value of VCSBs and the standards they create, governmental bodies, at the federal, state, and local levels, sometimes IBR such standards. *Id.* ¶ 20. In general, IBR happens when a legislature or agency, in a statute or regulation, refers to a privately authored standard, to set minimum compliance requirements.[1] When IBR'd, NFPA's standards are available through multiple channels, including in most cases at the relevant government office or libraries; for free viewing access on NFPA's website[2]; and for license or sale from NFPA. *See* Pauley Decl. ¶¶ 9, 31, 35, 36, 41.

---

[1] *See, e.g.*, Minn. R. 1315.0200, Subp. 1a ("All new electrical [systems] must comply with the regulations contained in the 2020 edition of the National Electrical Code (NEC) as approved by the American National Standards Institute (ANSI/NFPA 70-2020), Minnesota Statutes, section 326B.35, and the Minnesota State Building Code as adopted by the commissioner of labor and industry. The 2020 edition of the National Electrical Code, developed and published by the National Fire Protection Association, Inc., is incorporated by reference and made part of the Minnesota State Building Code.").

[2] Since 2006, NFPA has made all of its IBR'd standards available on its website for free, online reading. Pauley Decl. ¶ 31. The online access is read-only, meaning users cannot copy and distribute the works. That limitation is entirely consistent

This IBR process, which preserves copyright, yields significant public benefits: voluntary consensus standards provide consistency across jurisdictions; they are developed through a rigorous process that is dedicated to producing high quality standards, without the risk of industry capture; and their development imposes no burden to the public fisc, which otherwise would have to subsidize the costs for governments to develop their own standards. *See* OMB Circular No. A-119 (revised Jan. 27, 2016) (attached as Klaus Decl. Ex. S).

In recognition of these significant public benefits, Congress has mandated that federal agencies and departments use VCSB standards:

> all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities.

National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Pub. L. No. 104-113 § 12(d), 110 Stat. 775 (codified at 15 U.S.C. § 272).

Governmental bodies at all levels have been careful to preserve the elements of this longstanding public-private partnership, including the VCSB's copyright in its works. The OMB and Office of the Federal Register ("OFR") have been clear that IBR "must observe and protect the rights of the copyright holder," OMB Circular A-119 at 22 (revised January 2016) (attached as Klaus Decl. Ex. S), and must "balance" copyright considerations including by "work[ing] with copyright owners to further the goals of both transparency and public-private collaboration," OFR, IBR Handbook at 8–9 (2018) (attached as Klaus Decl. Ex. T). As noted, states and local bodies that have incorporated NFPA's standards have done so by reference rather than by copying the text.

---

with NFPA's Works being freely available for people who want to see what the Works say rather than use them for commercial profit. *Id.* ¶ 32.

2.   NFPA's Investment In And Revenue From Its Standards

NFPA invests substantial resources into the process of developing its Works. Pauley Decl. ¶¶ 24-30.  These include sizable upfront financial investments, human resources, NFPA's long-standing reputation, and the time of its employees and members.  *Id*.  NFPA also invests in other mission-driven work that yields substantial public benefits.  *Id.* ¶ 11.  For example, NFPA recently launched Outthink Wildfire, a comprehensive strategy to address the health, safety, and economic threats posed by wildfires.  *Id*.

The primary users of NFPA's Works are professionals and tradespeople from the AEC industries.  *Id.* ¶¶ 9-10.  These individuals pay for copies of the standards and use them in their businesses.  *Id.* ¶¶ 9, 33, 45.  NFPA also licenses the Works to third parties, who disseminate them or create derivative works, such as checklists for tradespeople to use on projects.  *Id*. ¶ 36.  Most recently, NFPA has launched an online subscription service, NFPA LiNK™, which serves the AEC community with tools that professionals can apply to the standards in the course of their professional projects (e.g., searching across standards, accessing situation-based guidance for specific workspaces or equipment, bookmarking, creating digital annotations, and sharing materials with other team members).  *Id.* ¶¶ 10, 39-41.

The revenue from NFPA's exercise of its copyrights enables NFPA's recoupment of investments already made in the Copyrighted Works and ability to invest in new Works.  *Id.* ¶¶ 34-42, 53, 57.

**B.   UpCodes' Appropriation Of NFPA's Works**

1.   UpCodes' Business Is Built On Unauthorized Exploitation Of Other Parties' Works

UpCodes is a start-up, for-profit corporation.  Klaus Decl. ¶ 5, Ex. C.  It makes money by luring users to its site with unauthorized copies of third-parties' standards and trying to upsell those users to UpCodes' paid premium service.  *See id.* ¶¶ 5 & 12, Exs. C & J.  This business model is well-known in the internet space

-5-

1    as a "freemium" model.  *See, e.g.*, Vineet Kumar, *Making Freemium Work*, Harv.

2    Bus. Rev. (2014), https://hbr.org/2014/05/making-freemium-work.

3         Even on its "free" tier, UpCodes makes clear its intended audience is

4    comprised of AEC tradespeople and other professionals who use standards in their

5    businesses.  UpCodes' home page states:  "UpCodes helps the AEC industry . . . ."

