DURIE TANGRI LLP
RAGESH K. TANGRI (SBN 159477)
rtangri@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
EUGENE NOVIKOV (SBN 257849)
enovikov@durietangri.com
ADITYA V. KAMDAR (SBN 324567)
akamdar@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:  415-362-6666
Facsimile:   415-236-6300

DURIE TANGRI LLP
ALLYSON R. BENNETT (SBN 302090)
abennett@durietangri.com
DURIE TANGRI LLP
953 East 3rd Street
Los Angeles, CA 90013
Telephone:  213-992-4499
Facsimile: 415-236-6300

Attorneys for Defendant
UpCodes, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NATIONAL FIRE PROTECTION ASSOCIATION, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>UPCODES, INC.,<br><br>              Defendant. | Case No. 2:21-cv-05262-DSF (Ex)<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  August 9, 2021<br>Time:  1:30 p.m.<br>Ctrm:  7D<br>Judge: Honorable Dale S. Fischer |

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION .................................................................................. 1

II.   FACTUAL BACKGROUND.................................................................. 2

III.   ARGUMENT......................................................................................... 4

    A.   NFPA is not likely to succeed on the merits. .................................... 4

        1.   Speaking the law does not infringe anyone's copyright. ...................... 4

            a.   *Georgia v. Public.Resource.Org* confirms that "no one can own the law." ......................................................... 4

            b.   *Veeck* confirms that publishing adopted building codes does not constitute infringement. ................................. 8

            c.   *Practice Management* is not to the contrary. ............................. 8

            d.   The merger doctrine provides an additional basis to hold that speaking the exact text of the law does not infringe copyright. ................................................................. 10

        2.   Informational notes and permissive rules that appear in a law are still "the law." ..................................................................... 11

            a.   Informational Notes within the text of the law are part of the law.......................................................................... 12

            b.   Exceptions to the law are part of the law. ................................. 13

        3.   To the extent any of the materials are not "the law," reproducing them in their entirety is fair use. .......................................... 14

            a.   Factor One:  "the purpose and character of the use".............. 16

            b.   Factor Two:  "the nature of the copyrighted work" ................ 18

             c.   Factor Three:  "the amount and substantiality of the portion used".......................................................................... 19

            d.   Factor Four:  "the effect of the use upon the potential market for or value of the copyrighted work".......................... 20

i

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

B.    NFPA has not established that irreparable harm is likely. ............................ 21

    1.    NFPA's three-month delay in bringing this motion undercuts any likelihood of irreparable harm......................................................... 22

    2.    NFPA's claimed harms are unsupported and overblown. .................. 22

C.    The balance of hardships does not favor NFPA. ........................................ 24

D.    The public interest would be disserved by an injunction against the dissemination of the law.................................................................................. 24

IV.    CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abend v. MCA, Inc.*,
  863 F.2d 1465 (9th Cir. 1988), *aff'd sub nom. Stewart v. Abend*, 495 U.S.
  207 (1990).........................................................................................................25

*Am. DJ Supply Inc. v. Am. Lighting Inc.*,
  No. CV 12-8934 GAF, 2013 WL 12123770 (C.D. Cal. May 2, 2013)..............22

*Am. Soc'y for Testing & Materials, Nat'l Fire Protection Ass'n, et al. v.
  Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018)..............................................................*passim*

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ..................................................................................18

*Banks v. Manchester*,
  128 U.S. 244 (1888)..........................................................................................1, 2

*Building Officials & Code Adm'rs v. Code Tech., Inc.*,
  628 F.2d 730 (1st Cir. 1980)........................................................................1, 2, 8

*Burrow-Giles Lithographic Co. v. Sarony*,
  111 U.S. 53 (1884).................................................................................................7

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..........................................................................15, 18, 19, 20

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ..............................................................................23

*Clark v. Martinez*,
  543 U.S. 371 (2005)................................................................................................8

*Ets-Hokin v. Skyy Spirits Inc.*,
  323 F.3d 763 (9th Cir. 2003) .........................................................................10, 11

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)................................................................................................2

iii

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ...............................................................22

*Georgia v. Public.Resource.Org, Inc.*,
    140 S. Ct. 1498 (2020)..............................................................*passim*

*Google LLC v. Oracle America, Inc.*,
    141 S. Ct. 1183 (2021)..............................................................*passim*

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)........................................................................21

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ....................................................21, 23

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
    No. 17 Civ. 6261 (VM), 2020 WL 2750636 (S.D.N.Y. May 27, 2020) .....*passim*

*Johanns v. Livestock Mktg. Ass'n*,
    544 U.S. 550 (2005)..........................................................................7

*McFly Inc.v. Universal City Studios, Inc.*,
    No. 85 5440, 1985 WL 72058 (C.D. Cal. Oct. 9, 1985) ....................................24

*Oakland Tribune, Inc. v. Chron. Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ...............................................................22

*Practice Management Information Corp. v. American Medical Association*,
    121 F.3d 516 (9th Cir. 1997), *as amended*, 133 F.3d 1140 (Jan. 9, 1998)..*passim*

*Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*,
    320 F.3d 1081 (10th Cir. 2003) ...........................................................23

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992), *as amended* (Jan. 6, 1993) ..........................18, 20

*Valeo Intellectual Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005) ...........................................................22

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
    293 F.3d 791 (5th Cir. 2002) (*en banc*)........................................................*passim*

**Statutes**

17 U.S.C. § 107 .......................................................................*passim*

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

1 Del. Admin. Code § 701-7-1.1...................................................................12

Cal. Code Regs. tit. 24, part 3, § 90.5(C) (2019).....................................12

Cal. Code Regs. tit. 24, part 3, § 100 (2019) ...........................................13

Cal. Code Regs. tit. 24, part 3, § 210.52(C)(1) (2019) ............................11

Cal. Code Regs. tit. 24, part 3, § 348.42 (2019) ......................................13

Chicago Municipal Code § 14E-6-604 ......................................................20

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

## I.    INTRODUCTION

Everyone has the right to speak the law.  Nobody—not the government, and not a private party—can control who is permitted to speak the law, and nobody may charge fees for the privilege.  That is because "no one can own the law."  *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1507 (2020).

Plaintiff National Fire Protection Association ("NFPA") owns copyright in hundreds of model codes.  It successfully urged many governments to adopt them as binding law:  the California Electrical Code, the Hawaii Fire Code, the Texas Life Safety Code, and others enacted in jurisdictions across the United States.  Breaking those laws carries criminal penalties.  *See, e.g.*, Los Angeles County Code of Ordinances, Article 24, section 84-1 (attached to Declaration of Joseph C. Gratz ("Gratz Decl.") as Ex. A).  NFPA claims that by posting those binding, criminally enforceable laws on its website, Defendant UpCodes, Inc. has infringed NFPA's copyrights.

