# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> UPCODES, INC., SCOTT REYNOLDS, and GARRETT REYNOLDS, <br><br> Defendants. | Case No. 2:21-cv-05262-SPG-E <br><br> **ORDER RE DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION [ECF NO. 142, 220]** |

Defendants UpCodes, Inc., Scott Reynolds, and Garrett Reynolds (collectively, "UpCodes") have moved pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56 for an Order granting summary judgment in favor of UpCodes on Plaintiff National Fire Protection Association, Inc.'s ("NFPA") two causes of action in the First Amended Complaint ("FAC") for copyright infringement. (ECF No. 142 ("UpCodes' Motion"); ECF No. 35 ("FAC")). NFPA has cross-moved for summary adjudication in its favor on the elements in its copyright infringement causes of action that (1) NFPA owns a valid copyright in its works; and (2) UpCodes exercises without NFPA's authorization at least one of NFPA's exclusive rights under 17 U.S.C. § 106 ("NFPA's Motion").

Having considered the parties' submissions, the numerous amicus briefs, the relevant law, the record in this case, and the arguments of counsel during the hearing on the Motions, the Court **DENIES** UpCodes' Motion for summary judgment and **GRANTS** NFPA's Motion for summary adjudication.

## I.    BACKGROUND

The following facts are undisputed, unless otherwise stated, and are viewed in the light most favorable to the non-moving party, whether it is NFPA on UpCodes' Motion or UpCodes on NFPA's Motion.  *See* (ECF No. 174 (Joint Appendix of Facts ("JAF"); ECF No. 142-2–9 (Joint Appendix of Evidence ("JAE")); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor.").[1]

### A.    Introduction

Over the last century in the United States, a complex public-private partnership has developed between non-profit, governmental standards development organizations ("SDO"), which are comprised of private industry groups or associations, and government agencies where the SDOs will develop voluntary consensus standards, guidelines, and procedures that set the best practices for installations in certain commercial industries

---

[1] When deciding a motion for summary judgment, the Court only considers evidence admissible at trial, though the form may differ at the summary judgment stage. *Godinez v. Alta–Dena Certified Dairy LLC*, No. CV 15–01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016). The Court has reviewed the entire record, including the parties' JAF, objections, and evidence. The Court discusses only the facts that are relevant to its decision. In those instances where a party has failed to properly address the other party's assertion of fact or failed to properly support an asserted fact with evidence, as is required by Rule 56(c), the Court considers those facts undisputed for purposes of the motions. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56-3. Further, it is not the Court's practice to rule on each objection individually, nor is it required to do so. To the extent that the Court relies on evidence that is the subject of an objection, the Court overrules the objection for purposes of the Motions. To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot for purposes of the Motions.

instead of those standards being developed by the government agencies.[2]  Recognizing the value of such standards, federal, state, and local governmental bodies have chosen to incorporate many of the standards by reference ("IBR") into statutes and regulations[3]— that is, to reference a privately authored voluntary consensus standard as relevant to a statute or regulation, without reproducing the standard's actual text into the regulatory text. (JAF 2463–66, 2468–69).  Federal, state, and local governments rely on and have endorsed the practice of IBR, instead of verbatim copying of privately authored standards.  (JAF 2472–95).  Today, for example, fire-safety standards published by SDOs are commonly incorporated into state codes across the nation.  Some states incorporate these codes wholesale or subject to only minor changes.[4]

**B.    The Parties in this Action**

1.    <u>NFPA</u>

NFPA is a nonprofit organization "devoted to saving lives and reducing loss from fire, electrical, and related hazards."  (JAF 2346).  As an accredited SDO,[5] NFPA publishes

---

[2] *See Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 597 F. Supp. 3d 213, 240 (D.D.C. 2022), *aff'd*, 82 F.4th 1262 (D.C. Cir. 2023); (JAF 2343).

[3] The Court overrules UpCodes' objection at JAF 2463, given UpCodes recognition that government bodies have "adopted" portions of the standards.  *See e.g.*, JAF 360, 362, 364, 366, 368, 370.

[4] Arizona, for example, has incorporated by reference as its state fire code the 2018 edition of the International Fire Code, published by the International Code Council.  *See* Ariz. Admin. Code § 4-36-201.  Illinois's State Fire Marshal, meanwhile, has adopted several NFPA codes and standards, subject to certain state-specific modifications.  See Ill. Admin. Code tit. 41, § 100.7(b).  Other states have taken a more targeted approach, incorporating specific provisions into particular statutes or regulations.  *See, e.g.*, Cal. Code Regs. tit. 8, § 3406(c) (requiring firefighters to be provided gloves with "[a] durable label in accordance with" NFPA standard number 1971); Wash. Admin. Code § 296-305-02002(1) (requiring structural firefighting clothing to "meet the requirements" of specified editions of NFPA standard number 1971); D.C. Code § 5-413(b)(1) (requiring construction of firefighting apparatus in compliance with NFPA standard number 1911).

[5] *See* ECF No. 142-4 ¶ 19 n.6 (stating NFPA has been designated an Accredited Standards Developer by the American National Standards Institute("ANSI"). "ANSI Accredited Standards Developers (ASD)," American National Standards Institute (ANSI), 2022,

more than 300 voluntary consensus standards, including NFPA 70, the National Electrical Code,[6] which, according to NFPA, is the world's leading standard for electrical safety; NFPA 101, the Life Safety Code, a widely used standard for building construction, protection and occupancy features that minimize the effects of fire and related hazard on human life; and NFPA13, Standard for the Installation of Sprinkler Systems for the design and installation of automatic fire sprinkler systems. (JAF 66, 2392-96; JAE Ex. 123 ("Pauley Decl.") ¶¶ 7–9). NFPA's voluntary consensus standards are developed through a rigorous process that includes open proceedings, public notice and opportunity for public comment, consensus decision-making that meet accreditation criteria. (JAF 2372–75). NFPA invests tens of millions of dollars annually to create their standards. (JAF 2381).

Core to its mission of creating voluntary consensus standards, NFPA encourages jurisdictions across the country to incorporate and use its standards. (JAF 54). The result is that many NFPA standards have been IBR-ed by federal agencies, states, and local governments, including NFPA 70, the National Electrical Code, which has been adopted in all 50 states. (JAF 65; Pauley Decl. ¶ 41). Some governmental agencies will IBR NFPA's standards or a portion thereof or may IBR other SDO's codes or standards that reference NFPA's standards. (JAF 68).

The primary users of NFPA standards are professionals from the architecture, engineering, and construction ("AEC") industry. (Pauley Decl. ¶ 7). Since 2006, NFPA has made its standards, including standards that have been IBR-ed, available online for free, read-only access through its Free Access service. (JAF 2437, 2439). That format

accessed 12/15/2022, available at https://www.ansi.org/american-national-standards/info-for-standardsdevelopers/ accredited-standards-developers#q=nfpa. The ANSI is a nonprofit organization that accredits SDOs in the United States. "Organizations Developing Standards," Standards Coordinating Body, https://www.standardscoordinatingbody.org/sdos.

[6] The National Electrical Code addresses, among other subjects, the installation of electrical conductors, equipment, and raceways; signaling and communications conductors, equipment, and raceways; and optical fiber cables and raceways in commercial, residential, and industrial occupancies. (Pauley Decl. ¶ 8).

allows anyone to read the text of an NFPA standard but prevents downloading and printing copies that would substitute for NFPA's paid offerings. (JAF 43-44). NFPA's standards that are IBR-ed are also available to the public without charge through multiple channels, including at government offices and libraries. (JAF 2471). Thousands of visitors access NFPA's standards, including IBR-ed standards, through its Free Access website each year. (JAF 2438). Free Access users can access NFPA's standards on their laptops, mobile devices, tablets, or other devices that have a web browser. (JAF 2440, 43-44).

NFPA also sells individual editions of print copies of standards for about $150 or less. (JAF 2420). Additionally, users may purchase online-access subscriptions through NFPA LiNK. (JAF 45, 2424). NFPA LiNK provides subscribers with access to the digital library of NFPA's standards, as well as provides features, "including dynamic search that allows users to locate relevant sections across different standards, expert commentary and visual aids, bookmarking and annotation tools, access to situation-based guidance for specific workspaces or equipment, a tool comparing what has changed from a prior edition, and other collaboration tools." (JAF 2425).

In addition to directly disseminating its standards, NFPA licenses its standards to other publishers and organizations that pay for the rights to distribute or use all or portions of NFPA's standards in their products and services. (JAF 2433). For example, NFPA licenses to companies that aggregate standards from different SDOs into digital libraries, along with jurisdiction-specific information and amendments. (JAF 2434). NFPA also licenses its standards to companies that create checklists, diagrams, programs that flag potential failures to meet standards, and other efficiency tools derived from its standards. (JAF 2435).

NFPA owns copyrights in all the standards it publishes. (JAF 2413-14). NFPA has obtained valid certificates of copyright registration issued by the U.S. Copyright Office for all the standards that it publishes, each within five years of publication. (Am. Pauley Decl. ¶ 11; JAF 2414-15). NFPA does not authorize its standards to be copied verbatim into

statutes or regulations, and the governmental bodies that IBR NFPA's codes respect NFPA's copyright.  (JAF 2506–08, 2491–95).