6    Klaus Decl. ¶ 6, Ex. D.  UpCodes provides workflows, specifically tailored to

7    particular industry professionals (e.g., architects, general contractors, or inspectors),

8    and proclaims UpCodes will save those professionals' billable time, "Supercharge

9    [their] code review," "Level-up [their] staff," "Win more work," and "Stay on time

10   and on budget."  *Id.* ¶ 9, Ex. G.

11        UpCodes claims it is simply trying to educate members of the public about

12   standards that have been IBR'd in their jurisdictions.  That is inconsistent with

13   UpCodes' marketing (which targets the AEC industries) and UpCodes' actual

14   consumer offering.  UpCodes does not just make standards available for viewing.

15   Even on the free tier, UpCodes provides users with tools and express instructions for

16   creating PDF copies of entire chapters, which users can then download or distribute

17   to others.



**Print Codes**

Mouse over any code section and click the print icon on the desired section to download that section and all child sections as a PDF. This feature can save you time making screenshots or summarizing code when communicating with other team members or clients.

18
19
20
21
22
23
24

25   *Id.* ¶¶ 10 & 11, Exs. H & I.  Through this printing/downloading, UpCodes can

26   effectively distribute new copies of entire chapters of NFPA's Works.  Because

27
28

1   UpCodes does not limit the quantity of text its users can print/download, those users

2   can download (and redistribute) substantially all of each Work UpCodes has posted.

3     UpCodes tries to convert free users to paying subscribers.  The main pages of

4   UpCodes' website prominently display banner advertising, encouraging users to

5   upgrade to its premium subscription service.  *Id.* ¶ 12, Ex. J.

6     UpCodes' business strategy has involved rapidly growing its user base by also

7   expanding the number of standards it appropriates.  *Id.* ¶¶ 17-19, Exs. O-Q.

8   UpCodes' founders say the site has a half-million monthly active users, and this past

9   March, UpCodes announced that it raised $3.36 million in pre-Series A funding.  *Id.*

10  ¶¶ 18-19, Exs. P-Q.

11      2. <u>UpCodes Added NFPA's Works And Now Competes Directly
      And Unfairly With NFPA</u>

12

13    For most of its existence, UpCodes did not post NFPA standards.  UpCodes

14  did post the works of another party, the ICC.  In 2017, ICC sued UpCodes for

15  copyright infringement.  The district court in that case issued an interim ruling,

16  which denied the parties' cross-motions for summary judgment but indicated

17  agreement with UpCodes' argument that, as adopted, ICC's works were in the

18  public domain.  *Int'l Code Council, Inc. v. UpCodes, Inc.* ("*ICC*"), No. 17 Civ. 6261

19  (VM), 2020 WL 2750636 (S.D.N.Y. May 27, 2020).  The court has not finally

20  resolved the copyright claims, and that action is pending trial.

21    Although it had not obtained any judgment in its favor (even against its

22  litigation adversary (ICC)), UpCodes has over the last several months added 12 (and

23  counting) of NFPA's Works to its service.  Klaus Decl. ¶ 7, Ex. E.  UpCodes did not

24  ask NFPA for permission or a license.  Pauley Decl. ¶ 37.  Nor did UpCodes seek a

25  declaratory judgment against NFPA.  UpCodes simply posted NFPA's Works.  And

26  it plans to post even more; it encourages users to "check back later or follow our

27  Twitter for announcements" to find even more standards.  Klaus Decl. ¶¶ 17-18,

28  Exs. O-P.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

UpCodes provides NFPA's Works to the same AEC tradespeople and businesses that otherwise would pay NFPA or its licensees for copies of its standards or subscriptions to NFPA LiNK.  Pauley Decl. ¶ 42.  UpCodes' free tier operates as a substitute for and directly competes with NFPA's sale of physical copies of standards, licensing, and the NFPA LiNK subscription service, *id.* ¶¶ 45, 47, 54.  And UpCodes' premium service also directly competes with NFPA LiNK by offering access to NFPA's Works and many of the same tools that NFPA's service provides.  *Compare id.* ¶ 13, Ex. K, *with* Pauley Decl. ¶¶ 10, 39-41, Ex. N.  But UpCodes competes on unfair terms:  it pays none of the substantial investments needed to create the Works.  It simply helps itself to the content that fuels its burgeoning business.

UpCodes claims it is not posting NFPA's Works but "the law" of particular jurisdictions.  That is wrong.  UpCodes copies and posts huge portions of NFPA's standards (e.g., the Introduction and all nine chapters of the NEC, omitting only some prefatory pages (with the table of contents and committee membership) and, in some (but not all) iterations of its postings, the NEC's informative annexes) and markets its service accordingly.  *See* Klaus Decl. ¶ 7.  Clicking "FIND YOUR CODES"—the most prominent link on the home page—takes the user to a page that lists standards *by publisher*, listing 15 of NFPA's standards.  *Id.* ¶ 7, Ex. E.