NFPA is wrong.  Court after court has reached the same conclusion:  words that carry the force of law cannot be subject to any private party's copyright.  "At bottom, the controlling authorities make clear that a private party cannot exercise its copyrights to restrict the public's access to the law."  *Int'l Code Council, Inc. v. UpCodes, Inc.*, No. 17 Civ. 6261 (VM), 2020 WL 2750636, at *7 (S.D.N.Y. May 27, 2020) ("*UpCodes*").  "Applying that principle to the facts of this case, [a plaintiff] cannot claim actionable infringement based only on Defendants' accurate posting of the [plaintiff's codes] as Adopted, which are essentially enacted state and local laws."  *Id.*  "The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process."  *Building Officials & Code Adm'rs v. Code Tech., Inc.*, 628 F.2d 730, 734 (1st Cir. 1980) ("*BOCA*").  "[T]he authentic exposition and interpretation of the law," which is "binding every citizen, is free for publication to all. . . ."  *Banks v. Manchester*, 128 U.S. 244, 253 (1888).  That is why "the express text of the law falls plainly outside the realm of copyright protection."  *Am. Soc'y for Testing &*

*Materials, Nat'l Fire Protection Ass'n, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 451 (D.C. Cir. 2018) ("*ASTM*").

Indeed, the precise question here was decided by the Fifth Circuit:

> The issue in this *en banc* case is the extent to which a private organization may assert copyright protection for its model codes, after the models have been adopted by a legislative body and become "the law". Specifically, may a code-writing organization prevent a website operator from posting the text of a model code where the code is identified simply as the building code of a city that enacted the model code as law? Our short answer is that as *law*, the model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives.

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 793 (5th Cir. 2002) (*en banc*). The Fifth Circuit was right. So was the First Circuit in *BOCA*, the D.C. Circuit in *ASTM*, the Supreme Court in *Banks*, and the Southern District of New York in *UpCodes*. There is only one way to express the law: using its text. Summaries and paraphrases will not do; to speak the law, one must speak the words that govern us, *in haec verba*.

NFPA spends much of its brief recounting all of the work that was put into its model codes. But limitations to copyright law—like the rule that no one can own the law—are "neither unfair nor unfortunate"; they are "the means by which copyright advances the progress of science and art." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991). UpCodes provides an innovative service that aids the public in accessing, learning, and understanding the law. In doing so, UpCodes does not infringe copyright when it speaks the law.

## II.   FACTUAL BACKGROUND

In 2016, brothers Scott and Garrett Reynolds founded UpCodes to make it easier for both industry professionals and laypeople to understand how to comply with state and local building codes. Decl. of Garrett Reynolds ("Reynolds Decl.) ¶ 3. Scott and Garrett poured their savings into starting UpCodes, and they did not pay themselves a salary until November 2017, a year and a half after founding the company. *Id.* ¶¶ 6–7. Now they both draw salaries of $80,000 per year, *id.* ¶ 7, a small fraction of the compensation of

2

NFPA's President, James Pauley ($1,160,647 in 2019), or its Executive Vice President, Bruce Mullen ($1,111,503 in 2019).  Gratz Decl. Ex. B at Gratz-24.

UpCodes publishes only the law on its website.  Reynolds Decl. ¶ 8.  UpCodes does not post model codes—including NFPA model codes—as model codes, but only as adopted into law by specific jurisdictions.  *Id.* ¶¶ 8–13.  Any visitor can view and print a supported jurisdiction's codes—with that jurisdiction's amendments integrated into the text—for free and without registering for an account.  *Id.* ¶¶ 14–16.  (If a user wants features beyond full access to the law, such as advanced search and collaboration tools, UpCodes offers those for a subscription fee.  *Id.* ¶¶ 17–18.)

NFPA writes hundreds of model codes and advocates successfully for them to be adopted into law.  *See* Gratz Decl. ¶¶ 4–5, Exs. C–D.  In 2020, NFPA spent approximately $15.3 million on "standards development," out of more than $85 million in operating expenses.  *Id.* Ex. E at Gratz-109; *see also id.* Exs. F–M (NFPA tax returns and audits for 2014 to present).  While these model codes are available for purchase as printed books, NFPA offers website visitors—after registering for an account and agreeing to contractual limits—"Free Access" to read-only copies of their codes.  *Id.* ¶ 15, Ex. N.  NFPA has also recently launched NFPA LiNK, a subscription service that lets paying users view and annotate model codes.  Pauley Decl. Supp. Pl.'s Mot. for Prelim. Inj. ("Pauley PI Decl.") ¶ 10, ECF No. 13-2.  Neither "Free Access" nor NFPA LiNK users can download or print NFPA's documents.  Gratz Decl. ¶¶ 16–17, Exs. O–P at Gratz-590.  While publications providing a few particular jurisdictions' amendments integrated into the text are available on paper, none of those integrated codes are available using the instructions on the "Free Access" page on NFPA's website or even through NFPA LiNK.  *Id.* Exs. N, Q, R.  For example, for the National Electrical Code, NFPA sells integrated code books on paper for the states of California and Oregon and local codes for Los Angeles, Chicago, and New York City.  *Id.* ¶ 19, Ex. R.  UpCodes, meanwhile, makes free integrated codes available for more than a dozen cities and states that NFPA does not offer.  Reynolds Decl. ¶ 23.

Recognizing that UpCodes makes the law more accessible, convenient, and usable,

its users' number one request was for laws in jurisdictions adopting NFPA model codes. *Id.* ¶ 19.  UpCodes first made those laws available on April 1, 2021.  *Id.* ¶ 21.

## III.   ARGUMENT

### A.   NFPA is not likely to succeed on the merits.

#### 1.   Speaking the law does not infringe anyone's copyright.

Courts have consistently held that copyright law does not give private parties control over the text of the law.  Courts have taken a number of doctrinal pathways to reach that consistent result.  But as the idiom goes, "all roads lead to Rome":  no matter what doctrinal pathway the Court chooses, NFPA is not likely to succeed on the merits.

##### a.   *Georgia v. Public.Resource.Org* confirms that "no one can own the law."

The Supreme Court ruled in 2020 that "no one can own the law."  *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1507 (2020).  That principle resolves this case.  NFPA's 25-page brief limits its discussion of that year-old Supreme Court case to two footnotes.  That's because both the principles announced in *Georgia* and the application of those principles in the particular factual situation presented in that case show why NFPA is unlikely to succeed on the merits here.