### 2.    UpCodes

Brothers Scott and Garrett Reynolds founded UpCodes in 2016 to create a profitable company that would make it easier for industry professionals to understand how to comply with state and local building codes.  (JAF 1-2; JAE Ex. 242).  Although UpCodes states that the Reynolds brothers founded UpCodes to also make it easier for laypeople to understand and comply with state and local building codes, *see* (JAF 2), UpCodes has identified industry professionals, such as "architectural or G[eneral] C[ontractor] firms, large companies, and 5-100 person teams as 'ideal users' and non-professionals, and 1-2 person firms as 'anti-users.'"  *See* (JAF 2 and NFPA Response; JAE Ex. 297; JAF 3012).

UpCodes posts NFPA's standards on its website by first acquiring books containing printed copies of NFPA's standards, scanning the printed copies, and converting them into a digitized, website-friendly format that is navigable by chapter and section.  (JAF 4, 2521).  UpCodes started uploading NFPA's standards to its website on April 1, 2021.  (JAF 76).  Unlike NFPA's website, UpCodes' website allows users to view, copy, paste, and print for free content, including NFPA standards that UpCodes has uploaded to its website, without registering for an account.  (JAF 11-12).  Users can also access advanced search and collaboration tools on UpCodes' website by paying a subscription fee.  (JAF 13).  UpCodes' features available to paid subscribers include search, bookmarking, diagrams, "Code Compare," and "Code Calculators."  (JAF 2522).

NFPA has not at any time authorized UpCodes to copy, publish, scan, or distribute its standards, whether IBR-ed or not.

### C.    Procedural History

NFPA commenced this case on June 29, 2021, (ECF No. 1), and filed the operative FAC on September 8, 2021.  (ECF No. 35).  NFPA sought a preliminary injunction prohibiting UpCodes from infringing its exclusive copyrights. (ECF No. 13).  On August 9, 2021, the Honorable Dale S. Fischer, the district judge who previously presided over

this case, denied NFPA's motion without prejudice to it being brought again on a fuller record. (ECF No. 30 ("PI Order")). The matter was subsequently assigned to this Court. (ECF No. 60).

UpCodes subsequently moved for summary judgment. (Mot.). NFPA cross moved for summary adjudication. After holding a hearing on the parties' Motions, the Court ordered supplemental briefing on the impact of *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023), if any, on the parties' fair use arguments. (ECF No. 189). The parties timely filed those briefs. (ECF Nos. 198, 199).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if the substantive law identifies the fact as critical such that the resolution of the fact under governing law might affect the outcome of the case, and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"[T]o carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citing *High Tech Gays v. Def. Indus. Sec. Clearance Off.*, 895 F.2d 563, 574 (9th Cir. 1990)). If the moving party satisfies its initial burden, the burden then shifts to the opposing party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. A genuine issue requires evidence, not speculation or guesswork. *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d

825, 829 (9th Cir. 2001). The opposing party may not simply rely upon the allegations or denials in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n.3 (1986). Nor can it rely on speculative or self-serving declarations that state only conclusions and not facts that would be admissible evidence. *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015). Instead, the opposing party, by citing to documents, depositions, declarations, admissions, interrogatory answers, or other material, must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 252).

In resolving a summary judgment or summary adjudication motion, the court does not weigh the evidence, determine the truth, or make credibility determinations. *See Anderson*, 477 U.S. at 255. The court construes the evidence and draws reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Thus, summary judgment or summary adjudication for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Copyright owners have the exclusive right "to reproduce the copyrighted work in copies," or to authorize another to do so. 17 U.S.C. § 106(1). The Copyright Act and case law "grants an author an exclusive right to produce his work (sometimes for a hundred years or more), not as a special reward, but in order to encourage the production of works that others might reproduce more cheaply." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 16 (2021); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984) (This "limited grant" is "intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired."). To establish

infringement of that exclusive right, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 548 (1985)).

Here, it is undisputed that NFPA has met its burden to establish a *prima facie* case of copyright infringement. It is undisputed that NFPA owns copyrights in all the standards it publishes, including IBR-ed standards. (JAF 2413-14). It is also undisputed that NFPA has obtained valid certificates of copyright registration issued by the U.S. Copyright Office for all the standards that it publishes, each within five years of publication, and for each of the standards that have been posted on UpCodes' website. (JAF 2414-15; Am. Pauley Decl. ¶ 11). It is also undisputed that UpCodes posts NFPA's standards on UpCodes' website without authorization from NFPA. Thus, UpCodes has violated at least one of NFPA's exclusive rights as the copyright owner. *See* (JAF 2509–40); *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017); *Weinberg v. Dirty World, LLC*, No. CV 16-9179-GW(PJWX), 2017 WL 5665023, at *5 (C.D. Cal. July 27, 2017) (plaintiff established a *prima facie* case of copyright infringement because the parties did not dispute that the plaintiff owned the exclusive license property rights and that the defendant used it on its website without the plaintiff's permission).

Because NFPA has established *prima facie* infringement, the burden then shifts to UpCodes to show that its unauthorized copying does not constitute infringement. *See United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (infringer "has the burden of rebutting the facts set forth in the copyright certificate"). UpCodes endeavors to meet its burden by challenging the validity of NFPA's copyright over the NFPA's IBR-ed standards and, alternatively, by arguing that its infringement is excused by the doctrine of fair use.

## A.    NFPA's Ownership of a Valid Copyright

The core of UpCodes' challenge to NFPA's copyright over the IBR'd standards is that the copyrights are no longer valid because the IBR-ed standards became "the law"

when federal and state governmental agencies adopted them into law. Thus, argues UpCodes, NFPA's IBR-ed standards cannot be copyrighted because (1) caselaw and the government edicts doctrine establishes that the standards are in the public domain as "the law," (2) the merger doctrine precludes a finding of copyright infringement, and (3) "serious constitutional concerns" prevent private ownership of "the law." The Court considers each argument in turn.

### 1.    "No One Can Own the Law" Argument

UpCodes first argues that its posting of "the law"[7] does not infringe NFPA's copyrights because "no one can own the law." (MSJ at 29–31). For this proposition, UpCodes relies on a series of Supreme Court decisions that have developed, interpreted, and applied the government edicts doctrine.[8] In response, NFPA argues that the Ninth Circuit's decision in *Practice Management Information Corp. v. American Medical Association*, 121 F.3d 516 (9th Cir. 1997) ("*PMIC*") disposes of UpCodes' "no one can own the law" argument. For the reasons stated below, the Court finds that *PMIC,* together with the Supreme Court's recent pronunciation of the government edicts doctrine, protects NFPA's copyright over NFPA's IBR-ed standards in this case.

In *PMIC*, the American Medical Association ("AMA") had developed an extensive coding system, the Physician's Current Procedural Terminology ("CPT"), "to enable physicians and others to identify particular medical procedures with precision." *Id.* at 517. The AMA revised the CPT annually to reflect new developments in medical procedures. *Id.* In 1977, Congress instructed the Health Care Financing Administration ("HCFA") to

---

[7] Judge Fischer found it unnecessary to reach this question in deciding NFPA's motion for preliminary injunction because NFPA had "provided evidence that UpCodes reproduces more than just the portion of the standards that have been adopted into law." (PI Order at 5). Although that remains true here, given that the Court is now tasked with deciding whether to grant summary judgment, the Court will address the merits of UpCodes' argument.

[8] *Wheaton v. Peters*, 33 U.S. 591 (1834), *Banks v. Manchester*, 128 U.S. 244 (1888), *Callaghan v. Myers*, 128 U.S. 617 (1888), and *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020).

establish a uniform code for identifying procedures on Medicare and Medicaid claim forms. *Id.* Rather than creating a code system from scratch, the HCFA contracted with the AMA to "adopt and use" the CPT. *Id.* Under the HCFA's regulation, parties seeking health insurance reimbursement for Medicare were required to use the codes created and copyrighted by the AMA. *Id.* at 518; *see also Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 877 F. Supp. 1386, 1388–89 (C.D. Cal. 1994) (HCFA "mandate[ed] the use of the CPT . . . for obtaining reimbursement"). Thus, if a party wanted Medicare or Medicaid reimbursement, that party had to use the CPT.

The plaintiff, Practice Management, a publisher and distributor of medical books, purchased copies of the CPT for resale at a lower price. Practice Management sued the AMA for a declaratory judgment that its copyright over the CPT was invalid. *See PMIC*, 121 F.3d at 518. Relying on the Supreme Court's decision in *Banks v. Manchester*, 128 U.S. 244 (1888), Practice Management raised the same argument as UpCodes raises here— that the CPT was "uncopyrightable" because it "became law and entered the public domain when HCFA by regulation required its use." *Id.* at 518. The Ninth Circuit rejected that argument. It held that "invalidating [AMA's] copyright on the ground that the CPT entered the public domain when HCFA required its use would expose copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation." *Id.* at 519.[9] Emphasizing copyright's purpose under the Constitution to "promote the progress of science and the useful arts," the court reasoned that, "'[t]o vitiate copyright, in such circumstances, could, without adequate justification, prove destructive of the copyright interest, in encouraging creativity,' a matter of particular significance in this context because of 'the increasing trend toward state and federal adoptions of model codes.'" *Id.*

---

[9] The court noted that its decision was in line with the First and Second Circuits, who had also declined to enjoin enforcement of private copyrights in these circumstances. *Id.* (citing *Building Officials & Code Admin. v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir. 1980); *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994)).

at 518 (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.06[C], at 5–92 (1996)).