*Id.* (red box added).

UpCodes' claim that it only posts a jurisdiction's binding legal requirements is not correct.  UpCodes posts portions of the Works that create no legal obligations, even where a jurisdiction has IBR'd a standard.  For example, NFPA's standards include numerous explanatory materials provided in the form of informational notes.  The standards make clear such notes are informational only and "are not enforceable as requirements."  Pauley Decl. ¶ 21; *see, e.g.*, Klaus Decl. ¶ 15, Ex. M at 1 (attaching Article 100 Definitions, Part I General, NFPA 70, 2020, printed from UpCodes).  UpCodes posts them anyway.  UpCodes likewise posts portions of NFPA standards that are "permissive rules," which "identify actions that are allowed but not required" and impose no mandatory requirement.  Pauley Decl. ¶ 22; Klaus Decl. ¶ 16, Ex. N.

## ARGUMENT

NFPA satisfies all of the requirements for a preliminary injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I.   NFPA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

NFPA establishes its claim of prima facie infringement by (1) "show[ing] ownership of the allegedly infringed material," and (2) demonstrating a violation of "at least one exclusive right."  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007)).

### A.   NFPA Owns Or Controls Valid Copyrights In The Works

Certificates of registration issued by the Copyright Office for the Copyrighted Works are included with this filing.  Pauley Decl. Exs. A to L.  The certificates create a presumption of copyright validity and ownership.  17 U.S.C. § 410(c); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).  UpCodes currently offers all of these standards and indicates that it will offer additional standards in the future.  Klaus Decl. ¶¶ 7, 17-18, Exs. E, O-P.

### B.   UpCodes Violates Numerous Of NFPA's Exclusive Rights

UpCodes' unauthorized exercise of any one of NFPA's exclusive rights under § 106 constitutes infringement.  UpCodes infringes four different rights:

- **Reproduction Right, § 106(1)**:  UpCodes digitally reproduces large portions of NFPA's Works on the UpCodes services without a license. *See, e.g.*, *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 289 (S.D.N.Y. 2013) (digitally reproducing books violates reproduction rights under § 106(1)), *aff'd*, 804 F.3d 202 (2d Cir. 2015).

- **Derivative Works Right, § 106(2)**:  UpCodes recasts NFPA's Works into different formats, including through compilations of chapters and text with user annotations created on the UpCodes site, infringing NFPA's exclusive right under § 106(2) to create derivative works.  *See* § 101 ("derivative work" includes any form in which a work "may be recast, transformed, or adapted").

- **Distribution Right, § 106(3)**:  UpCodes distributes NFPA's Works by uploading them to the site where UpCodes' users download, print, and further distribute copies.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) (uploading digital files for others to copy violates distribution right).

- **Public Display Right, § 106(5)**:  UpCodes' online display of the Works infringes NFPA's exclusive right of public display.  *Perfect 10*, 508 F.3d at 1160.

UpCodes' prima facie liability for infringement is clear.

### C.   UpCodes' Anticipated Affirmative Defenses Are Meritless

UpCodes' arguments in *ICC* show the defenses it will raise here.  UpCodes cannot defeat this motion unless it "show[s] a likelihood that [at least one]

1  affirmative defense will succeed." *VidAngel*, 869 F.3d at 856 (affirming preliminary
2  injunction over defendant's defenses).  UpCodes cannot make that showing.

3      1.    NFPA Does Not Lose Its Copyrights When Governmental
            Bodies IBR Its Standards
4

5  UpCodes will argue that IBR'ing destroys the copyright and puts the Works
6  into the public domain.  UpCodes is wrong.

7  The Constitution gives Congress the power to define the scope of copyright
8  protection.  U.S. Const. art. I, § 8, cl. 8.  The Copyright Act provides that NFPA's
9  Works had copyright protection the moment NFPA fixed those Works in a tangible
10  medium of expression.  § 102(a).  Congress has not said that standards lose
11  copyright upon being IBR'd.  On the contrary, Congress provided for copyright
12  protection and established a framework through which standards would retain their
13  protection and permit governments to rely on those standards through IBR.  The
14  Executive Branch has implemented that framework in a manner that ensures
15  copyright protection is respected.  Ninth Circuit precedent confirms that is the case.

16      (a)    *The Copyright Act And Other Congressional And
              Administrative Actions Show IBR Does Not Divest
17              Copyright*

18  Nothing in the Copyright Act or any other statute provides that a standard is
19  ineligible for copyright protection or loses such protection after being IBR'd.  The
20  Act says that: "Copyright protection under this title is not available for any work of
21  the United States Government," § 105(a), but NFPA's standards are not such works.
22  *See* § 101 ("[a] 'work of the United States Government' is a work prepared by an
23  officer or employee of the United States Government as part of that person's official
24  duties").  And legislative history makes clear that "publication or other use by the
25  Government of a private work *would not affect its copyright protection in any way.*"
26  H.R. Rep. No. 94-1476, at 60 (1976) (emphasis added).  If "particular
27  circumstances" mean that "the need to have a work freely available outweighs the
28

-11-                                    Case No. 2:21-cv-05262-DSF (Ex)

need of the private author to secure copyright," Congress stated that it would be "dealt with by specific legislation [or] agency regulations." *Id.* at 59.