###### i.   *Georgia* announced the principle that "no one can own the law," then addressed an edge case in which the copied text lacked legal force.

The facts of the *Georgia* case presented a difficult question:  whether official annotations that do *not* carry the force of law can be subject to copyright.  That question split the Court five to four, with the majority holding that those annotations are in the public domain, and four Justices arguing that those annotations may be subject to copyright.  But the Court was not split on the answer to an easier question:  whether the text of the binding laws themselves can be subject to copyright.  All nine Justices agreed that they cannot.  140 S. Ct. 17 at 1507 ("no one can own the law"); *id.* at 1512 ("statutes and opinions" are not copyrightable); *id.* at 1515 ("statutes and regulations cannot be copyrighted, but accompanying notes lacking legal force can be") (Thomas, J.,

4

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

dissenting); *id.* at 1522 ("Beyond doubt, state laws are not copyrightable.") (Ginsburg, J., dissenting).  And the answer to that easier question resolves this case:  enacted electrical and fire codes are state (and local) laws.  No one can own them.

To apply the principle that "no one can own the law" to the annotations before it, the Court needed to inquire into the process by which they were prepared.  While some texts, like statutes and judicial opinions, are very clearly "the law," other texts, like official annotations, are in a gray area.  "Rather than attempting to catalog the materials that constitute 'the law,'" therefore, the Court adopted a bright-line rule excluding from copyright "works that are (1) created by judges and legislators (2) in the course of their judicial and legislative duties," even if they are not "the law" because they do not have binding force.  140 S. Ct. at 1507–08.  The Court thus created a zone of safety around "the law":  the principle that "no one can own the law" is so important it places even some materials that lack the force of law in the public domain.

The Court did not create this zone of safety ***around*** the binding law to carve away the public's rights with respect to the binding law itself.  Materials created by lawmakers in their lawmaking capacities are in the public domain, without requiring an inquiry into whether or not they are also binding law.  But this prophylactic rule supplements, and does not supplant, the principle it serves:  binding law is not subject to copyright, no matter who put pen to paper.

Privately written texts become binding law in a variety of situations, and in none of those situations does the writer end up owning the law.  When a citizen drafts a ballot initiative that is put before voters and becomes law, that citizen does not own copyright in a portion of their state's statutes.  (Needless to say, nobody ever thought Howard Jarvis had a copyright in Prop 13.)  When a lobbyist writes a bill and is successful in having it enacted, the lobbyist does not own copyright in a portion of the United States Code.  And likewise when a private organization prepares a model code and is successful in having it adopted as the binding law, that organization does not own copyright in that law.

In the *Georgia* opinion, the Court expressed concern that copyright could create an

5

"economy-class version of the Georgia Code" and a separate, more elaborate version for "first-class readers."  140 S. Ct. at 1512.  "If everything short of statutes and opinions were copyrightable, then States would be free to offer a whole range of premium legal works for those who can afford the extra benefit.  A State could monetize its entire suite of legislative history.  With today's digital tools, States might even launch a subscription or pay-per-law service."  *Id.* at 1512-13.  A ruling for NFPA here would create precisely the result the Court was trying to avoid in *Georgia*.  NFPA seeks to separate citizens into "economy-class" readers, who are not permitted to copy-and-paste, print, or download the law, *see* Gratz Decl. ¶ 16, Ex. O, and "first-class readers" who have a "subscription" that allows them to make full use of the law, *see* Pauley PI Decl. ¶ 39, ECF No. 13-2.  UpCodes, consistent with the *Georgia* opinion, brings a first-class experience to all citizens for free.  Reynolds Decl. ¶¶ 14–16.

In considering the application of *Georgia* to UpCodes, Judge Marrero in the Southern District of New York held that, while the "author-focused rule" announced in *Georgia* was "not dispositive of this case," the Supreme Court's opinion nonetheless "provides significant guidance that this Court must keep in mind when addressing the parties' arguments regarding" UpCodes' posting of materials enacted into law.  *UpCodes*, 2020 WL 2750636, at *8.  In light of the Supreme Court's statement that "no one can own the law," the court held that "any rule in the case at hand must respect the public's need for full and unfettered access to the law."  *Id.*  "Because no one can own or restrict access to it," the court held, "the law is clearly in the public domain."  *Id.*

### ii.    The legislature is the "author" of the laws it adopts, even if a legislator did not draft the text in the first instance.

NFPA suggests that the prophylactic rule announced in the *Georgia* case (even where a text is not binding, it is still in the public domain if it was authored by a lawmaker acting in a lawmaking capacity) supplants the principle that "no one can own the law."  Mot. at 14 n.3, ECF No. 13.  Even texts that set forth binding rules governing citizens' conduct may be subject to copyright, NFPA's argument goes, if the texts themselves were

6

penned in the first instance by someone other than a legislator.

That argument is wrong, because it would violate the principle that "no one can own the law."  But even were the Court to hold that the identity of the "author" is always outcome-determinative, the texts at issue here still would be in the public domain because they are still attributable to legislators speaking in their legislative capacity.  When a legislative body adopts a text as the law, that text becomes attributable to the legislative body, not to the person who held the pen.  Indeed, the Supreme Court has observed that the term "author" is given a "more enlarged definition" in the copyright context than "in the limited sense of a book and its author."  *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884).  "An author in that sense is 'he to whom anything owes its origin; originator; maker; one who completes a work of science or literature.'"  *Id.* at 57–58 (citation omitted).  The lawmakers are the "maker[s]" of the law, and therefore its authors.

The adoption of a private text as law is analogous to the government's adoption of private speech.  For example, texts written by a private entity for agricultural-promotion campaigns were government speech, and not private speech, for First Amendment purposes where the government "exercise[d] final approval authority over every word used in every promotional campaign."  *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 561 (2005).  Just as the Secretary of Agriculture was the author of those promotional campaigns, so the California Legislature is the author of the California Electrical Code as it appears in Title 24 of the California Code of Regulations, even though much of the text was written by a private party and then adopted by the government.

The Supreme Court's rule that "no one can own the law" does not depend on who held the pen when the law was written, or what contractual arrangements were made in an attempt to circumvent that principle.  Because it is lawmakers in their lawmaking capacity who make binding law, they are the "authors" of the binding law.

The First Circuit, reversing a grant of a preliminary injunction against copying of a privately written model code, discussed another application of the term "author"—the "metaphorical concept of citizen authorship":  "The citizens are the authors of the law,

and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process." *BOCA*, 628 F.2d at 734. Such an interpretation of the statutory text avoids the due-process and First-Amendment issues that would arise if a private party had the right to choose who could speak the law. *See, e.g.*, *id.*; *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (discussing the canon of constitutional avoidance).