The Ninth Circuit then analyzed *Banks*, interpreting it to hold that judges do not hold copyright in their opinions because (1) "the public owns the opinions because it pays the judges' salaries" and (2) "due process require[s] free access to the law." *PMIC*, 121 F.3d at 518–19 (citing *Banks*, 128 U.S. at 253). The court found that *Banks*'s first justification does not apply to privately developed standards because "copyrightability of the [code] provides the economic incentive for the [SDO] to produce and maintain [it]." *Id*. at 518. The court next found that *Banks*'s second rationale did not apply, explaining that *Banks*'s due process concern may justify terminating an otherwise valid copyright only if there is "evidence that anyone wishing to use the [code] has any difficulty obtaining access to it." *Id*. at 519. The court found that Practice Management was "not a potential user denied access to the CPT, but a putative copier wishing to share in the AMA's statutory monopoly." *Id*. Moreover, Practice Management did not contend that the AMA had restricted access to users. *Id*. The court held that the "AMA's right under the Copyright Act to limit or forgo publication of the CPT pose[d] no realistic threat to public access" because the AMA had "no incentive to limit or forgo publication." *Id*. If the AMA were to do so, the Ninth Circuit recognized that "HCFA would no doubt exercise its right to terminate its agreement with the AMA." *Id*. The court found significant that, in the event the AMA restricted public access to the CPT, other remedies would be available for infringers, including fair use and due process defenses. *Id*. The court also suggested that "mandatory licensing at a reasonable royalty could be required in light of the great public injury that would result if adequate access to the CPT were denied." *Id*.

UpCodes argues that *PMIC* does not apply because *PMIC* did not address a situation where a private entity claims the exclusive right to speak the law. (MSJ at 35–36). However, that is not a distinction recognized as salient by the Ninth Circuit. As NFPA points out, the way in which the HCFA made CPT mandatory is no different in substance from the IBR of many standards here. In *PMIC*, regulations required use of an HCFA

-12-

coding system. Rather than create a coding system from scratch, HCFA incorporated CPT by regulation. *See PMIC*, 121 F.3d at 517–18. In fact, the Ninth Circuit cited NFPA 70 and its IBR by a safety regulation as an example of the type of standard whose copyright it refused to vitiate. *See id.* at 519 n.5 ("16 C.F.R. § 1505.5(e)(5) (requiring electrically operated toys to have a type SP–2 electrical power cord, as defined in the National Electrical Code authored by the [NFPA])").[10] Moreover, like in *PMIC*, UpCodes has provided no evidence that anyone who wants to read the standards has had any difficulty doing so through NFPA's free-to-access website. *See PMIC*, 121 F.3d at 519 (refusing to revoke the AMA's copyright because "[t]here [was] no evidence that anyone wishing to use the [copyrighted codes] ha[d] any difficulty obtaining access to it"); *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822, at *14 (D.D.C. Feb. 2, 2017) ("*ASTM I*") (relying on *PMIC* and finding the plaintiffs' standards had not entered the public domain upon their incorporation by reference into federal regulations under *Banks*, explaining there was no evidence that anyone had been denied access to the plaintiffs' standards and rejecting defendant's argument that the public should be granted more expansive access), *reversed on other grounds*, 896 F.3d 437 (D.C. Cir. 2018). Just as the Ninth Circuit preserved AMA's copyright protections in the CPT, this Court therefore rejects UpCodes' assertion that NFPA loses its copyright over the standards once they have been IBR-ed into law.

---

[10] In addition to NFPA's model code, the court also cited the following statutes as exemplar copyrighted works that would be subject to invalidation under Practice Management's and UpCodes' theory: 32 C.F.R. § 199.13(e)(2) (limiting payment of dental benefits to procedures defined in the Current Dental Terminology); 32 C.F.R. § 199.2 (conditioning payment of civilian medical benefits for mental disorders on showing the patient has a disorder listed in the Diagnostic & Statistical Manual of Mental Disorders); 16 C.F.R. § 1201.7 (requiring architectural glazing materials to conform to standards published by the American National Standards Institute); 7 C.F.R. § 1755.870(a)(8) (incorporating by reference Underwriters Laboratories Inc.'s Standard Test for Flame Propagation Height of Electrical and Optical–Fiber Cables Installed Vertically in Shafts); 11th Cir. R. 28–2(j) (requiring attorneys to conform their citations to The Bluebook: A Uniform System of Citation).

1    UpCodes further argues that, aside from *PMIC*'s applicability to this suit, the

2    Supreme Court's decision in *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255 (2020)

3    holds that "no one can own the law." (MSJ at 31–33). The question presented to the Court

4    in *Georgia* was whether the Copyright Act's protection of "original works of authorship"

5    extends to annotations in the Official Code of Georgia Annotated, which is the authoritative

6    version of Georgia's statutes under Georgia law. 590 U.S. at 1503–04 (citing 17 U.S.C.

7    § 102(a)). To answer that question, the Court referenced the "government edicts doctrine,"

8    which holds that "officials empowered to speak with the force of law cannot be the authors

9    of—and therefore cannot copyright—the works they create in the course of their official

10   duties." *Id.* The "government edicts doctrine" was established as a "limitation on

11   copyright protection" for certain government work product based on the Copyright Act's

12   "authorship" requirement.[11] *Id.* at 1504. The doctrine dates back to the Supreme Court's

13   decisions in *Wheaton v. Peters*, 33 U.S. 591 (1834), *Banks v. Manchester*, 128 U.S. 244

14   (1888), and *Callaghan v. Myers*, 128 U.S. 617 (1888). *See Georgia*, 590 U.S. at 1505.

15   The "animating principle" behind the government edicts doctrine—and the core of

16   UpCodes' argument here—"is that no one can own the law" and "that all should have free

17   access to its contents." *Id.* (internal quotation marks and citations omitted). However,

18   *Georgia* made clear that *Banks* did not hold that the law "is free for publication to all" and

19   thereby noncopyrightable *because it is the law*, but instead because it is "*work done by the*

20   *judges.*" *See Georgia*, 590 U.S. at 1507 (emphasis added).

21   In *Georgia*, LexisNexis had drafted the annotations in dispute pursuant to a work-

22   for-hire agreement with a Georgia state commission, such that Georgia was considered the

23   "author" of those annotations for copyright purposes. *See id.* at 1505. When

24   Public.Resource.Org copied the annotated code, Georgia sued, arguing that the annotations

25   were not in the public domain because, unlike the statutes, they did not carry the "force of

26   law." *Id.* The Supreme Court held that the government edicts doctrine applies equally to

---

[11] Under the Copyright Act, copyright may vest initially only in an "author." 17 U.S.C.
§§ 102(a), 201(a).

-14-

"non-binding, explanatory legal materials created *by a legislative body* vested with the authority to make law." *Id*. at 1503 (emphasis in original). The Court held that, "[b]ecause Georgia's annotations are authored by an arm of the legislature in the course of its legislative duties, the government edicts doctrine puts them outside the reach of copyright protection." *Id*. In so holding, the Court established "a straightforward rule" "based on the identity of the author" of a work, not based on whether the work has the "force of law." *Id*. at 1506–07. *Georgia*'s bright-line rule excludes from copyright "works that are (1) created by judges and legislators (2) in the course of their judicial and legislative duties," even if they are not "the law" because they do not have binding force. *Id*. at 1507–08. The Court based this rule on its construction of the term "author" in the Copyright Act, noting that judges and legislators could not be considered authors entitled to copyright in their official works because those officials were "vested with the authority to make and interpret the law." *Id*. at 1507.[12]  As a corollary to its author-focused rule, the Supreme Court held that the government edicts doctrine "does not apply, however, to works created by . . . private parties[ ] who lack the authority to make or interpret the law." *Id*.

UpCodes argues that *Georgia*'s adoption of a prophylactic rule that "no one can own the law" resolves this case. (MSJ at 31–33). In essence, UpCodes argues that anything carrying the "force of law" cannot be copyrighted. However, that same argument was rejected by the Supreme Court in *Georgia*. Georgia had raised the same argument as UpCodes that the government edicts precedents should be construed "to focus exclusively on whether a particular work has 'the force of law.'" *Id.*  at 1511. In dissent, Justice Thomas endorsed that view. *Id.* at 1515 (Thomas, J., dissenting) ("[I]t must follow from our precedents that statutes and regulations cannot be copyrighted, but accompanying notes lacking legal force can be"). As the majority explained in rejecting that view, Justice

---

[12] Section 105 of the Copyright Act states that "[c]opyright protection under this title is not available for any work of the United States Government." 17 U.S.C. § 105. The Act defines a "work of the United States Government" as "a work prepared by an officer or employee of the United States Government as part of that person's official duties." *Id*. § 101.

Thomas's dissent "conjur[ed] a trinity of alternative 'origin[s] and justification[s]'" for the Court's earlier cases and "suggest[ed] that each [justification] would yield a rule that requires federal courts to pick out the subset of judicial and legislative materials that independently carry the force of law." *Id.* at 1512 n.4.  The Court's majority held that an author-focused rule, not the dissent's force-of-law rule, had been "voted on and committed to writing" by the Court's prior cases.  *Id.*[13]  Thus, *Georgia* held that, "[i]nstead of examining whether given material carries 'the force of law,' we ask only whether the author of the work is a judge or legislator." *Id.* at 1513.  In so holding, *Georgia* simply extended the "government edicts doctrine" established in *Wheaton*, *Banks*, and *Callaghan* from works of only judges to include works of legislators acting in their capacities as such. *Georgia*, 590 U.S. at 1507–08.  Further, the Supreme Court made clear that its "straightforward rule" "does not apply" to works created by "private parties[ ]  who lack the authority to make or interpret the law." *Id.* at 1507.