Subsequent Congressional and administrative actions confirm that IBR does not destroy copyright. In 1991, Congress directed the National Research Council ("NRC") to conduct a study on standards development. *See* National Research Council, *Standards, Conformity Assessment, and Trade into the 21st Century* vii (National Academy Press 1995), *available at* https://www.nap.edu/read/4921/chapter/1. NRC's study contained a detailed overview of the U.S. standards-development system and specifically noted that many standards developers "offset expenses and generate income through sales of standards documents, *to which they hold the copyright*." *Id.* at 32 (emphasis added). The study concluded that the "U.S. standards development system serves the national interest well" by "support[ing] efficient and timely development of product and process standards that meet economic and public interests," *id.* at 157, and recommended that Congress pass a law to promote the use of privately developed voluntary consensus standards by federal agencies.

Congress responded to NRC's study by doing what it recommended. Congress passed the NTTAA, which directs that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies . . . as a means to carry out policy objectives or activities." Pub. L. No. 104-113 § 12(d).

Pursuant to the NTTAA, the OMB has issued guidelines for agencies' use of privately developed voluntary consensus standards. The OMB guidelines provide that when an agency IBRs a standard, "*[the] agency must observe and protect the rights of the copyright holder* and any other similar obligations." OMB Circular A-119 at 22 (Klaus Decl. Ex. S). Further confirming that VCSBs retain control over their exclusive rights in the standards, the OFR, the federal agency responsible for the publication of agency actions, rejected a proposed rule that would have required

1   any federally IBR'd material to be posted for free online viewing and downloading.

2   The OFR expressly stated that VCSB standards "should not lose their copyright" as

3   a result of IBR and rejected proposals to the contrary.  Incorporation by Reference,

4   79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014).  OFR has also developed the IBR

5   Handbook, which instructs federal agencies to "balance" considerations, including

6   "work[ing] with copyright owners to further the goals of both transparency and

7   public-private collaboration."  OFR, IBR Handbook at 8-9 (2018) (attached as Klaus

8   Decl. Ex. T).

9        In sum, the Copyright Act, its legislative history, and subsequent action by

10  Congress and the relevant Executive Branch agencies all point to one conclusion:

11  IBR'ing of a standard does *not* divest its copyright protection.

12             *(b)     Under Ninth Circuit Precedent, IBR Does Not Terminate*
               *Copyright Protection For Privately Developed Standards*

13

14       The Ninth Circuit has rejected the arguments that UpCodes will make here.

15  In *Practice Management*, the American Medical Association ("AMA") created a

16  copyrighted coding system (called "CPT") for identifying medical procedures.

17  Congress later directed the Health Care Financing Administration ("HCFA"), the

18  federal agency responsible for administering Medicare and Medicaid

19  reimbursement, to establish a uniform code for identifying doctors' services on

20  reimbursement forms.  HCFA did not create a new code, but instead contracted with

21  AMA for a license to "adopt and use" its copyrighted work, the CPT, for this

22  program.  HCFA specified that whoever wanted to apply for Medicare and Medicaid

23  reimbursement had to use the AMA's work—and only that work—to do that.

24  *Practice Management*, 121 F.3d at 517.  In other words, the government agency

25  IBR'd a private party's copyrighted work to establish legal compliance

26  requirements.

27       The plaintiff, Practice Management, was a for-profit book publisher that

28  wanted to create and distribute copies of the CPT.  *Id*. at 518.  When it did not get a

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

requested volume discount from AMA for use of the CPT, Practice Management sued AMA. Practice Management argued that "the CPT became uncopyrightable law when HCFA adopted the regulation mandating use of CPT code numbers in applications for Medicaid reimbursement." *Id*. That is UpCodes' argument, but the Ninth Circuit rejected it.

The court framed the issue as whether the government edicts doctrine, articulated in *Banks v. Manchester*, 128 U.S. 244 (1888), applied to AMA's work.[3] The court held it did not.

First, the Ninth Circuit analyzed the relevant incentives to create new works. The court held that copyright protection for the CPT "provide[d] the economic incentive for the AMA to produce and maintain" that work. *Practice Management*, 121 F.3d at 518. "To vitiate copyright, in such circumstances, could, without adequate justification, prove destructive of the copyright interest, in encouraging creativity," concerns that are entirely inapplicable when a government official or agency is the author. *Id.* (quoting 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.06[C], at 5–92 (1996)). In response to an amicus brief filed by NFPA and other VCSBs, the court expressed particular concern that accepting Practice Management's public domain argument (which is UpCodes' argument) "would expose copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation." *Id*. at 519.