### b. *Veeck* confirms that publishing adopted building codes does not constitute infringement.

*Veeck v. SBCCI* disposed of the exact same issues raised by NFPA here, and the Fifth Circuit's reasoning decides this case as well. Peter Veeck published the building codes of Anna, Texas, and Savoy, Texas, on his website. *Veeck*, 293 F.3d at 793. Anna and Savoy's building codes incorporated by reference SBCCI's 1994 *Standard Building Code*, among other SBCCI model codes. *Id.* SBCCI alleged that Veeck's publication of the laws of Anna and Savoy infringed its copyrights in its model codes. *Id.* at 794. The *en banc* Fifth Circuit unequivocally rejected that argument, holding that "as *law*, the model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives." *Id.* at 793.

Like Veeck, UpCodes publishes only the law, identified by the jurisdiction in which it is operative. Reynolds Decl. ¶¶ 8–9. It does not post NFPA's model codes except as adopted into law by specific jurisdictions. *Id.* Some jurisdictions adopt NFPA's model codes as the law without making any amendments to the text, and so the substance of jurisdictions' building codes may be identical to the NFPA model codes that they incorporate by reference. *See id.* ¶ 10. And, as the SBCCI did in *Veeck*, the NFPA actively sought the codes' adoption into law. Gratz Decl. ¶ 4, Ex. C. There is no daylight between the material facts in this case and the material facts in *Veeck*. For the same reasons SBCCI did not succeed in *Veeck*, NFPA is not likely to succeed here.

### c. *Practice Management* is not to the contrary.

NFPA argues that the Ninth Circuit decision in *Practice Management Information*

*Corp. v. American Medical Association*, 121 F.3d 516 (9th Cir. 1997), *as amended*, 133 F.3d 1140 (Jan. 9, 1998), is inconsistent with *Veeck*.  But there is no conflict between *Practice Management* and *Veeck* because *Practice Management* addresses a different situation:  whether a numbering system that has received governmental approval falls into the public domain as a result of that approval.  *Practice Management* did not address a situation where, as here, a private entity claims the exclusive right to speak the very words adopted by the government as binding law.

In *Practice Management*, the plaintiff sought a declaratory judgment that the defendant's copyright in its numbering system "was invalid" after a government entity incorporated it within a larger numbering framework.  *Id.* at 518.  The Ninth Circuit declined to hold that AMA's copyright in its numbering system (analogous to NFPA's model codes in unenacted form) was invalid.  The Ninth Circuit did not ultimately enforce AMA's copyright, however, and so it did not decide the question of what, even if there is copyright infringement, the appropriate remedy would be.  *Id.* at 520–21 (remanding for entry of judgment in favor of defendant due to copyright misuse); *id.* at 519 (suggesting that a reasonable royalty, rather than an injunction, would have been the appropriate remedy if actionable infringement had been found).

Here, UpCodes is not asking this Court to hold that NFPA's copyrights in its *model* codes are *invalid*—only that they are not *infringed* by the dissemination of material that has been adopted into law, *as enacted law*.  *Practice Management* did not address an analogous scenario; it was, at worst, similar to a situation in which a party simply republished, for example, the National Electrical Code purely as a model code, without identifying it as the law of any particular jurisdiction.

Indeed, both the Fifth Circuit in *Veeck* and the Solicitor General have distinguished the precise situation at issue here from the one at issue in *Practice Management*.  As *Veeck* recognized, "copyrighted works do not 'become law' merely because a statute refers to them," and this presents a different situation from text "enacted into positive law."  *Veeck*, 293 F.3d at 805.  The *Veeck* court distinguished *Practice Management*

9

because *Veeck*, like this case, "concerns the wholesale adoption of a model code promoted by its author . . . precisely for use as legislation." *Id.* at 804. *See* Gratz Decl. ¶ 4, Ex. C (discussing NFPA's promotion of its model codes for use as legislation). *Practice Management*, by contrast, did not involve a situation in which text was adopted into law at the urging of the party claiming copyright. That is why Solicitor General Olson, writing on behalf of the United States in opposing certiorari in *Veeck*, wrote: "In short, the opinions in [*Practice Management*] and *CCC Information Services* did not purport to hold that governmental adoption of a privately created code could never affect the rights of the public to make copies of it, and they do not establish that there is a conflict in the circuits on the question presented in this case." *See Amicus Curiae* Br. at 12–13, *S. Bldg. Code Cong. Int'l, Inc. v. Veeck*, No. 02-355 (U.S. filed May 2003) (attached to Gratz Decl. as Ex. S at Gratz-630–31). (That brief also lays out five specific features that distinguish *Practice Management* from *Veeck* (and from this case), which may provide a helpful roadmap for the Court. *See* Gratz Decl. Ex. S at Gratz-629–31.)

For these reasons, NFPA's contention that *Practice Management* controls, and compels a different result from *Veeck*, is incorrect. The Ninth Circuit has not addressed the precise question at issue here. That question is answered by the Supreme Court's statement that "no one can own the law." But if that principle does not resolve the case, *Practice Management* does not resolve it either.

### d. The merger doctrine provides an additional basis to hold that speaking the exact text of the law does not infringe copyright.

The merger doctrine, which prevents copyright from granting exclusive rights to ideas or facts, provides an alternative basis for rejecting NFPA's claims. "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the work can be expressed only in one way, lest there be a monopoly on the underlying idea." *Ets-Hokin v. Skyy Spirits Inc.*, 323 F.3d 763, 765 (9th Cir. 2003) (citation omitted).

The adopted codes UpCodes copied are the law, so they are "'facts' under

10

copyright law.  They are the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801.  "The building codes . . . can be expressed in only one way; they are facts.  [UpCodes] placed those facts on [its] website in precisely the form in which they were adopted" by state and local jurisdictions. *Id.* at 802.  There is no way to state the law other than to use the exact words of the law:  "An individual wishing to publish the text of a law cannot develop his own, unique version and still publish an authoritative copy." *Id.* at 801 (quoting with approval dissent to panel opinion).  The "idea" or "fact" of the law has thus merged with its expression in the text of the law.