Following *Georgia*, the pertinent question is not whether the underlying standard—whether it be a code that comprehensively governs a broad range of primary conduct and carries criminal penalties or specifications for a privately used service that carries no repercussions—qualifies as "binding law."  Instead, the question is "only whether the author of the work is a judge or a legislator." *Georgia*, 140 S. Ct. at 1513.  If yes, the work must remain in the public domain not subject to copyright; if not, the work is copyrightable, at least insofar as the government edicts doctrine—or UpCodes "public domain" argument—is concerned. *Id.*

Because NFPA is a private party and has no authority to make or interpret the law, its copyrighted standards are not in the public domain and are copyrightable under the government edicts doctrine.  (JAF 2505).  As NFPA correctly notes, the noncopyrightable

---

[13] For example, the Court recounted that *Banks* "withheld copyright protection from headnotes and syllabi produced by judges." *Id.* at 1511 (citing *Banks*, 121 U.S. at 253). The Court held that, while these "supplementary materials do not have the force of law, . . . they are covered by the doctrine . . . *because of who creates them*." *Id.* (emphasis added).

-16-

government edicts are simply those words that have been authored by a legislature or agency that IBR's the standard.  *See, e.g.,* (JAF 2468–70 ("'This agency incorporates by reference N.F.P.A. #72 . . . .'" (quoting 16-219 Me. Code R. ch. 17 § 1))).[14]  The underlying IBR-ed standard, however, has not lost its copyright under *Georgia.  See Facility Guidelines Inst., Inc. v. UpCodes, Inc.*, No. 4:22-CV-01308-AGF, 2023 WL 4026185, at *3 (E.D. Mo. June 15, 2023) ("*FGI*") ("Because FGI is a private entity that lacks the authority to make or interpret the law, the government edicts doctrine does not apply."); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 597 F. Supp. 3d 213, 232 (D.D.C. 2022) ("*ASTM III*") ("A government body that merely incorporates a standard by reference does not independently create any content, and therefore does not become an 'author' of the standard."); *Int'l Code Council, Inc. v. UpCodes, Inc.*, No. 17 CIV. 6261 (VM), 2020 WL 2750636, at *8 (S.D.N.Y. May 27, 2020) ("*ICC*") ("Because ICC is a private party that lacks the authority to make or interpret the law, the Government Edicts doctrine is clearly not dispositive of this case."); *but see id.* at *6–7 (finding that the plaintiff's model codes, as adopted, were part of the public domain because they were in fact "enacted state and local laws binding on the enacting jurisdictions' constituents" and therefore not subject to copyright protection).  As the court recognized in *ASTM I*, "changes to the statutory or regulatory framework that reconsider the balancing of interests underlying modern copyright law and incorporation by reference must be made by Congress, not this court."  2017 WL 743822, at *14.  Thus, the Court rejects UpCodes'

---

[14] UpCodes does not identify any instance in which a governmental body has copied and pasted the text of an NFPA standard into a statute or regulation.  The fact that governmental bodies use IBR is an intentional policy choice: to protect NFPA's (and other SDOs') copyrights.  (JAF 2472–95); *see, e.g.*, OMB Revised Circular (IBR respects copyright); Fla. Stat. Ann. § 120.54 (permitting IBR, if "posting the material on the Internet . . . would constitute a violation of federal copyright law").

argument that case law[15] prevents NFPA from maintaining its copyright in the standards once they have been IBR-ed by a jurisdiction.

### 2. Merger Doctrine Argument

UpCodes next asks the Court to apply the "merger doctrine" to find that NFPA's standards cannot be copyrighted because the expressions in the standards have merged with the law to become facts and therefore the doctrine bars NFPA's infringement claim. "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000). "In such an instance, it is said that the work's idea and expression 'merge.'" *Id.*

In *PMIC*, the Ninth Circuit rejected this precise argument. There, Practice Management argued that the CPT was an uncopyrightable industry standard or "idea" under section 102(b) of the Copyright Act and the merger doctrine because HCFA mandated use of CPT codes in Medicaid applications. *PMIC*, 121 F.3d at 520 n.8. The court recognized that owners of copyrights in expressions mandated by industry standards may not use their copyrights to "stifle independent creative expression in the industry." *Id.* (citing *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523–24 (9th Cir. 1993)). However, the court found that the AMA's copyright did not stifle creative expression in the medical coding industry. *Id.* The court explained that the copyright did "not prevent Practice Management or the AMA's competitors from developing comparative or better

---

[15] UpCodes also relies heavily on the Fifth Circuit's decision in *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 796 (5th Cir. 2002) (en banc). *Veeck* reads *Banks* and the other government edicts cases as establishing that "the law" cannot be copyrighted. *Veeck*, 293 F.3d at 800. However, the *Georgia* Court expressly rejected that reading of those cases. Thus, *Veeck* does not control this case. *See also id.* at 803–05 (narrowing its holding to cases concerning "the wholesale adoption of a model code" for use as legislation but not to cases, like *PMIC*, that involve references to extrinsic standards); *ASTM I*, 2017 WL 473822 at *13 (finding *Veeck* did not apply because the standards at issue were not adopted verbatim in their entirety into legislation).

-18-

coding systems and lobbying the federal government and private actors to adopt them." *Id.*
Instead, the AMA's copyright "simply prevent[ed] wholesale copying of an existing
system." *Id.*

Here, too, there are numerous ways to express the ideas underlying NFPA's
standards. For example, as NFPA points out, the idea that automatic sprinklers should be
installed in certain areas can be, and has been, expressed in multiple ways. *Compare* (JAF
2410) *with* (JAF 2412). Accordingly, UpCodes' argument—that at the time it copied
NFPA's standards, those standards were "the law," which can only be expressed one way—
is foreclosed by the Ninth Circuit's *PMIC* decision.[16]

### 3. Constitutional Concerns Argument

UpCodes' final argument against the copyrightability of the at-issue standards is that
permitting private ownership of standards essential to understanding legal obligations
implicates serious due process and First Amendment concerns. (MSJ at 60–61 (citing
*ASTM II*, 896 F.3d at 447)).

In *ASTM II*, PRO raised virtually identical arguments. *See ASTM II*, 896 F.3d at
446. However, the D.C. Circuit declined to rule on the "thorn[y] question of whether
standards retain their copyright after they are incorporated by reference into law," 896 F.3d
at 441. Instead, the D.C. Circuit found it best to address only the statutory fair use issue
and leave for another day the question of whether the Constitution permits copyright to
persist in works incorporated by reference into law. The Circuit Court took this approach
to "avoid 'passing on questions of constitutionality unless such adjudication is
unavoidable.'" *Id.* (citing *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944))
(alterations omitted). "After all," the Circuit Court found, "it is one thing to declare that
'the law' cannot be copyrighted but wholly another to determine whether any one of these

---

[16] UpCodes argues that *PMIC* is distinguishable because the numbering system at issue
was not "the law," so the party accused of infringement was not similarly constrained.
(MSJ at 44–45). However, for the reasons explained more fully above, the Court rejects
UpCodes' attempt to distinguish *PMIC* on the basis that it did not involve AMA's
copyright over "the law."

incorporated standards—from the legally binding prerequisite to a labeling requirement, to the purely discretionary reference procedure—actually constitutes 'the law.'" *Id.* (internal citations omitted). Moreover, the D.C. Circuit's decision to avoid the constitutional questions that PRO raised—and that UpCodes raises here—also served to limit "the economic consequences that might result from the SDOs losing copyright." *Id.* It also avoided the need to create several unique caveats to copyright law for incorporated standards depending on how the particular standard was IBR-ed into law. *Id.*

Here, the Court finds the D.C. Circuit's reasoning persuasive and will therefore follow it and defer adjudication of UpCodes' constitutional concerns as to the "law" it publishes for a later day. This approach is particularly prudent given that UpCodes has provided no evidence that NFPA has eliminated or threatened public access to its IBR-ed standards. Indeed, the record contrarily demonstrates that NFPA has made its IBR-ed standards readily available to the public without charge through multiple channels, including through its website and at government offices and libraries, *see* (JAF 2471), thereby quelling potential due process concerns. *See PMIC*, 121 F.3d at 519. Thus, as in *PMIC*, any due process "requirement of free access to the law" does "not justify termination of" NFPA's copyright in the IBR-ed standards.

Further, as discussed below, genuine disputes of material facts exist regarding whether UpCodes has published only IBR-ed standards as "the law" or has also published NFPA standards that have been amended, deleted, or expressly excluded from the law, or that have otherwise not been mentioned in any statute, regulation, or ordinance.

Finally, regarding UpCodes' First Amendment argument, the Court agrees with NFPA that the Copyright Act already accommodates First Amendment concerns, including "through the idea /expression dichotomy, merger doctrine, and doctrine of fair use. (MSJ at 63).