---

[3] The Supreme Court recently explained that the government-edicts doctrine provides "officials empowered to speak with the force of law cannot be the authors of—and therefore cannot copyright—the works they create in the course of their official duties." *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1504 (2020). The Court held the doctrine applied to Georgia Official Code annotations "authored by an arm of the legislature in the course of its legislative duties." *Id.* The Court made clear that the doctrine's "straightforward rule" "*does not apply* . . . to works created by government officials (*or private parties*) who lack the authority to make or interpret the law." *Id*. at 1507 (emphasis added).

Second, the Ninth Circuit held that due process did not support terminating AMA's copyright, which "pose[d] no realistic threat to public access" because "[t]here [was] no evidence that anyone wishing to use the [coding system] ha[d] any difficulty obtaining access to it," or that AMA had any "incentive to limit or forgo publication." *Id.*

The Second Circuit's decision in *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.* (*CCC*), 44 F.3d 61 (2d Cir. 1994), is to the same effect. The court there held that several states' IBR'ing of the Red Book, which provides automobile valuations, did not put that work into the public domain. *Id.* at 73-74. The court said that a rule divesting copyright upon IBR would be "antithetical" to the copyright system's interest in encouraging the creation of new works. *Id.* & n.30.

UpCodes' public domain defense fails under *Practice Management* and *CCC*. The purposes of the Copyright Act weigh in favor of copyright protection continuing after IBR. The copyright provides the incentives for NFPA and other VCSBs to continue creating works that are critical to public safety. And continued copyright protection for NFPA's Works raises no due process issue about public access to IBR'd standards. NFPA's standards are even more accessible to the public than the works in *Practice Management* because NFPA makes its standards available to any member of the public for free viewing on its website.[4]

_____

[4] *Practice Management* also requires rejection of UpCodes' affirmative defense of merger. Under that defense, "courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way." *Satava v. Lowry*, 323 F.3d 805, 812 n.5 (9th Cir. 2003). The Ninth Circuit rejected Practice Management's merger defense because AMA's copyright did not "stifle independent creative expression in the medical coding industry"; it did not prevent the plaintiff or AMA's competitors from developing competing coding systems but "simply prevent[ed] wholesale copying of an existing system." *Practice Management*, 121 F.3d at 520 n.8. NFPA's copyright does not prevent anyone, including UpCodes, from developing competing standards.

1    UpCodes will rely on the out-of-Circuit decisions in *Veeck v. Southern*
2  *Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002) (en banc),
3  and *ICC v. UpCodes*.  Those cases are inapposite, and even if they were not,
4  *Practice Management* controls in this Circuit.

5    In *Veeck*, the *en banc* Fifth Circuit held by a 9-6 vote that SBCCI's "model
6  building codes" entered the public domain when two small towns adopted them.
7  293 F.3d at 793.  The *ICC* court adopted the reasoning of the *Veeck* majority.  *ICC*,
8  2020 WL 2750636, at *9-10, *12-14.  Although both decisions use sweeping
9  language regarding "the law,"[5] the cases are distinguishable.

10    In particular, *Veeck* said that SBCCI did not deserve the incentives that
11  copyright protection provides because the text of SBCCI's model codes served "no
12  other purpose than to become law."  293 F.3d at 805.  By contrast, NFPA's
13  standards are created to provide, and are recognized as providing, high quality safety
14  benchmarks for industry professionals whether or not those standards are IBR'd.
15  Pauley Decl. ¶¶ 6-9.

16    Indeed, *Veeck* was careful to distinguish the sorts of standards that NFPA
17  creates (and has created for 125 years) from SBCCI's model codes.  In response to
18  an amicus brief filed by NFPA and other VCSBs, *Veeck* explained it was *not*
19  holding that "copyrights may be vitiated simply by the common practice of

---

[5] The *Veeck* decision contained broad language opining that the rationale of *Banks* cannot be limited to works authored by government employees.  293 F.3d at 795-800.  To the extent this language is inconsistent with *Practice Management*, the Ninth Circuit's decision controls.  Likewise, the *Veeck* majority's interpretation of *Banks* to mean "the law," whatever its source, "is not subject to federal copyright law," 293 F.3d at 800, cannot be squared with the Supreme Court's decision in *Public.Resource.Org*, that the government edicts doctrine holds only that government officials and bodies cannot be "authors" under the Copyright Act, and that the doctrine does not apply to private-party authors.  140 S. Ct. at 1506-07.

Case No. 2:21-cv-05262-DSF (Ex)
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

1  governmental entities' incorporating their standards in laws and regulations." 293

2  F.3d at 803–04.

3       *Veeck*'s refusal to hold that reference to extrinsic standards injects them into

4  the public domain is reflected in *Practice Management* and decisions from other

5  courts.  Those courts have recognized the calamitous consequences that would

6  follow from UpCodes' argument and have refrained from holding that the text of a

7  standard enters the public domain upon being IBR'd.  *See CCC*, 44 F.3d at 74 ("We

8  are not prepared to hold that a state's reference to a copyrighted work as a legal

9  standard for valuation results in loss of the copyright."); *Building Officials & Code*

10 *Admin. v. Code Tech., Inc.* ("*BOCA*"), 628 F.2d 730, 736 (1st Cir. 1980) (declining

11 to definitively rule government edicts doctrine applied to private standards because

12 of, *inter alia*, "a possible trend towards state and federal adoption" of privately

13 developed works, which "serve an important public function" and "arguably . . . do

14 a better job than could the state alone"); *John G. Danielson, Inc. v. Winchester-*

15 *Conant Props., Inc.*, 322 F.3d 26, 39 (1st Cir. 2003) ("*BOCA* did not resolve the

16 issue and this court has not done so since."); *Practice Management*, 121 F.3d at 518.