NFPA argues that the merger doctrine cannot apply because "NFPA's copyright does not prevent anyone, including UpCodes, from developing competing standards." Mot. at 15 n.4, ECF No. 13.  True enough—but such a standard would not be the law. The law on when electrical outlets must be installed near a kitchen countertop in California is:  "A receptacle outlet shall be installed at each wall countertop and work surface that is 300 mm (12 in.) or wider."  Cal. Code Regs. tit. 24, part 3, § 210.52(C)(1) (2019) (attached to Gratz Decl. as Ex. T at Gratz-674).  If UpCodes attempted to express that law using other words, whether by making up a different rule or by attempting to paraphrase, it would not be publishing the law of California.  To state the law, UpCodes' expressive choices are not just constrained, but dictated:  it can use only the exact words of the law.  This also distinguishes *Practice Management* regarding merger:  because the numbering system there was not the law, the party accused of infringement in that case was not similarly constrained. *See Practice Mgmt.*, 121 F.3d at 520 n.8.  Because the binding text of the law "can be expressed only in one way," *Ets-Hokin*, 323 F.3d at 765, the merger doctrine bars a claim for copyright infringement.

### 2.   Informational notes and permissive rules that appear in a law are still "the law."

NFPA argues that it is likely to succeed on the merits because the text of the laws at issue includes informational notes and permissive rules that do not expressly state a prohibition against particular conduct.  This "swiss-cheese" argument—in which NFPA

---

1    would benefit from having interspersed these materials in and among the text of its model

2    laws—does not aid NFPA.  That text is just as much the law as mandatory "thou shalts"

3    and "thou shalt nots."

4            As an initial matter, though, the entirety of the works at issue are adopted directly

5    into law—not just certain paragraphs, or certain mandatory provisions.  For example, the

6    code that NFPA chose as illustrative—the 2014 National Electrical Code—was adopted in

7    its entirety, albeit with amendments, by the state of Delaware.  1 Del. Admin. C. § 701-7-

8    1.1 (attached to Gratz Decl. as Ex. U at Gratz-682) ("Each of the following Codes and

9    Standards, published by the National Fire Protection Association, Batterymarch Park,

10   Quincy, MA 02269, are hereby adopted *in their entirety* with the exception of any

11   changes, additions or deletions as listed in these Regulations as a supplement and addition

12   to the Delaware State Fire Prevention Regulations.  The text of these adopted Codes and

13   Standards shall be fully enforceable as provisions of these Regulations *as if the same were*

14   *incorporated and set forth at length herein*. . . .  NFPA 70, National Electrical Code,

15   2014") (emphases added).  Indeed, this language tracks the sample ordinances which

16   NFPA urges legislatures to adopt.  *See* Gratz Decl. Ex. V (Sample Ordinance).

17           NFPA gives two examples of text within its model laws that it contends are not "the

18   law," but as discussed below, neither can be omitted while continuing to convey the full

19   meaning of the law.  (As discussed below in section III.A.3.c., *infra*, UpCodes does omit

20   those portions of NFPA's publications, such as their cover, prefatory matter, and index,

21   that are not necessary to convey the full meaning of the law.)

22                   **a.    Informational Notes within the text of the law are part of the**
                            **law.**

23

24           NFPA argues that UpCodes should have omitted text marked "Informational Note."

25   The code says that such notes "are not enforceable as requirements. . . ."  Cal. Code Regs.

26   tit. 24, part 3, § 90.5(C) (2019) (Gratz Decl. Ex. T at Gratz-669).  But notes are the law

27   because they say what the text of the enforceable requirements means.  Just as a definition

28   of a term in a statute is no less "the law" than a mandatory provision, the informational

notes were adopted as law and are necessary to understand the accompanying text.

The very example used by NFPA illustrates this: in connection with the definition of the term "Authority Having Jurisdiction," the law says: "Informational Note: The phrase 'authority having jurisdiction,' or its acronym AHJ, is used in NFPA documents in a broad manner, since jurisdictions and approval agencies vary, as do their responsibilities." Decl. of Kelly Klaus Supp. Pl.'s Mot. for Prelim. Inj. ("Klaus PI Decl.") Ex. M at Klaus-112, ECF No. 13-30. When one is reading the law and interpreting what it means by the term "Authority Having Jurisdiction," the statement that the term is used "in a broad manner" is necessary to understand and frame arguments about the meaning of that term when it appears in the mandatory text of the law.

Other informational notes are similarly part of the law. For example, the law regarding installation of wires sometimes depends on whether or not the wires are "concealed." *See, e.g.*, Cal. Code Regs. tit. 24, part 3, § 348.42 (2019) (Gratz Decl. Ex. T at Gratz-675). A wire is "concealed" when it is "[r]endered inaccessible by the structure or finish of the building." *Id.* § 100, Gratz-671, Definition of "Concealed." One way of installing wires is in a raceway, defined in the law as "[a]n enclosed channel designed expressly for holding wires. . . ." *Id.*, Gratz-672, Definition of "Raceway." But a raceway is often installed on the surface of a wall to hide wires, rather than being installed within a wall. Are wires installed in such a raceway considered "concealed," even though they are much easier to remove than wires concealed by a wall? To answer that legal question, one must turn to the "Informational Note" to the definition of "concealed": "Wires in concealed raceways are considered concealed, even though they may become accessible by withdrawing them." *Id.*, Definition of "Concealed."

Thus, because the material marked "Informational Note" adopted as part of the law is necessary to fully interpret the meaning of the remaining text, it is part of "the law."

### b.   Exceptions to the law are part of the law.

Next, NFPA argues that portions of text adopted into law are not "the law" because they "identify actions that are allowed but not required." Mot. at 9, ECF No. 13. NFPA

contends that when a law says that particular conduct is *not* prohibited by that law, that text is not part of the law.

NFPA's example illustrates why this view is wrong.  NFPA quotes the Colorado Electrical Code section 600.4(D), which governs the label that must be placed on certain light fixtures saying what the fixture's maximum wattage is.  That section says that the label has to be put in a place where one can see it when changing the lightbulb, but:  "The marking shall be permitted to be installed in a location not viewed by the public."  Klaus PI Decl. Ex. N at Klaus-122, ECF No. 13-31.  NFPA seems to say that UpCodes should have omitted that sentence, since it does not mandate particular behavior.  But a law's exceptions are just as much a part of the law as its positive requirements.  Consider a situation in which the government accuses a particular light fixture of not meeting the legal requirements of the jurisdiction's electrical code because the maximum-wattage label is hidden from public view.  The person accused of the violation would respond by citing the specific provision of the law permitting that placement of the label.  The provision forms a part of the law, even though it does not mandate particular behavior.

Thus, because sentences in the law that do not state mandatory requirements or prohibitions are nonetheless necessary to understand one's legal duties, those sentences form part of "the law."