In sum, neither the Copyright Act nor controlling precedent serves to invalidate NFPA's copyright protection when a government body IBRs NFPA's standards. The Court recognizes there are substantial policy arguments on both sides of this issue, including the

need to preserve a vital public-private partnership between the government and SDOs, and the need for the public to have a full understanding of how to comply with various legal requirements. Ultimately, though, this suit is not about access to "the law," despite UpCodes' attempting to frame it as such, but instead about the validity of NFPA's copyrighted standards under current federal law. "Copyright protection is a creature of statute, and as such is the result of careful policy considerations by Congress." *ASTM I*, 2017 WL 473822, at *9. "Congress has already passed on the question of revoking copyright protection for standards that have been incorporated by reference into regulations, and any further consideration of the issue must be left to Congress for amendment." *Id.* Indeed, "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Eldred v. Ashcroft*, 537 U.S. 186, 212 (2003). The Copyright Act specifies circumstances in which a copyright owner may lose a vested copyright interest. *See* 17 U.S.C. § 302 (term expiration); *id.* §§ 204, 304(c) (termination). UpCodes has failed to show that a governmental jurisdiction's IBRing alone of a standard is among them.

Accordingly, NFPA is entitled to summary adjudication in its favor on the elements in its copyright infringement causes of action that (1) NFPA owns a valid copyright in its standards, whether IBR-ed or not; and (2) UpCodes has infringed NFPA's copyright in the at-issue standards by exercising without NFPA's authorization at least one of NFPA's exclusive rights under 17 U.S.C. § 106. ("NFPA's Motion").

## B. Fair Use Framework

Alternatively, UpCodes argues that, even if NFPA has established a *prima facie* case of copyright infringement, UpCodes' conduct is excused by the affirmative defense of fair use. The Court thus considers this affirmative defense next.

"The Copyright Act encourages creativity by granting to the author of an original work 'a bundle of exclusive rights.'" *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985)). It gives creators "the exclusive right[ ]" to

-21-

"reproduce," "distribute," and "perform" the copyrighted works.  17 U.S.C. § 106(1), (3)–(4).  It is through these protections that Congress has "motivate[d] the creative activity of authors and inventors" so that the public can benefit from "their genius."  *Sony*, 464 U.S. at 429.  Moreover, the Copyright Act "reflects a balance of competing claims upon the public interest:  Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts."  *Id.* (citation omitted).  The defense of "fair use" aims to strike the proper balance between encouraging creativity and ensuring availability.  *Id.*  "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, to promote the progress of science and useful arts."  *Campbell* v. *Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994).

To determine whether a particular use is "fair," the statute sets out four factors to be considered:

> (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)    the nature of the copyrighted work;
>
> (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  The fair use doctrine "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Stewart v. Abend*, 495 U.S. 207, 236 (1990) (internal quotation marks omitted).  The doctrine "set[s] forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances."  *Google LLC*, 593 U.S. at 19.  Fair use is a "flexible" concept, and "its application may well vary depending on context."  *Id.*  "All [the factors] are to be explored, and the results weighed together, in light of the purposes of copyright."  *Campbell*, 510 U.S. at 578 (holding that commercial character of

song parody did not create presumption against fair use).  The four statutory factors must be balanced "in light of the objectives of copyright law, rather than view[ed] as definitive or determinative tests."  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003).

The Supreme Court and Ninth Circuit "have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use."  *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020).  Here, therefore, UpCodes "bears the heavy burden of showing there are no genuine issues of material fact" about whether its copying was fair.[17]  *See Ambat v. City and Cnty. of S.F.*, 757 F.3d 1017, 1031 (9th Cir. 2014).  Before turning to the four factors, the Court considers recent cases that have addressed similar claims of copyright infringement and fair use.

### 1.    ASTM

Plaintiffs American Society for Testing and Materials, NFPA, and American Society of Heating, Refrigerating, and Air-Conditioning Engineers (collectively "ASTM Plaintiffs") sued PRO alleging copyright infringement in the District Court for the District of Columbia.  PRO is a non-profit with the stated mission of "mak[ing] the law and other government materials more widely available."  *ASTM I*, 2017 WL 473822, at *2 (citation omitted).  PRO sought to post copies of Plaintiffs' standards on its website so that others would be able to copy, print, distribute, or make derivative works of Plaintiffs' standards for free.  The ASTM Plaintiff's brought suit against PRO under the Copyright Act (17 U.S.C. § 101 *et seq.*) and the Lanham Act (15 U.S.C. § 1051 *et seq.*), alleging copyright infringement and trademark infringement.  The district court granted summary judgment and permanent injunctive relief to Plaintiffs.  *ASTM I*, 2017 WL 473822, at *25.  PRO appealed.

On appeal, PRO argued that IBR makes the standards "part of the 'law,'" that the law can never be copyrighted, and that PRO's use was fair.  *ASTM II*, 896 F.3d 437, 446.

---

[17] Judge Fischer previously denied NFPA's motion for a preliminary injunction "without prejudice to a motion on a fuller record."  (PI Order at 13).  The Court's prior analysis was also based on assessing NFPA's likelihood of success on the merits.

The D.C. Circuit found that PRO's first argument presented a "serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations, but opted to save this "thorn[y]" constitutional question "for another day." *Id.* at 447, 441. As stated previously, it explained that it could resolve the appeal within the confines of the Copyright Act without addressing the constitutional question, a course that was particularly prudent because the record revealed little about how the challenged standards were incorporated. *Id.* at 447. The Circuit explained that its narrow approach avoided creating "sui generis caveats to copyright law for incorporated standards." *Id*.

The D.C. Circuit then addressed the second of Defendant's two main arguments: that its use of Plaintiffs' copyright material was permissible "fair use" because it facilitates public discussion about the law—a use within the "public domain." *Id*. at 446. Though the Circuit Court found reason to believe "as a matter of law" that Defendant's "reproduction of certain standards 'qualif[ied] as a fair use of the copyrighted work,'" it reasoned that "the better course [was] to remand the case for the district court to further develop the factual record and weigh the [four fair-use] factors as applied to [Defendant's] use of each standard in the first instance." *Id*. at 448–49 (quoting *Harper & Row*, 471 U.S. at 560).

The D.C. Circuit found that the standards "and the modes of their incorporation var[ied] too widely to conclusively tell goose apart from gander, and the record [was] just too thin to tell what went into the sauce." *Id*. at 449. The D.C Circuit blamed the parties, "who poorly served the [district] court by treating the standards interchangeably." *Id*. The Circuit Court then proceeded to provide guidance to the district court in applying the four fair use factors on remand. This Court discusses those most relevant to the instant case.

As to the first factor, the D.C. Circuit found that the district court "properly rejected some of [defendant's] arguments as to its transformative use—for instance, that [defendant] was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards." *Id*. at 450. On remand, though, the D.C. Circuit directed the district court to consider

"whether, in certain circumstances, distributing copies of the law for purposes of facilitating public access could constitute transformative use." *Id.*  The Circuit Court made clear that "the law" for these purposes was not co-extensive with all IBR-ed material and that the fairness of "[Public.Resource.Org]'s specific use" must be assessed for each portion of a standard.  *See id.* at 450-51.  The Circuit Court distinguished between an incorporated standard that "provides information essential to comprehending one's legal duties," which "would weigh heavily in favor of permitting a nonprofit seeking to inform the public about the law to reproduce in full the relevant portions of that particular standard," and the incorporation of a standard as a reference procedure, which does not. *Id.*

The Circuit Court added, "[a]lthough PRO's copies of the technical standards may, in some cases, serve as a substitute for the SDOs' versions, little, if anything, in the record indicates that PRO stands to profit from its reproduction.  Moreover, the district court discounted PRO's claimed purpose, reflected in the organization's mission statement and summary-judgment submissions to the court, that it was distributing the standards to facilitate public debate." *Id.* at 449.

The Circuit Court found, however, that the record did not support the conclusion that PRO distributed copies of the incorporated standards solely to undermine the ASTM Plaintiffs' ability to raise revenue.  *Id.* at 448 (citing *ASTM I*, 2017 WL 473822, at *18). Instead, the Circuit Court credited PRO's stated purpose to educate "the public about the specifics of governing law."  *Id.*  The Circuit Court also disapproved of the way in which the district court and parties "treat[ed] the standards interchangeably" by not considering the variations and legal statuses of each of the standards.  *Id.* at 448–49.  It therefore directed the district court to reconsider PRO's defense on "a fuller record regarding the nature of each of the standards at issue, the way in which they [were] incorporated, and the manner and extent to which they were copied by [PRO]." *Id.* at 449.  However, the Circuit Court made clear that the district court need not analyze each standard individually,

especially when the "standards [were] susceptible to groupings that are relevant to the fair use analysis." *Id.*

As to the second fact—nature of the copyrighted work—the Circuit Court stated that this inquiry "demands an individual appraisal of each standard and its incorporation." *Id.* at 451. The Circuit Court noted that "Courts often reduce this inquiry to the question of whether the work is factual or fictional, as '[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.'" *Id.* (quoting Harper & Row, 471 U.S. at 563). In considering the works in question before the district court, the Circuit Court found "[a]ll of the works at issue [ ] [fell] at the factual end of the fact-fiction spectrum, which counsel[ed] in favor of finding fair use." *Id.* That said, it stated that where the work falls on this spectrum is just one heuristic for assessing whether the work falls under copyright protection. *Id.* The Circuit Court found that the standards at issue had "all, in some capacity, been incorporated by reference into law." *Id.* Based on this fact, as well as its reliance on the *Banks'* cases holding that judges may not copyright the law, *see* 128 U.S. at 253, and a Sixth Circuit case holding that a person may publish the law of a state, the D.C. Circuit concluded "we think that standards incorporated by reference into law are, at best, at the outer edge of 'copyright's protective purpose.'" *Id.* The D.C. Circuit noted, however, that how close IBR-ed standards come to the edge will vary standard by standard. *Id.* at 452. "Where the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standard has been expressly copied into law, this factor weighs heavily in favor of fair use. But where the incorporation does not lend to such easy substitution, fair use is harder to justify." *Id.*

As for the fourth factor, the Circuit Court noted that PRO's use of the standards was not for 'commercial purposes," but it remanded the case to the district court to determine this factor on a fuller record. *Id.* at 452-53.