17      In 2018, in a case in which NFPA is a plaintiff, the D.C. Circuit declined to

18 adopt the defendant's public domain argument (which UpCodes made in *ICC* and

19 will make here).  The D.C. Circuit instead held that the district court (which had

20 granted summary judgment to NFPA) should reconsider its rejection of the

21 defendant's fair use defense.  *American Society for Testing & Materials v.*

22 *Public.Resource.Org, Inc.* ("*ASTM*"), 896 F.3d 437 (D.C. Cir. 2018).  The D.C.

23 Circuit said that one of the reasons for resolving the appeal on fair use, rather than

24 considering the sweeping public domain argument, was that the fair use defense

25 "allow[s] copying only where it serves a public end *rather than permitting*

26 *competitors to merely sell duplicates at a lower cost*."  *Id.* at 447 (emphasis added).

27 Here, UpCodes is a competitor providing near duplicates of NFPA's Works for free

28 or (on its paid tier) at prices that undercut NFPA's prices.  Pauley Decl. ¶¶ 45, 47.

1    In sum, UpCodes cannot show it is likely to succeed on its argument that IBR

2 divests NFPA's copyrights and places its Works in the public domain.

3              2.    <u>UpCodes Cannot Show Its Affirmative Defense Of Fair Use Is
                     Likely To Succeed</u>

4                   (a)    *UpCodes Makes Commercial, Non-Transformative Use Of

5                          NFPA's Works*

6    The fair use defense requires consideration of four enumerated fair use

7 factors, the first of which ("the purpose and character" of the defendant's use,

8 § 107(1)), focuses on whether the use is commercial and transformative.

9 *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 529-30 (9th Cir. 2008).

10    UpCodes' use obviously is commercial:  it copies and distributes those Works

11 to profit in its business.  UpCodes pays nothing for its use, which therefore is

12 "presumptively … unfair."  *VidAngel*, 869 F.3d at 861 (citation omitted).

13    UpCodes' use also is not transformative.  A transformative use adds

14 "something new, with a further purpose or different character, altering the first

15 [work] with new expression, meaning, or message."  *Campbell v. Acuff-Rose Music,*

16 *Inc.*, 510 U.S. 569, 579 (1994).  UpCodes does no such thing.  It "merely repackages

17 [and] republishes the original," conduct that "is unlikely to be deemed a fair use."

18 *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) (citation

19 omitted).  Fundamentally, UpCodes' use is for the same purpose as NFPA's—

20 providing the information to the AEC professionals—which "seriously weakens a

21 claimed fair use."  *Worldwide Church of God v. Phila. Church of God, Inc.*, 227

22 F.3d 1110, 1117 (9th Cir. 2000) (citation omitted).[6]

23

24 ───────────────────
[6] The purpose and character of UpCodes' use is fundamentally different than the use
25 in *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir.
26 2014), a case on which UpCodes has relied in other litigation.  The court found fair
   use where Bloomberg disseminated solely for news purposes the recording of a
27 *private* call open to a limited number of invited financial analysts.  *Id.* at 78.
28 Bloomberg provided the record to individuals interested in the call's contents who

1    The D.C. Circuit's *ASTM* decision indicates this factor weighs against

2 UpCodes.  The court there suggested that, in certain circumstances, "[the first]

3 factor would weigh heavily in favor of permitting a *nonprofit* seeking to inform the

4 public about the law to reproduce in full the relevant portions of that particular

5 standard."  *ASTM*, 896 F.3d at 450.  UpCodes, however, is a *for-profit company* that

6 uses NFPA's works to upsell users to its paid premium service.  And UpCodes

7 copies and distributes material that is *not* "essential to complying with any legal

8 duty," *id*. at 450, including informational notes and other materials that establish no

9 legal duty.

10    (b)    *The Nature Of NFPA's Works Does Not Support Fair Use*

11    The second factor considers "the nature of the copyrighted work."  § 107(2).

12 That the standards are factual rather than fictitious makes no difference.  *TVEyes,*

13 *Inc.*, 883 F.3d at 178 (rejecting "argument that, since facts are not copyrightable, the

14 factual nature of [plaintiff's] content militates in favor of a finding of fair use").

15    In *ASTM*, the D.C. Circuit said the key to this factor is whether the copied

16 portion of a standard imposes binding legal requirements.  *ASTM*, 896 F.3d at 451.