### 3. To the extent any of the materials are not "the law," reproducing them in their entirety is fair use.

Some courts have situated their analysis of related factual situations as an application of the fair use doctrine set forth in 17 U.S.C. § 107.  Those cases predated the Supreme Court's opinion in *Georgia*, which observed that the fair-use defense is "notoriously fact sensitive," and so if the right to speak the law depended on fair use, "[t]he less bold among us would have to think twice before using official legal works that illuminate the law we are all presumed to know and understand."  *Georgia*, 140 S. Ct. at 1513.  The rule is the one announced in *Veeck*:  that "as law, the model codes . . . are not subject to the copyright holder's exclusive prerogatives."  *Veeck*, 293 F.3d at 793

14

1  (emphasis omitted).  That said, because some courts have analyzed related questions by

2  applying fair use, and because the Supreme Court's recent decision in *Google LLC v.*

3  *Oracle America, Inc.*, 141 S. Ct. 1183, 1197 (2021), provides even further support for the

4  fair-use arguments here than was available in those cases, we now discuss the application

5  of the fair use doctrine to this case.

6       In *ASTM*, the D.C. Circuit chose to focus on fair use rather than address what it saw

7  as "a serious constitutional concern with permitting private ownership of standards

8  essential to understanding legal obligations."  *ASTM*, 896 F.3d at 447.  To the extent the

9  defendant there had used the standards at issue in that case "in a manner not encompassed

10  by the fair use doctrine, thereby again raising the question of whether the authors of such

11  works can maintain their copyright at all," *id.*, the court noted that it might need to resolve

12  the broader question.  But by situating its analysis as one of fair use, the D.C. Circuit

13  avoided what it saw as a constitutional question.  To the extent this Court has similar

14  reluctance to address the broader question, the fair-use doctrine provides an alternate

15  avenue for the Court to rule that UpCodes does not infringe NFPA's copyright.

16       The non-exclusive statutory factors to be considered in making that determination

17  are:  (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3)

18  the amount and substantiality of the portion used, and (4) the effect of the use upon the

19  potential market for or value of the copyrighted work.  17 U.S.C. § 107.  In its opinion

20  issued earlier this year in *Google LLC*, the Supreme Court weighed in regarding fair use

21  for the first time in more than 20 years, clarifying many issues that had developed in the

22  lower courts since *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994).  The

23  Supreme Court explained that "the [fair use] provision's list of factors is not exhaustive

24  (note the words 'include' and 'including'), that the examples it sets forth do not exclude

25  other examples (note the words 'such as'), and that some factors may prove more

26  important in some contexts than in others."  *Google LLC*, 141 S. Ct. at 1197.  The basic

27  purpose of fair use, the Court explained, is "providing a context-based check that can help

28  to keep a copyright monopoly within its lawful bounds."  *Id.* at 1198.

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

### a. Factor One: "the purpose and character of the use"

The first factor looks to "the purpose and character of the use."  17 U.S.C. § 107.

### i. UpCodes provides new and innovative ways for the public to access and use the law.

Courts have "used the word 'transformative' to describe a copying use that adds something new and important."  *Google LLC*, 141 S. Ct. at 1203.  One way that a use can be transformative is when the use "seeks to create new products," to "expand the use and usefulness" of preexisting materials.  *Id.*  Such use is transformative because it is "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself."  *Id.*

UpCodes provides (without a subscription) a number of new and important features that let citizens find and learn the law more easily than the NFPA does:

- **Integrated amendments for many more jurisdictions.**  For example, UpCodes shows local amendments integrated into the text of the electrical codes of Connecticut, Delaware, Washington D.C., Hawaii, Idaho, Iowa, Maine, Massachusetts, Michigan, Montana, New Jersey, North Carolina, Ohio, Rhode Island, South Carolina, Tennessee, Texas, and Utah; NFPA does not offer any product that includes those jurisdictions' local amendments (though it offers others).  *Compare* Reynolds Decl. ¶ 22 *with, e.g.*, Gratz Decl. ¶ 19, Ex. R.

- **Free access without registration.**  The NFPA's "Free Access" requires the user to create an account and agree to a contract of adhesion before the user can read law.  *See* Gratz Decl. ¶¶ 15–16, Exs. N–O.  If the user declines to enter into the contract, NFPA denies the user access to the law.  *See id.* Ex. O.

- **Printing the law.**  One is not always at one's computer when doing electrical work or meeting with a building inspector.  That is why UpCodes allows users to print out the law.  Reynolds Decl. ¶ 16.  *No* NFPA product—not even its paid subscription plan—allows any printing at all.

- **Copy-and-pasting the law.**  NFPA's free service does not have this capability;

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

only those who pay NFPA may copy and paste the law using its services.  Gratz Decl. ¶ 16, Ex. O.

And UpCodes' subscription offering includes the following features that NFPA does not:

- **Code Compare.**  Different jurisdictions adopt different versions of codes, and apply different amendments to those codes.  UpCodes allows users to "redline" the enacted law of one jurisdiction with the analogous provision of another jurisdiction.  Reynolds Decl. ¶ 17, Ex. D.  NFPA does not.

- **Search Across Different Codes.**  UpCodes allows users to search across, for example, the 2019 California Electrical Code (adopting with amendments the 2017 National Electrical Code) and the 2019 California Fire Code (adopting with amendments the 2018 International Fire Code).  Reynolds Decl. ¶ 18, Ex. E.  NFPA allows search only across NFPA publications.

UpCodes contributes new products that expand the usefulness of the law beyond what NFPA offers.  UpCodes' use is thus transformative.

### ii.  Using model codes as the law is transformative.

UpCodes' use of NFPA's works is also transformative for an even simpler reason: because the works are not used *as model codes*.  As Judge Marrero put it in the *UpCodes* case:  "Posting enacted laws for the purpose of educating members of the public as to their legal obligations may be transformative, even if the enacted laws are identical to other copyrighted works."  *UpCodes*, 2020 WL 2750636, at *24.  That is because "the dissemination of enacted laws for public awareness" is an activity that "clearly serves a transformative purpose."  *Id.* at *25.  While the model codes at issue "primarily serve the purpose of model codes, providing recommendations on the standards that governments should adopt to improve and safeguard their built environments," the materials posted by UpCodes "are actual regulations binding the public and governing its conduct."  *Id.*

### iii.  Because UpCodes provides free access to the law, and charges only for certain additional features, UpCodes' use is largely noncommercial.

Within the first factor, courts consider whether the "use is of a commercial nature

17

or is for nonprofit educational purposes."  17 U.S.C. § 107.  While "a finding that copying was not commercial in nature tips the scales in favor of fair use," "the inverse is not necessarily true, as many common fair uses are indisputably commercial."  *Google LLC*, 141 S. Ct. at 1204.  Instead, the inquiry looks to the extent to which the defendant takes for itself the economic rewards from public dissemination, or instead makes a use that benefits the public more broadly in some way.  "The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair."  *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).  Even where a use is to some extent commercial, "the commercial nature of a use is a matter of degree, not an absolute."  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992), *as amended* (Jan. 6, 1993) (cleaned up).