### 2.    Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith

This case arose out of the licensing of a Warhol silkscreen print by the Andy Warhol Foundation for the Visual Arts ("AWF") to a magazine. In 1984, rock-and-roll

photographer Lynn Goldsmith licensed her photograph of the artist Prince in her studio to Vanity Fair for a single use as an "artist reference for an illustration" that the magazine commissioned Warhol to create. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 508 (2023). Later, Warhol used the photograph to create the "Prince Series," consisting of "13 silkscreen prints and two pencil drawings." *Id.* at 518. After Prince's death in 2016, AWF licensed one image from the Prince Series (the "Orange Prince") to Condé Nast (Vanity Fair's parent company) to use in a Vanity Fair commemorative edition celebrating Prince. *Id.* at 508. Goldsmith notified AWF that she believed that the image violated her copyright, and AWF sued Goldsmith and her agency seeking a declaratory judgment of noninfringement or, in the alternative, fair use. Goldsmith counterclaimed for infringement. *Id.*

The district court granted summary judgment in favor of AWF, holding that the Prince Series works were fair uses of Goldsmith's photograph. *Id.*. The Second Circuit reversed, holding that "all four fair use factors favored Goldsmith." *Id.* AWF sought and the Supreme Court granted *certiorari* on the narrow question of whether the first of the four fair use factors—"the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"—weighed in Goldsmith's favor. *Id.*

The Supreme Court affirmed the Second Circuit's decision. Summarizing the first fair use factor, the Court explained that, "whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use. If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.* at 532.

In framing the first fair use factor this way, the Supreme Court cautioned that "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative

works." *Id*. at 529.  Thus, to protect a copyright owner's exclusive right to prepare derivate

works—i.e., any other form in which a work may be recast, transformed, or adapted—"the

degree of transformation required to make 'transformative' use of an original must go

beyond that required to qualify as a derivative." *Id*.  Equally important, the Court

underscored that a "use that has a distinct purpose is justified because it furthers the goal

of copyright, namely, to promote the progress of science and the arts, without diminishing

the incentive to create." *Id*. at 510-511.  By contrast, uses that share the purpose of a

copyrighted work simply provide a "substantial substitute for matter protected by the

copyright owner's interests in the original work or derivatives of it, . . . which undermines

the goal of copyright." *Id*. at 531-532 (original alterations omitted, internal quotation

marks and citation omitted).

To demonstrate the first factor's focus on the "specific use" at issue, the Court

referenced Warhol's famous Campbell's soup.  Whereas the purpose of Campbell's soup

logo is to advertise soup, the Court explained that Warhol's "canvases do not share that

purpose." *Warhol*, 598 U.S at 539.  Instead, Warhol's Soup Cans series "uses Campbell's

copyrighted work for an artistic commentary on consumerism, a purpose that is orthogonal

to advertising soup." *Id*.  The Court explained that Warhol's "use therefore does not

supersede the objects of the advertising logo." *Id*.  By contrast, the Court held that

"portraits of Prince used to depict Prince in magazine stories about Prince . . . share

substantially the same purpose."  That purpose was the commercial licensing to magazines

publishing articles about Prince. *Id*. at 526  The *Warhol* Court limited its holding in

*Campbell*, which upheld fair use in the context of musical parody.  *Campbell v. Acuff-Rose

Music, Inc.*, 510 U.S. 569, 579 (1994).  The Court explained that *Campbell* "cannot be read

to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning

or message." *Warhol,* 598 U.S. at 541.

The Supreme Court concluded that the first factor favored the copyright holder,

Goldsmith, largely because the specific use that Goldsmith challenged "share[d]

substantially the same purpose" as the uses Goldsmith commonly made of her photographs.

-28-

*Id*. at 537-538.  The Court explained that, because both Goldsmith's original photograph and Warhol's license of Orange Prince to Condé Nast involved "portraits of Prince used in magazines to illustrate stories about Prince," the uses were not "distinct and different."  *Id*. at 535-536.  That is, the two uses shared the same objectives, even if they were not "perfect substitutes."  *Id*. at 536.  While acknowledging the differences in portrayal and the alleged infringer's claim that the painting added a new meaning or message—that it served as a comment on the dehumanizing nature of celebrity—the Court nonetheless determined that the "commercial nature of the use . . . looms larger."  *Id*. at 547 (original alterations omitted, internal quotation marks and citation omitted).  Thus, because "Goldsmith's original photograph of Prince, and AWF's copying use of that photograph in an image licensed to a special edition magazine devoted to Prince, share substantially the same purpose, and the use is of a commercial nature," the first fair use factor weighed in favor of the copyright owner.  *Id*. at 550.

### C.  Fair Use Application

With the above legal backdrop in mind, the Court applies the fair use factors to the facts of the present case.

#### 1.  Purpose and Character of UpCodes' Use

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  This factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'"  *Warhol*, 598 U.S. at 511 (citing 17 U.S.C. § 107).  "The central question it asks is whether the new work merely supersedes the objects of the original creation ('supplanting' the original), or instead adds something new, with a further purpose or different character."  *Id.* at 509 (internal quotation marks and alterations omitted).  The first factor "relates to the problem of substitution"—"copyright's bête noire"—and thus does not protect the later "use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work."  *Id.* at 528.  When the

later work will "substitute for" or "supplant" the original work, the first factor cuts against the fairness of the later use. *Id.*

The fact that most copying "has some further purpose, in the sense that copying is socially useful *ex post*," does not render such uses fair. *Id.* at 528-529 (noting that "[m]any secondary works add something new"). Instead, the first factor asks "whether *and to what extent*" the use at issue has a purpose or character different from the original." *Id.* at 529 (emphasis in original). The question "is a matter of degree." *Id.* at 528. The larger the difference, the more likely the first factor weighs in favor of fair use. The smaller the difference, the less likely. *Id.* at 529. A use that has a further purpose or different character is said to be "transformative." *Id.* Though it is not strictly necessary for a fair use to be transformative, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. To determine whether a work is transformative entails "an objective inquiry into what was made, i.e., what the user does with the original work." *Warhol*, 598 U.S. at 545. Whether a work is transformative "cannot turn merely on the stated or perceived intent" of the infringer. *Id.* The "subjective intent of the user (or the subjective interpretation of a court)" cannot determine the purpose of the use. *Id* at 545.

Additionally, the mere introduction of "some new expression, meaning, or message" is not enough to tip the factor toward fair use. If it were, "'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." *Id.* at 512. The Copyright Act "defines derivative works, which the copyright owner has 'the exclusive right' to prepare, to include 'any other form in which a work may be recast, transformed, or adapted.'" *Id.* at 529 (internal citations and alteration omitted). "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.*

Lastly, the fact that an infringing "publication was commercial as opposed to nonprofit . . . tends to weigh against a finding of fair use." *Harper & Row*, 471 U.S. at 562. The commercial nature "is to be weighed against the degree to which the use has a

-30-

further purpose or different character." *Warhol*, 598 U.S. at 510; *see also Campbell*, 510 U.S. at 579.  Thus, where "an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.*

a)      *Transformative*

UpCodes' specific use of NFPA's standards share the same purpose as NFPA's use. The Court agrees with NFPA that there is no daylight between UpCodes' commercial use of the standards and NFPA's use.  The core of what UpCodes markets, displays, and distributes is the text of NFPA's standards (JAF 2928-70), and UpCodes' copies are near-perfect (JAF 2933–37) or perfect (JAF 2929–32) substitutes for NFPA's standards.  Each of the NFPA standards currently posted on UpCodes is available on NFPA's Free Access website, after logging in to a free account.  (JAF 2439).  The Court's holding rests on several considerations.

First, UpCodes' use shares the same overriding purpose as NFPA's—namely, to provide access to the text of NFPA's standards for AEC companies and professionals who use those standards for various reasons in their jobs.  (JAF 2939–40, 3009).  Just as AWF's licensing of Orange Prince substituted for Goldsmith's licensing of her photo for magazine profiles, UpCodes offers an effective substitute for the "typical use" of NFPA's standards by licensees and professionals in the AEC industries. *Warhol*, 598 U.S. at 534; JAF 2938-41.  As the record on summary judgment demonstrates, UpCodes copies NFPA's standards nearly verbatim and wholesale, and then displays and distributes near identical copies to its users.