17 As discussed, UpCodes copies and distributes numerous portions of the standards

18 that impose no legal duty even where the standards are IBR'd.  This factor therefore

19 does not favor fair use.

20    (c)    *UpCodes' Extensive Copying Of NFPA's Works Weighs*
         *Against Fair Use*
21

22    The third factor considers "the amount and substantiality" of UpCodes'

23 copying, § 106(3), and here weighs against fair use.  UpCodes copies and posts the

24 lion's share of NFPA's Works, omitting only the table of contents, index, and (in

25 some instances) informative annexes.  Klaus Decl. ¶ 7; *TVEyes*, 883 F.3d at 179

26

27 ────────────────
   otherwise had no access to it.  *Id*. at 82.  *Swatch* is inapposite because NFPA's

28 works are publicly available, including for free online viewing.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

("This factor clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear."); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015) ("[t]he larger the quantity of the copyrighted text the [user] can see and the more control the [user] can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase").

*ASTM* made clear that, even where a defendant claims to copy to educate the public, the defendant must "limit[] its copying to only what is required to fairly describe the standard's legal import." 896 F.3d at 452. UpCodes' objective is to sell subscriptions, not to educate the public. And it does not limit is copying to material that describes a standard's legal import. UpCodes copies and posts portions of the standards that impose no legal duties. Copying and distributing material that "does not govern any conduct" weighs against fair use. *Id*.

          *(d)*    *UpCodes' Appropriation Of The Works Usurps NFPA's Markets*

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). Because UpCodes uses NFPA's works "'for commercial gain,' the likelihood of market harm 'may be presumed.'" *Leadsinger*, 512 F.3d at 531–32 (citation omitted).

UpCodes cannot show an absence of market harm. Market harm flows, first, from UpCodes' usurpation of NFPA's markets for the sale of physical copies and subscriptions to access its standards. UpCodes' online offerings contain the entirety of the standards' substantive chapters and thus "serve as a market substitute for the original." *Campbell*, 510 U.S. at 587. Even the district court in the *ICC* case, which sided with UpCodes as to the first three factors, thought it "fair to say" that UpCodes' posting was "an effective substitute for" the plaintiff's works. *ICC*, 2020 WL 2750636, at *28.

Moreover, under the fourth factor, the Court must consider not only UpCodes' appropriation of NFPA's works, but "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (citations omitted).  There is no question that if anyone could do what UpCodes is doing, the market for NFPA's works would be destroyed.  This "impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).  *See Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 65 (1st Cir. 2012) ("If anyone could freely access the Works . . . the Monastery would have no market in which to try and publish, disseminate, or sell its [works]. . . . Thus, the Monastery's [works] (which the Archbishop does not contest were expensive to create) would have been toiled over, with no possible market in which to reap the fruits of its labor.").

In sum, UpCodes cannot show a likelihood of prevailing on fair use.

## II. NFPA WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Preliminary injunctive relief preserves the status quo *ante litem*, which "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (citations omitted).  The relevant state of affairs here is that which existed *before* UpCodes began posting NFPA's Works.  *See id.* (opposite holding "would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun"); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (status quo is "the last actual, peaceable uncontested status which preceded the pending controversy" (citation omitted)).

1    UpCodes' decision to exploit NFPA's Works without seeking a license

2    upends the status quo.  UpCodes *could have* sought a declaratory judgment, but it

3    did not.  UpCodes should not benefit from its "ask forgiveness rather than

4    permission" strategy.  If not enjoined during the pendency of this litigation,

5    UpCodes' conduct threatens NFPA with several recognized forms of irreparable

6    harm.

7    First, UpCodes is interfering with and threatening the success of NFPA's

8    development of the market for its own subscription service, NFPA LiNK.  Pauley

9    Decl. ¶¶ 42-52.  NFPA has invested substantially in this market and in

10   demonstrating there is value in the AEC community paying for copies of NFPA's

11   Works.  *Id.* ¶ 49-52.  UpCodes offers nearly identical content and features as NFPA

12   LiNK but competes on unfair terms because it has not had to shoulder the costs of

13   developing the standards.  UpCodes makes NFPA's content available for printing,

14   download, and re-distribution for free, a price with which NFPA cannot compete.

15   *Id.* ¶¶ 45, 48.

16   If AEC professionals are led to believe that UpCodes is a legitimate

17   alternative to NFPA LiNK, NFPA will lose potential subscribers.  *Id.* ¶¶ 50-52.  *See*

18   *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1013 (C.D. Cal.

19   2011) (defendants' service threatened "to create incorrect but lasting impressions

20   with consumers about what constitute[d] lawful video on demand exploitation" of

21   copyrighted works); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.

22   Supp. 2d 1197, 1215 (C.D. Cal. 2007) ("[l]oss of market share in this nascent

23   market" is irreparable (citation omitted) (alteration in original)).[7]

24

25

---

26   [7] *See also Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("In the context of
     copyright infringement cases, the harm to the plaintiff's property interest has often

27   been characterized as irreparable in light of possible market confusion."); *Merkos*
     *L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96-97 (2d Cir.