UpCodes made the text of building codes freely available on its website to make it easier for the public to learn about and follow those laws.  Reynolds Decl. ¶ 3.  It does not charge any money for that.  *Id.* ¶ 14.  All of the laws on the UpCodes website are available for free and may be viewed without registering for an UpCodes account.  *Id.* Instead, UpCodes makes money by charging for access to certain additional features that may further ease compliance with the law, such as bookmarking, advanced search capabilities, and team collaboration capabilities.  *Id.* ¶¶ 17–18.  In this way, UpCodes does not reap any private economic rewards from making the law available; instead, the economic rewards it reaps come only from the functionality that UpCodes itself adds.

### b.  Factor Two:  "the nature of the copyrighted work"

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  *Campbell*, 510 U.S. at 586.  "The nature of model building codes plainly puts them at the periphery of copyright protection rather than its core."  *UpCodes*, 2020 WL 2750636, at *26; *accord ASTM*, 896 F.3d at 451 ("we

18

think that standards incorporated by reference into law are, at best, at the outer edge of 'copyright's protective purposes.'") (citation omitted).  "Where the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly copied into law, this factor weighs heavily in favor of fair use." *ASTM*, 896 F.3d at 452.  Accordingly, "the second factor heavily favors a finding of fair use as to" materials adopted into law.  *UpCodes*, 2020 WL 2750636, at *26.

**c.**   **Factor Three:  "the amount and substantiality of the portion used"**

The third factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), asking whether the portion copied is "reasonable in relation to the purpose of the copying," *Campbell*, 510 U.S. at 586.  "[T]he extent of permissible copying varies with the purpose and character of the use." *Id.* at 586–87.  "The 'substantiality' factor will generally weigh in favor of fair use where, as here, the amount of copying was tethered to a valid, and transformative, purpose." *Google LLC*, 141 S. Ct. at 1205.

In the context of standards incorporated into law, the D.C. Circuit held that if the defendant "limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law." *ASTM*, 896 F.3d at 452.  Similarly, the *UpCodes* court held that this factor "does not weigh against a finding that accurate copying of the [model codes] as Adopted is a fair use, because the substantial copying of the [model codes] is nonetheless limited to exactly what is contained in the enacted laws themselves." *UpCodes*, 2020 WL 2750636, at *27.  And UpCodes disseminates only those portions of the publications at issue that constitute *the law*:  if one wishes to see the cover, or consult the index, or to read NFPA's essay on the "History and Development of the National Electrical Code," one cannot do so via UpCodes.  *See* Reynolds Decl. ¶ 8.  And with respect to each jurisdiction, UpCodes disseminates only those portions of the publications at issue that were actually adopted as the law.  For example, Chicago did not

19

adopt Article 604 of the 2017 National Electrical Code, and UpCodes does not disseminate that unadopted section when it shows the law of Chicago.  *Id.* ¶ 12, Ex. B; Chicago Municipal Code § 14E-6-604 (attached to Gratz Decl. as Ex. W).  UpCodes thus disseminates as little as possible while still disseminating the authentic text of the law.  Accordingly, the third factor does not weigh against a finding of fair use.

### d.  Factor Four:  "the effect of the use upon the potential market for or value of the copyrighted work"

The fourth factor examines "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  Not all effects on the market are legally cognizable for purposes of the fourth factor.  Courts "must consider not just the amount but also the source of the loss."  *Google LLC*, 141 S. Ct. at 1206.  For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act."  *Campbell*, 510 U.S. at 591–92. In considering the fourth factor, courts must also "take into account the public benefits the copying will likely produce."  *Google LLC*, 141 S. Ct. at 1206.  "Are those benefits, for example, related to copyright's concern for the creative production of new expression? Are they comparatively important, or unimportant, when compared with dollar amounts likely lost (taking into account as well the nature of the source of the loss)?"  *Id.*

In considering whether "to allow enforcement of [the plaintiff's] copyright here would risk harm to the public," the Supreme Court instructs us to ask whether enforcing the copyright would allow the copyright holder to gain profits unrelated to "copyright's basic creativity objectives."  *Id.* at 1208.  Where the copyright holder seeks profits from user lock-in or other extrinsic factors, rather than from its own contribution, those profits are not cognizable under the fourth factor.  *Id.*  That is, "an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine."  *Sega Enters. Ltd.*, 977 F.2d at 1523–24.

Thus, in considering the fourth factor, the Court must distinguish between effects on the market that are cognizable under the Copyright Act, and those that are not. There are two possible markets for NFPA's work. The first is the market for *model* codes. But as to that market, UpCodes does not provide a substitute. A visitor to the UpCodes website can find only the *laws* of particular jurisdictions, which adopt the model code to varying degrees; if a visitor wants the *model* code, he or she must buy a copy from NFPA.

The second possible market for NFPA's work is the market *for the text of the law*. This market is not cognizable under the fourth factor because copyright does not give anyone the exclusive right to speak the law. Stated differently, the question is whether the use affects a market because it involves "exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). The customary price for the right to speak the law is zero. Because there is no cognizable market for the right to disseminate the law—just as there is no cognizable market for the right to review a play, or the right to parody a song—there is no cognizable market harm from UpCodes' use of the law *as the law*, rather than as a model code. If people are buying copies of model codes from NFPA *because there is no other way to acquire a copy of the law*, NFPA was never entitled to those revenues. The possible loss of those undeserved revenues does not weigh against a finding of fair use.

Accordingly, because there is no reason to think that UpCodes' use has any effect on the market for NFPA's model codes *as model codes*, the fourth factor does not weigh against a finding of fair use. And at any rate, any "potential harms to [NFPA]'s markets for its works cannot outweigh the benefits and necessity of enabling unfettered access to enacted laws." *UpCodes*, 2020 WL 2750636, at *28.

## B.   NFPA has not established that irreparable harm is likely.

"[L]ikely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright infringement case," and cannot be presumed. *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). NFPA's three-month delay in bringing this motion and its decision to post the same material on its website for free

weigh against a finding that irreparable harm is likely.

### 1.   NFPA's three-month delay in bringing this motion undercuts any likelihood of irreparable harm.

UpCodes posted most of the material at issue on April 1, 2021.  Reynolds Decl. ¶ 21.  NFPA brought this motion more than three months later, on July 9, 2021.  "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Oakland Tribune, Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).  Delays of three months have frequently been found to weigh against a finding of irreparable harm.  *See, e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (approximately three-month delay "undercut Garcia's claim of irreparable harm."); *Am. DJ Supply Inc. v. Am. Lighting Inc.*, No. CV 12-8934 GAF (FMOx), 2013 WL 12123770, at *9 n.6 (C.D. Cal. May 2, 2013) ("While a three month delay is not in and of itself dispositive, it certainly undercuts to some degree [the] assertion of imminent harm."); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) ("A three-month delay in seeking injunctive relief is inconsistent with Valeo's insistence that it faces irreparable harm.").  This delay alone would undercut any likelihood of irreparable harm between now and a final judgment on the merits.

### 2.   NFPA's claimed harms are unsupported and overblown.

NFPA admits that it makes the material at issue in this case available on its website for free.  Yet it claims that it will suffer irreparable harm if that same material is not immediately removed from UpCodes' website.  NFPA is wrong.

NFPA's first two claims of harm—(1) that UpCodes is "interfering with and threatening the success of NFPA's development of the market for its own subscription service," Mot. at 22, ECF No. 13, and (2) that UpCodes "threatens the value of NFPA's licenses and its goodwill and relationship with those licensees," *id.* at 23—are speculative.  Most of the relevant material has been posted on UpCodes' website for three months, and yet NFPA provides no evidence of a single existing or would-be NFPA LiNK user who cancelled or failed to purchase a subscription, any drop in revenue for any NFPA product

22

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

attributable to UpCodes, or any licensee who has sought to terminate or renegotiate its NFPA license.  *See, e.g.*, Pauley PI Decl. ¶ 47, ECF No. 13-2 (asserting, without any evidentiary support, that it is "obvious" that "UpCodes will be able to 'upsell' a significant number of users to its premium service who otherwise pay for authorized access through NFPA LiNK."); *id.* ¶ 55 (raising the possibility that licensees could seek concessions, without saying that any have).  Without evidentiary support, NFPA's claims of harm fail.  *See, e.g.*, *Herb Reed Enters.*, 736 F.3d at 1250 (reversing a preliminary injunction where the "pronouncements [of irreparable harm] [were] grounded in platitudes rather than evidence"); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (citations omitted).

More fundamentally, any loss in subscribers to NFPA LiNK has nothing to do with the copyrighted works at issue because NFPA admits that it already offers those works for public review, for free.  Rather, NFPA believes that it can use a preliminary injunction to improve its competitive position in the market for enhanced paid services based on the law.  For the reasons already explained in section III.A.3.d., *supra*, NFPA has no right to a competitive advantage in that market.

NFPA's third claimed harm—that it will have fewer resources to "invest in creating and updating standards," Mot. at 23, ECF No. 13—fares no better.  That argument is just a dressed-up claim that NFPA will lose money:  Because almost *every* organization faces resource constraints, every plaintiff could argue that an action that decreases its revenue harms its ability to invest in future products.  But a decrease in revenue is exactly the types of harm that can be addressed with a money judgment, and injuries that can be remedied with damages are not irreparable.  *Herb Reed Enters.*, 763 F.3d at 1250; *see also Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003) ("[A]ctionable business losses resulting from cancelled subscriptions or lower

23

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)

advertising volume" are not irreparable because they "can be remedied by money damages."). And at any rate, NFPA gives no reason to think that it cannot continue to spend the approximately $15 million it currently spends annually on "standards development" if it did not receive every penny of the $54 million it makes yearly from its publications; NFPA's membership dues and grants alone could pay for that activity, even setting aside revenue from publications. *See* Gratz Decl. Ex. E at Gratz-109.

### C. The balance of hardships does not favor NFPA.

As discussed above, NFPA will suffer no hardship if the material that it makes available for free on its website is also made available for free on UpCodes' website during the pendency of this litigation. And to the extent there is any hardship, it arises not from any legitimate copyright interest, but from competition between the parties in the market for new and innovative features built upon the law.

UpCodes, meanwhile, will suffer substantial harm if enjoined. UpCodes' users rely on UpCodes for access to the law. Before posting the fire, electrical, and life-safety laws at issue in this case, access to those laws was the most-requested feature among UpCodes users. Reynolds Decl. ¶ 19. UpCodes has made substantial investments to incorporate those laws into its service. *Id.* ¶ 20. If UpCodes is forced to withdraw access to these laws, users will be left with the mistaken impression that nobody may utter the text of, for example, the California Electrical Code, without NFPA's permission. *See McFly Inc.v. Universal City Studios, Inc.*, No. 85 5440, 1985 WL 72058, at *13 (C.D. Cal. Oct. 9, 1985) ("If granting a preliminary injunction would cause a defendant financial loss and damage to business reputation which would significantly outweigh any likely damage to plaintiff, the hardships balance in favor of defendants.").

### D. The public interest would be disserved by an injunction against the dissemination of the law.

The public interest is in wide and unfettered access to and knowledge of the law. An injunction here would disserve that public interest. That is particularly true because UpCodes is the *only* source of unified copies of the law integrating local amendments for

24

more than a dozen jurisdictions.  *See* section III.A.3.a.i., *supra*.  An injunction would mean that electricians and other building professionals in those jurisdictions would have *no* source for a document showing the full text of their local electrical code; they would instead need to reference multiple documents, some published by NFPA and some published by their local government, to learn the applicable law.

Indeed, even with respect to government-approved materials that are *not* the law, the Ninth Circuit has recognized "the great public injury that would result if adequate access to" those materials "were denied."  *Practice Mgmt.*, 121 F.3d at 519.  The Ninth Circuit thus suggested that an injunction would be inappropriate even for those non-law materials, and that "mandatory licensing at a reasonable royalty could be required."  *Id.*  Indeed, even where the harm to the public was not something so serious as reduced access to the text of the law, but instead "denying the public the opportunity to view a classic film," the Ninth Circuit has held that such a "public injury" precluded the "harsh and drastic" remedy of an injunction against dissemination of the material at issue.  *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988*)*, *aff'd sub nom. Stewart v. Abend*, 495 U.S. 207 (1990).  To be clear, no such royalty is appropriate, because NFPA does not own the law.  But even if it did, the public interest would not be served by an injunction.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny NFPA's motion, confirming that NFPA is not likely to succeed in its attempt to gain a monopoly on the right to speak the law.


Dated:  July 19, 2021                             DURIE TANGRI LLP


                                        By:_____*/s/ Joseph C. Gratz*____
                                                JOSEPH C. GRATZ

                                        Attorneys for Defendant
                                        UpCodes, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2021 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

DEFENDANT'S MEMO. OF P & A IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION / CASE NO. 2:21-CV-05262-DSF (EX)