Second, UpCodes urges the Court to consider its stated mission: to make it easier for both industry professionals and laypeople to understand how to comply with state and local building codes.  (JAF 2).  However, *Warhol* makes clear that the Court may engage only in an "objective inquiry" into "what the user does with the original work;" the user's "subjective intent" is irrelevant.  In other words, UpCodes' purported intent to publish "the law" with a "socially useful purpose" does not make its use of NFPA's standards

-31-

transformative.  To the contrary, the objective nature of UpCodes' actual infringement shows that it is opposed to its stated purpose.  UpCodes does not generally copy, display, or distribute the laws promulgated by legislatures and other bodies.  Instead, UpCodes frequently wholesale copies NFPA's standards, even if those copied standards are "not required" for compliance with the law.  (JAF 2829-35).  Indeed, UpCodes displays vast swaths of NFPA's standards that are not, by their own account, "the law," including over one thousand informational notes that are not "enforceable as requirements."  (JAF 2773-74).  As such, UpCodes' use of NFPA's standards is dramatically over-inclusive for serving its claimed purpose, as NFPA rightly notes.  (ECF No. 201-1 at 8).

Third, UpCodes' inconsistent addition of amendments in a small fraction of its copies does not make its use transformative.  *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (magazine's "wholesale copying sprinkled with written commentary [] was at best minimally transformative" and such minimal transformation was "substantially undercut by its undisputed commercial use").  Indeed, the Court in *Warhol* addressed a similar argument when it rejected the doctrine that "any use that adds some new expression, meaning, or message" is transformative because such an expansive doctrine "would swallow the copyright owner's exclusive right to prepare derivative works."  598 U.S. at 541.  To preserve that right — namely, to make derivative works — the degree of transformation "required to make 'transformative' use of an original must go beyond that required to qualify as a derivative."  *Id.* at 510.  Thus, UpCodes' inconsistent addition of amendments in a small fraction of its copies of NFPA's standards does not make UpCodes' use transformative.[18]

Finally, even if the amended sections added by UpCodes are minimally transformative, the fact that a small fraction of NFPA's standards contain these added

---

[18] To be clear, the Court does not find that making "the law" freely available and more accessible on the internet can never be a transformative use.  But UpCodes has not shown that any of its additional features furthers a legitimate goal of aiding the public.  "Copying might have been helpful to convey a new meaning or message.  It often is.  But that does not suffice under the first factor."  *Warhol*, 598 U.S. at 547.

amendments does not justify UpCodes' copying of all the other sections of NFPA's standards that do not contain amendments. *Warhol* emphasized copyright's "tradeoff between stimulating innovative activity" and "allowing follow-on innovation." *Id.* at 549. Here, UpCodes has failed on summary judgment to show any innovation beyond copying and repackaging NFPA's copyrighted standards.

b) *Commercial*

*Warhol* asserts that whether a "use is commercial as opposed to nonprofit is an additional 'element of the first factor.'" *Id.* at 531 (citation omitted). UpCodes is a for-profit corporation aimed at achieving a $1 billion valuation. (JAF 2858, 2860). UpCodes' unlicensed use of NFPA's standards on both its "free" and "paid" tier has one objective purpose: making money. (JAF 2860–2927). The objective purpose behind UpCodes' posting of the standards for free is to serve its "freemium" business strategy. (JAF 2904). Under that strategy, UpCodes' free tier provides access to NFPA's standards (and other SDOs' standards), and the paid tier provides access to additional features such as advanced search capabilities and compliance tools. (JAF 2906). UpCodes generates revenue by attracting users to its website, offering some content for free to funnel prospective customers to its platform, and monetizing a portion of its free-tier users by converting them to paying customers. (JAF 2908). Growing the number of free users helps attract financial investment and provides UpCodes' sales team with leads for account expansion. (JAF 2909–10).

Posting NFPA's standards on its free tier to grow the funnel for its paid tier is indisputably commercial.[19] (JAF 2904–08). In UpCodes' own words, its use of NFPA's standards "redounds to its commercial benefit." *See* (MSJ at 72). The commercial character of UpCodes' use thus weighs strongly against the fair use defense. *See Warhol*,

---

[19] UpCodes' founder summarized the company's freemium strategy in a June 2017 email: "We currently provide the codes online for free to drive SEO and work to convert the visitors onto a premium tier." (JAF 2913; JAE Ex. 246).

598 U.S. at 537–39; *Google LLC*, 593 U.S. at 1199 ("wholesale copying aimed at creating a market substitute is presumptively unfair").[20]

c)    *Justification for the Use*

The Court in *Warhol* explained that the "justification" for the use at issue must be considered as part of the first fair use factor. *Warhol*, 598 U.S. at 531. A use that has a distinct purpose is "justified because it furthers the goal of copyright." *Id*. By contrast, a use that shares the purpose of a copyrighted work "is more likely to provide the public with a substantial substitute for matter protected by the [copyright owner's] interests in the original work or derivatives of [it]," which undermines the goals of copyright. *Id*. at 531–32. Because justificatory strength is a matter of degree, the stronger the justification the more likely it is that such a copying will satisfy the first prong of the fair use analysis. Where copying is for a commercial use similar to the original, "a particularly compelling justification is needed." *Warhol*, 598 U.S. at 547.

Nevertheless, narrower grounds for justification may exist if the "copying is reasonably necessary to achieve the user's new purpose." *Id.* at 532. This is true, for instance, when a secondary work parodies the original. For such a use to pass muster under the first prong of this test, a court must ask if the justification for the copy is sufficiently powerful.

Even taking UpCodes' stated purpose at face value, its copying is not "reasonably necessary to achieve" that purported purpose. *Id*. at 532. UpCodes' argument rests on the premise that providing access to the text of NFPA's standards is itself an independent justification for its copying. (Reply at 6). But whether there is an independent justification for the copying must be evaluated through the lens of the infringer's new and different purpose. *Warhol*, 598 U.S. at 531–32. That UpCodes provides access to the text of

---

[20] UpCodes' commercial use also fundamentally distinguishes this case from the non-profit uses addressed in *ASTM II*. *See ASTM II*, 896 F.3d at 449 (finding that little, if anything, in the record indicate[d]" that the defendant, a free website hosting standards incorporated into law, "[stood] to profit from its reproduction" of the law).

-34-

standards is not new or different because NFPA already provides free access to the same standards. Like satire or Warhol's commentary on celebrity, providing information about "the law" in various jurisdictions is a message that "can stand on its own two feet." *See id.* at 547 (the mere fact that copying may be "helpful to convey a new meaning or message" is insufficient to justify commercial copying for similar use). If it were the case that UpCodes merely wanted to share NFPA's IBR-ed content, rather than exploiting NFPA's copyrighted works without authorization, UpCodes could have simply linked its users to NFPA's Free Access. (JAF 2980).

### 2.   Nature of the Copyrighted Work

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). "Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works." *Kelly*, 336 F.3d at 820 (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001)). Consequently, "under this factor, the more creative a work, the more protection it should be accorded from copying." Nimmer on Copyright § 13.05[A][2][a].

On NFPA's motion for preliminary injunction, Judge Fischer noted that in *ASTM II*, 896 F.3d at 451, the D.C. Circuit found that the standards at issue had "all, in some capacity, been incorporated by reference into law, and . . . the express text of the law f[ell] plainly outside the realm of copyright protection," but "where the incorporation [did] not lend to such easy substitution, fair use [was] harder to justify." (PI Order at 9-10). Thus, like *ASTM II*, Judge Fischer found as to NFPA's IBR-ed standards that "the actual text of the law is factual" weighing "strongly in favor of a finding of fair use," but that the portions of the standard, such as informational notes, that had not been adopted into law posed a closer question." *Id.* at 10. Although Judge Fischer concluded that NFPA's non-IBR-ed copied content was largely factual and weighed in favor of a finding of UpCodes' fair use,

-35-

Judge Fischer denied a preliminary injunction because the Court had insufficient information before it to make the determination whether UpCodes' reproduction of the standards was fair use. *Id.* at 4, 10.

Here, at the summary judgment stage, the record still does not allow for this Court to determine the second factor as a matter of law. Although this factor requires "an individual appraisal of each standard and its incorporation by reference," *see ASTM II*, 896 F.3d at 451, UpCodes has not shown as to each standard (to the extent that it has identified each standard or portion thereof for which it asserts fair use), that no genuine issue of material fact exists. To the contrary, the parties dispute a number of material facts regarding such standards. For example, UpCodes claims that it only posts the "law,"— namely, NFPA's standards as adopted by specific jurisdictions. *See* (Reply at 9, 13). NFPA argues, however, that UpCodes also posts NFPA's standards or portions of its standards that jurisdictions have either deleted, amended, or explicitly excluded from their governing requirements, or that are not mentioned in any statute, regulation, or ordinance. *See* (JAF 369, 2662-717). In support, NFPA points to the following examples, among others:

- **NFPA 58**: UpCodes posts the full text of NFPA 58: Liquefied Petroleum Gas Code without amendments as "the law" of Alabama, New Jersey, and Minnesota. (JAF 2663, 2680, 2695). However, those states have incorporated that standard with extensive amendments, (JAF 2662-706, including deleting dozens of sections and whole chapters that UpCodes posts); (JAF 2665-68, 2682-83, 2696-98). *See, e.g.*, N.J. Admin. Code § 5:18-3.1. New Jersey expressly amended Section 6.5.3.13 of NFPA 58 (2017) "to delete the words '600 volts, nominal' and replace them with the words '240 volts, nominal.'" JAF 2684. UpCodes does not post that amendment—it posts NFPA's copyrighted text. (JAF 2685).

- **NFPA 211**: UpCodes posts the entirety of NFPA 211 as "the law" because some jurisdictions IBR the International Mechanical Code ("IMC"). (JAF

300-01; 2718-21).  But the IMC's only reference to NFPA 211 is a section that reads "Metal chimneys shall be constructed and installed in accordance with NFPA 211." (JAF 2722-23).  The IMC adopts different rules that do not look to NFPA 211 for other topics like factory-built chimneys, masonry chimneys, and connectors.  (JAF 2728-29). UpCodes nevertheless posts the NFPA 211 chapters on each of those topics.  (JAF 2730-43).  The IMC is explicit that referenced standards, like NFPA 211, "shall be considered as part of the requirements of this code to the prescribed extent of each such reference." (JAF 252).  Even if Maryland's incorporation of the IMC justified posting NFPA 211's chapter on metal chimneys, it could not possibly justify UpCodes' position that the law of Maryland includes other portions of the NFPA 211 that are not only not referenced in the IMC, but are in conflict with provisions of the IMC.

- **NFPA 221 (2015)**: UpCodes relies on the IBC (2015) as the basis for posting NFPA 221 (2015): Standard for High Challenge Fire Walls, Fire Walls, and Fire Barrier Walls in full.  (JAF 302-05).  As NFPA 221's name would suggest, a "fire wall" is different than a "fire barrier wall." (JAF 2749).  The IBC's only reference to NFPA 221 is a provision addressing fire walls.  (JAF 2746).  The IBC contains different rules for fire barriers.  (JAF 2750).  Yet UpCodes posts NFPA 221's chapter on fire barriers as "the law" of jurisdictions that have incorporated the IBC.  (JAF 2744-54); *see also* (JAF 2755-62) (additional example with respect to UpCodes' NFPA 853 (2015) posting).

- **NFPA 1 (2018)**: UpCodes relies on 815 Ky. Admin. Regs. 10:060 (2022) as the basis for posting NFPA 1 (2018).  That regulation does IBR NFPA 1 (2018), but the regulation also states that it "shall apply to all buildings except one (1) and two (2) family dwellings." 815 Ky. Admin. Regs. 10:060, §§ 2(1), 8 (2022).  Nonetheless, UpCodes posts sections of NFPA 1 (2018) that are

specifically and exclusively applicable to one and two family dwellings as the law of Kentucky. (JAF 2763-67).

Moreover, UpCodes essentially concedes that UpCodes has published deleted, amended, or expressly excluded standards, argues that the publication of such standards was "error," and represents that, since being made aware of these errors through NFPA's Motion, UpCodes has corrected the errors. (Reply at 14; *see e.g.*, JAF 2663, 2666, 2668, 2670, 2672, 2679, 2680, 2683, 2685, 2688, 2690, 2695, 2698, 2700, 2702). But even if this Court were to assume these postings of NFPA's standards were mere error—which the Court need not do on UpCodes' Motion—UpCodes' correction does not preclude a trier of fact from finding that, as to these "errors," UpCodes infringed NFPA's copyrights, at a minimum, during the time that NFPA's non IBR-ed standards were posted on UpCodes' website. Nor does it preclude a determination that UpCodes' conduct did not constitute fair use. Thus, given the fact that UpCodes has not provided specific, competent, and undisputed evidence on summary judgment that it publishes only largely factual content from NFPA's standards as "the law," the Court here finds that a genuine dispute of material fact exists as to the second factor.

### 3. Amount and Substantiality of the Portion Used

The third factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), asking whether the portion copied is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. "[T]he extent of permissible copying varies with the purpose and character of the use." *Id.* at 586–87. This inquiry is concerned with "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Dr. Seuss*, 983 F.3d at 456 (quoting *Seltzer*, 725 F.3d at 1178). This factor weighs against fair use if the infringer publishes "the heart" of the copyrighted work without justification. *Monge*, 688 F.3d at 1179.

Here, the Court finds UpCodes posts online a significant portion—or the "heart"—of each of the NFPA standards it has copied. (JAF 2928). Although UpCodes asserts that

-38-

it does not post model codes *as* model codes, this is a distinction without a difference, especially given the Court's above discussion of the first fair use factor.  (JAF 2928).  As the Ninth Circuit has held, "[w]hile wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (internal quotation marks and citation omitted).

Notwithstanding, to support its actions as fair use, UpCodes argues that, because UpCodes disseminates the law, "which often constitutes entire portions of the works in suit, this factor must weigh in favor of finding fair use."  (MSJ at 73).  In making this argument, UpCodes quotes Judge Fischer's finding as to the PI Order that this third factor "weighs in favor of fair use."  (PI Order 10).  As stated previously, at the Preliminary Injunction stage, Judge Fischer was working with a limited record, which pales in comparison to what the Court currently has before it.  This is a distinction with a difference. Here, the record developed shows that UpCodes posts to its site a significant portion of each of the NFPA standards it has copied.  (JAF 2928).  As such, this factor tends not to weigh in favor of fair use.

### 4.    Effect of the Use

The fourth and final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  Of the enumerated factors courts consider in the fair use analysis, the fourth factor—market harm—"is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566.  "This factor encompasses both (1) 'the extent of market harm caused by the particular actions of the alleged infringer,' and (2) 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original' and 'the market for derivative works.'" *McGucken v. Pub Ocean Ltd*., 42 F.4th 1149, 1163 (9th Cir. 2022) (citing *Dr. Seuss*, 983 F.3d at 458). The fourth factor requires courts to ask whether consumers treat a challenged use "as a market replacement" for a copyrighted work or a market complement that does not impair

-39-

demand for the original.  *Campbell*, 510 U.S. at 591.  When "'the intended use is for commercial gain,' the likelihood of market harm 'may be presumed.'"  *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 531 (9th Cir. 2008) (citing *Sony*, 464 U.S. at 451).

When a case involves commercial use, such as here, "the defendant must rebut that presumption of market effect."  *ASTM III*, 597 F. Supp. 3d at 237; *see also Sony*, 464 U.S. at 451 ("If the intended use is for commercial gain, that likelihood may be presumed.  But if it is for a noncommercial purpose, the likelihood must be demonstrated."); *Campbell*, 510 U.S. at 590–91 (holding that, because fair use is an affirmative defense, "its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets," and that a silent record on the fourth factor "disentitled the proponent of the defense" to summary judgment); *Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*, No. 17-CV-07249-RS, 2018 WL 5310831, at *5 (N.D. Cal. June 29, 2018) ("The burden is thus on defendants to disprove market harm.").

UpCodes argues its infringement has no effect upon the potential market for NFPA's standards because (1) there is no cognizable market for NFPA's standards, given that copyright does allow for the exclusive right to speak the law, and (2) UpCodes provides access only to the laws, not model codes.  (MSJ at 73–74).  NFPA contests both contentions, arguing that, "if UpCodes' conduct were to become widespread, it would become increasingly difficult for NFPA (and its authorized licensees) to compete."  (MSJ at 84).  Additionally, "[i]n a landscape where NFPA shoulders all of the costs to develop the standards and UpCodes (and copycats) pay nothing, NFPA would be at an unsustainable competitive disadvantage."  *Id.*

The Court here agrees with NFPA that UpCodes has not met its burden to affirmatively show no genuine dispute of material fact exists on the issue of market harm.  To the contrary, NFPA and UpCodes have both provided evidence that, if UpCodes can continue with its current practices, or if these practices become widespread, it may be exceptionally difficult for NFPA to compete.  The resulting revenue loss would potentially

-40-

imperil NFPA's self-funded, voluntary consensus development model.  (JAF 3054-55).[21]
As the Court recognized above, NFPA and UpCodes have the same target market.[22]
Additionally, UpCodes and NFPA compete for the same customers and sales.   The
potential for market harm is thus great.  This, along with the fact that UpCodes business is
for commercial gain, precludes UpCodes' Motion.[23]

5.    Summary & Conclusion

Fair use is a mixed question of law and fact.  If there are no genuine issues of material
fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier
of fact can reach only one conclusion, a court may conclude as a matter of law whether the
challenged use qualifies as fair use of the copyrighted work. *Worldwide Church of God v.*
*Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1115 (9th Cir. 2000).

---

[21] UpCodes' documents provide some evidence of diversionary impact from the infringement. For instance, ████████████████████████████████ and later accessed NFPA standards on UpCodes when they became available.  (JAF 3034).  Looking at another example, the architectural firm ████████████████████████ user later accessed NFPA standards on UpCodes when they became available. (*Id*. 3036).  Although the exact causal story here is unknown, the Court notes that ████████████████████████████████████████ since accessing NFPA's standards on UpCodes' website. (*Id*. 3037).  A further example is listed at JAF 3038-39.

[22] *See also* (JAF 2938) (When asked at his deposition if UpCodes is "potentially substitutional" for NFPA's products, UpCodes' expert, Douglas Kidder, testified he believed "that the NFPA free access and UpCodes' free access are similar products given the restriction that the code is available, the same text is available in both NFPA and UpCodes.").

[23] The Court here notes that, as above, there is no meaningful distinction between posting codes as codes and posting codes as law, especially when the infringer is engaged in a commercial enterprise.  Therefore, UpCodes' contention that it provides access only to the laws, not to the model codes, is inapposite and, as discussed above, incorrect.

-41-

Here, the Court holds as to UpCodes' Motion, genuine disputes of material fact exist on the affirmative defense of fair use that preclude summary judgment.

## IV. CONCLUSION

For all the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment and **GRANTS** Plaintiff's Cross-Motion for summary adjudication.

**IT IS SO ORDERED.**

DATED:  August 23, 2024



_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

-42-