28

-22-

1   Second, UpCodes threatens the value of NFPA's licenses and its goodwill and

2   relationship with licensees.  Pauley Decl. ¶¶ 53-55.  Licensees have already brought

3   UpCodes' unauthorized service, and similar infringing services, to NFPA's

4   attention.  *Id.* ¶ 55.  UpCodes' offerings threaten those licensees' business and strain

5   NFPA's relationships with them.  *Id.*  Courts have repeatedly held that harm to

6   licensing relationships is irreparable.  *Columbia Pictures Indus., Inc. v. Galindo*

7   ("*Nitro TV*"), No. 2:20-cv-03129-SVW-GJS, 2020 WL 3124347, at *2 (C.D. Cal.

8   May 11, 2020) ("Not only is Defendant directly infringing Plaintiffs' copyrights,

9   creating a financial loss to Plaintiffs, but Plaintiffs have provided evidence that the

10  unlawfully distributed Copyrighted Works may undermine the value of Plaintiffs'

11  legitimate licenses."); *Fox Television Stations, Inc. v. BarryDriller Content Sys.,*

12  *PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) (irreparable harm was clear

13  when revenues from licensing market at issue had "become increasingly important

14  to the . . . industry, and are used to fund the development and acquisition of [new

15  Works]" and the allegedly infringing service "threaten[ed] to damage Plaintiffs'

16  ability to negotiate favorable [licenses]"); *WTV Sys.*, 824 F. Supp. 2d at 1012–13

17  (finding unlicensed streaming "jeopardize[d] the continued existence of Plaintiffs'

18  licensees' businesses" and harmed plaintiffs' goodwill with its licensees).

19  Third, UpCodes' infringement threatens NFPA's ability to invest in creating

20  and updating standards and thus its contribution to overall public safety.  Pauley

21  Decl. ¶¶ 56, 59.  This type of incalculable harm merits injunctive relief.  *See*

22  *Salinger*, 607 F.3d at 81 ("Harm might be irremediable, or irreparable, for many

23  reasons, including that a loss is difficult to replace or difficult to measure, or that it

24  is a loss that one should not be expected to suffer.").

25

26

27  2002) (sale of competing prayer books to same market of synagogue customers

28  would result in irreparable harm).

### III.   THE BALANCE OF HARDSHIPS TIPS DECISIVELY FOR NFPA

The harms NFPA faces absent an injunction are substantial.  The harms to UpCodes, in contrast, are negligible.  UpCodes only began appropriating NFPA's Works this year.  For the previous five years of its existence, UpCodes operated without those Works.  UpCodes has just raised millions in funding, so it does not stand to suffer hardship if it cannot use NFPA's standards.  Klaus Decl. ¶¶ 19-20.  Even if UpCodes claimed poverty, that would support an injunction, as it would show the inadequacy of money damages, which UpCodes would be unable to pay.  *See BarryDriller*, 915 F. Supp. 2d at 1147.

UpCodes cannot claim an equitable interest in being able to continue engaging in likely infringing activity.  *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *superseded by statute on other grounds*, 17 U.S.C. § 117(c); (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities"); *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) ("[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . ." (quotation marks and citations omitted)).

### IV.   A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

NFPA's standards are devoted to issues of great importance to the public, such as fire safety.  The public interest is served by protecting financial incentives for the continued creation of standards and the resulting beneficial public-private system in place in the U.S.  *See Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822, at *25 (D.D.C. Feb. 2, 2017), *rev'd in part, vacated in part on other grounds*, 896 F.3d 437 (D.C. Cir. 2018) (in granting a permanent injunction, finding that the public interest is served by "the protection of financial incentives for the continued creation of valuable works, and the continued value in maintaining the public-private system in

Case No. 2:21-cv-05262-DSF (Ex)

1  place in the U.S. to ensure continued development of technical standards"); *see also*

2  *CCC*, 44 F.3d at 66 (a policy "embodied into [copyright] law is to encourage authors

3  to publish innovations for the common good").

4  The issuance of an injunction would not adversely impact the public interest.

5  NFPA already provides access to its standards for free viewing on its website, so

6  there is no lack of public access to them.

7  **V.    MINIMAL SECURITY SHOULD BE REQUIRED**

8  Security in the amount of $50,000 is appropriate, because the required

9  security need not be substantial, *see, e.g.*, *WTV Sys.*, 824 F. Supp. 2d at 1015

10  (requiring $50,000 bond), and any hardship UpCodes faces results from its

11  voluntary decision to build a business around violating NFPA's rights.

12  **CONCLUSION**

13  NFPA respectfully submits its motion should be granted.

14

15  DATED:  July 9, 2021                    MUNGER, TOLLES & OLSON LLP

16

17

18  By:    */s/ Kelly M. Klaus*

19  KELLY M. KLAUS

Attorneys for Plaintiff

20  NATIONAL FIRE PROTECTION

ASSOCIATION, INC.

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION