UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., Plaintiff, | ) Case No. LA CV 21-05262-SPG (Ex) |
| vs. | ) Los Angeles, California |
| UPCODES, INC., | ) Wednesday, February 26, 2025 |
| Defendant. | ) (3:09 p.m. to 5:12 p.m.) |

FINAL PRETRIAL CONFERENCE AND MOTIONS IN LIMINE
BEFORE THE HONORABLE SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Recorded; CourtSmart |
| Courtroom Deputy: | Patricia Gomez |
| Transcribed by: | Jordan Keilty<br>Echo Reporting, Inc.<br>9711 Cactus Street, Suite B<br>Lakeside, California 92040<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For Plaintiff:

KELLY M. KLAUS, ESQ.
JENNIFER L. BRYANT, ESQ.
ROSE L. EHLER, ESQ.
Munger Tolles & Olson, LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
(213) 683-9100

ALEXANDRA LIM, ESQ.
Munger, Toles & Olson, LLP
601 Massachusetts Avenue, NW
Suite 500 E
Washington, D.C. 20001
(202) 220-1100

SHANNON C. AMINIRAD, ESQ.
Munger Tolles & Olson, LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000

For Defendant:

JOSEPH C. GRATZ, ESQ.
HANNAH JIAM, ESQ.
UMEET K. SAJJAN, ESQ.
Morrison & Foerster, LLP
425 Market Street
San Francisco, California 94105
(415) 268-7522

MARK D. MARCISZEWSKI, ESQ.
WHITNEY O'BYRNE, ESQ.
Morrison & Foerster, LLP
707 Wilshire Boulevard
Suite 6000
Los Angeles, California 90017
(213) 892-5200

SARA DOUDAR, ESQ.
Morrison & Foerster, LLP
12531 High Bluff Drive
Suite 100
San Diego, California 92130
(858) 720-5125

Los Angeles, California, Wednesday, February 26, 2025 3:09

--o0o--

(Call to order.)

THE CLERK: Calling item number three, Civil Case 21-5262, National Fire Protection Association, Inc. versus Upcodes, Incorporated.

Counsel, please make your appearances beginning with Plaintiff's counsel.

MS. EHLER: Good afternoon, your Honor. Rose Ehler from Munger, Tolles and Olson, for Plaintiff National Fire Protection Association, NFPA.

MS. BRYANT: Jennifer Bryant, also for Plaintiff NFPA.

MR. KLAUS: Good afternoon, your Honor. Kelly Klaus, also for NFPA.

THE COURT: All right. Good afternoon.

MS. AMINIRAD: And good afternoon, your Honor. Shannon Aminirad, also for NFPA.

THE COURT: All right. Good afternoon.

MS. O'BYRNE: Good afternoon, your Honor. Whitney O'Byrne from Morrison and Foerster, on behalf Defendant.

MR. GRATZ: Good afternoon, your Honor. Joe Gratz for Defendants.

MS. JIAM: Good afternoon, your Honor. Hannah Jiam on behalf of Defendant.

MR. MARCISZEWSKI: Good afternoon, your Honor. It's Mark Marciszewski of Morrison and Foerster on behalf of Defendant.

THE COURT: All right. Good afternoon to you all.

MS. DOUDAR: Good afternoon, your Honor. Sara Doudar on behalf of Defendants.

MS. SAJJAN: Good afternoon, your Honor. Umeet Sajjan on behalf of Defendants.

THE COURT: All right. Good afternoon to you.

And on Zoom?

MS. LIM (via Zoom): Hello, your Honor. Alexandra Lim on behalf of Plaintiff, NFPA.

THE COURT: All right. Good afternoon.

Okay. So, we're here for the final pretrial conference in this case. The jury trial is currently set for March 18. Are the parties ready?

(No audible response.)

THE COURT: Yes? Okay.

We have a lot to do today. This might be a two-part series, but my goal is to sort of go through what's still at issue based on the parties' filings and rule on hopefully most of the motions in limine. Some of them may be tentative based on issues that we will address.

So, let me just start by discussing briefly what from the parties I believe are still at issue.

So, NFPA is asserting at this point one claim for direct copyright infringement. The parties have effectively agreed that the indirect claim is a nonissue. It rises and falls with the direct claim, correct?

MS. EHLER: That's right, your Honor. There's a stipulation as it relates to the indirect claim that it rises and falls and that the Defendants either are jointly liable or not.

THE COURT: Okay. The big issue that I see -- and it was an issue to the extent you can tell in the motion for summary judgment -- is there doesn't seem to be agreement as to the works that are at issue and how to categorize them. I saw in I believe it was the Defense's memorandum of contentions of law and fact that they had listed approximately 45 codes that were at issue.

One of the difficulties that I had with the motion for summary judgment is it applies to a certain extent in abstract because it wasn't clear to me what specifically or what particular code or work was at issue for particular arguments.

My understanding is there are codes that incorporate -- that have been incorporated by reference. There are codes that have informational explanatory text associated with them. There are codes that have amendments associated with them that have or have not been adopted by

the Defense's or Upcodes, and so on. And, so, if -- if I as a judge struggle with that particular issue, I know the jury is going to struggle even more, and it really falls primarily on the Plaintiffs to have some sort of plan for the trial as to how you're going to be referring to these particular codes so that the jury knows at issue and what law that I give applies to what particular issue.

Without revealing too much, what's your plan?

MS. EHLER: Sure, your Honor. Rose Ehler for the Plaintiff.

So, there are 45 codes. We have been working through some potential stipulated facts on these issues, including the list of the codes, the copyright registration, certificate number, the date on which they were posted to Upcodes' website, and whether they are amended or unamended.

We've also been working through some stipulations that will potentially identify which codes are incorporated by reference in at least one jurisdiction, either in whole or in part, and then which codes are subject to this indirect adoption theory.

And the concept is that we'll be able to hammer out some of those details so that at least there'll be buckets as to those. I think there may be some issues for which we have arguments as it relates to one particular incorporation by reference or code that, you know, aren't

going to be the subject of stipulation, like whether or not a part of the code is enforced in a particular jurisdiction or if the incorporation by reference for that jurisdiction covers one particular subject matter but the code covers other subject matters, then, you know, we have an argument about what that means.

But our concept, your Honor -- and this relates to some of the other claims and defenses -- would be that most of that would not be for the jury to decide, that we could -- that we've got stipulations, and then ultimately, the decisions they make about fair use would likely be the same for most of the codes in the categories that we're presenting in the stipulation.

So, I don't know -- that probably doesn't give your Honor quite enough detail, but it may be more clear when the parties get through the stipulation as to what this will look like.

THE COURT: And when will the parties get through the stipulation as to what this will look like?

MS. EHLER: I think we're close.

THE COURT: All right. I seem to recall from the summary judgment motion when looking at the Joint Appendix of Facts there were a number of works that were at issue where the Defense said, Oh, we didn't realize that there was an amendment and, you know, now we do.

And my question is how do the parties plan on proceeding as to that? Are -- is the argument that it -- that the Defense is stuck with a point in time when they were unaware of the amendment or are the parties dealing with what they know now?

MS. EHLER: That particular issue hasn't been something that we've discussed together as parties yet.

THE COURT: Okay. So, anyway, that's kind of the big issue in this case in terms of having something concrete that can be shown or provided to the jury so that everybody's on the same page as to what 45 standards are at issue and what they look like and what bucket they fall into. To the extent that we can categorize them into buckets, bite size buckets that the juries can -- can deal with, that would be the cleanest way to do this trial. So, that's my hope, that the parties are going to make some headway on that particular issue and that there's not going to be a lot of dispute on that issue.

So, I'm going to put that. I'm going to put a pin in that and put it to the side for a second and move on.

Another big issue is the flow of the trial in terms of whether Plaintiff should go first versus whether the Defense should go first.

During the summary judgment stage, it seemed like -- I mean, it lent itself -- it made sense for the

Plaintiffs to go first because of the prima facie case issue. Even though there are additional elements or -- yeah, elements at issue for trial, I still think it makes sense for the Plaintiffs to go first to sort of frame the issue in terms of, again, what is at issue, what works are at issue amongst the 45, what they look like, even though the Court made determinations on elements one and two of the direct infringement claim.

And, as part of that, my tentative is to -- is to say that the Plaintiff would put forward its case in chief, to include the direct infringement claims and damages and willfulness, and then it would shift to the Defense to put forth the affirmative defense or defenses. We can talk about that.

To me that makes the most sense and is the least confusing to the jury and, of course, the Court controls the movement and the operation. So, that's what I'm putting out there.

Does the Defense wish to be heard on that issue?

MR. GRATZ: Your Honor, we -- we understand your Honor's tentative. We think that in this case, the jury will -- even if we go first, the jury will hear the set. They will hear about what these works are. They will hear from NFPA about what these works are since we will be calling them as part of our case to explain what these works

are, and they'll be hearing that in the context of what Upcodes is doing and what -- what the -- what the use is.

And, so, as we said in our papers, we think because the -- the biggest issue here is the fair use issue and it's one on which we bear the burden, we think it makes sense for us to -- to -- to present our case first. But we -- we understand that -- that there are other ways of viewing the issue.

THE COURT: Plaintiffs?

MS. EHLER: I agree with your Honor, not surprisingly, that the clarity of issues will be sufficiently advanced if the Plaintiffs are presenting their witnesses through direct examinations, explaining what the works are, how they're created, and putting that evidence on first, and the works can really only come in through the Plaintiff witnesses because they are the ones with the foundation for them. So, that's sort of the -- the first piece of the logical story.

And then, as it relates to the fair use defense, while Defendants do have the burden, that too requires understanding NFPA's purpose in creating the works to compare it to Defendant's purpose in using and posting the works. That's what Warhall (phonetic), you sort of look at the copyright holder's purpose and then compare the alleged infringer's use, and the same thing for other factors or

that their use analysis, like the potential markets, is identify what the potential markets are for the Defense to then put on evidence that they are not allegedly harmed or won't be harmed if the conduct is widespread.

So, from our perspective, for the jury, this will make much more sense if the evidence comes through in NFPA's affirmative case in chief first and then it shifts to Defendants to -- to rebut that.

And one thing we have agreed on with Defendants is that witnesses can testify at once. So, if they're on the stand once, the scope of the cross can go beyond the scope of direct. And, so, that will help, you know, with both I think understanding and efficiency of the trial.

THE COURT: I stand by my tentative. The only thing that I -- I'm sort of trying to conceptualize in my mind is where does damages fit into the -- you know, the Plaintiff's case in chief given the role that their use plays in this scenario?

MS. EHLER: They're distinct issues. So, I -- it's -- it fits it in two ways, your Honor. The same witness is both -- our expert witness is both articulating the market harm and potential market harm as it relates to factor four of the fair use analysis. That's the same witness who is also speaking to actual damages and identifying gross revenues and profits.

So, from an efficiency standpoint, it would make sense for that to come in at one time, but they're distinct, and we could separate that if that were your Honor's thinking, if there, you know, was an expert witness. So, there'd be no reason that we couldn't. But I think from an efficiency standpoint, they're all in the same witness, and they're somewhat intertwined but distant.

MR. GRATZ: And -- and our concern, your Honor, is that they would be hearing about that before they've heard about our affirmative fair use case and -- and that that may sort of be some amount of whipsawing in -- in and of itself and that if the -- if the -- if the hope is to sort of get out what the -- what the works are and then shift to what it is that was done with the works and why, what the reasons were for doing that, that that might make sense as a sequencing but that that would sort of have them put on a -- just a sort of mini case at the front and then have all of the issues going to fair use, including the testimony of our -- of our founders coming in sort of in that -- in that second portion.

THE COURT: So, with respect to damages, how many witnesses are we talking about?

MS. EHLER: We have one expert witness on damages. That's it.

THE COURT: And that's both actual and statutory?

MS. EHLER: Let me qualify that a little bit. There is some factual evidence about increased cost to NFPA that will come in through a fact witness, but the actual calculation of lost sales comes in through the expert witness. So, there are two.

Statutory damages is going to be spread across a number of witnesses because it involves the value of the works, the importance of the works. Also, aspects of that are going to come through Defendant's witnesses because it relates to their use and infringement as well. So, statutory damages permeates, I think, many of the witnesses.

THE COURT: So, what I'm hearing is there's really no clean way of addressing the damages issue as I have outlined in my head.

MS. EHLER: I think it would be inefficient to try to segregate them both because they are intertwined with, for example, factor four issues but also because I think it's going to be more efficient for the witnesses to be on the stand once. And, so, it may just cut down on the time for trial as well.

THE COURT: Okay. So, I'm going to stick with my tentative. I think I'm inclined to just have Plaintiffs put on the case in chief, and then we will switch to the affirmative defenses. It's -- it's -- it's mostly final, but if we do meet again before the trial, I'm open to any

additional ideas, but it's -- it's an uphill battle. I'm planning on just doing it with Plaintiff's in chief and then the Defense case -- or Defense affirmative defenses, and we'll leave it at that.

Let's move on. One moment.

(Pause.)

THE COURT: I'm just going to go -- I think what I'll do is the way I've sort of outlined the final pretrial conference in my head is going through the documents that have been filed in the order that they would typically come in in trial.

So, I will get to the motions in limine close to the end, which may inform some of the discussion up front, but it just makes sense to me to do it this way. So, I'm going to go to the statement of the case that the parties have presented next because that comes in in two ways.

Typically, when conducting voir dire, I like to give the jury just sort of an overview at a high level of what the case is about. So, it would come in in that way just to say what the claims and defenses are.

And then, as to the standard jury instructions, I believe it's like instruction number two as well. And, sometimes, I don't do exactly the same thing. Sometimes the parties give me two different -- one very broad for the jury selection and then one more specific for the jury

instruction. But in this kind of a case, I think it -- it makes sense to just do the same one.

So, the Plaintiffs have filed -- well, the parties have filed a statement of the case, and each party has filed their version, and the opposite party has objected.

So, if you have that in front of you, I wanted to address first Plaintiff's statement of the case and the Defense's objections to that.

One of the first issues is in the Plaintiff's statement of the case, the Defense objects to the term, "It has already been decided."

My tentative is to overrule that objection just to "It has already been decided," because I think the -- the parties -- or strike that -- the jury needs to know what they have to do in this case, what their job is, what's at issue still, and, you know, courts across the country have used that terminology. I have certainly used it in other trials, and it doesn't say who decided it. It's just that this is not an issue for you to decide.

Defense wish to be heard on that particular objection?

MR. GRATZ: We understand your Honor's tentative and the reasons for it. With respect to that, we -- we think that it -- we don't think that it is necessary to say that, but just to say declaratively that -- that it is true

that NFPA owns that copyright, but we -- we understand the Court's inclination.

THE COURT: Okay. That part's final. All right.

Moving on to the next objection as to the Plaintiff's statement of the case. And it goes to the second phrase in "It has already been decided," and that was with respect to Upcodes copying the codes and publishing them. I apologize. I'm trying to get the statement in front of me. One moment.

(Pause.]

THE COURT: Okay. So, the -- it's Document 263, page three, line -- starting at line 12:

"It has already been determined that Defendants without Plaintiff's authorization copied Plaintiff's copyrighted standards and distributed content from the same through the Upcodes website."

Defense objects to that language and proposes alternative language. One moment.

(Pause.)

THE COURT: I guess the alternative would be page seven, line -- roughly line five:

"Defendants operate the Upcodes website on which they post Plaintiff's

standards and other standards."

Is that fair?

MR. KLAUS: I believe -- I -- I believe, your Honor, that it's on page seven.

THE COURT: Okay.

MR. KLAUS: It's the Defendant's proposed language. It's page seven, lines eight through nine. And, in particular, Defendants would like it to say that Plaintiffs copied and distributed text that appears in the standards as opposed to our framing, which is that they copied the standards, and then they distributed portions -- not -- they copied 100 percent of the standards and distributed part of them.

THE COURT: Okay. That's fair. I understand why you're disputing that.

I go back to the motion for summary judgment order. In effect, what the Court decided -- there's no dispute about the first part of the elements. And I think both parties agree on that language.

In effect, what the Court decided was, as to element two, that the Plaintiffs had proven -- forgive me for using this word -- infringement as to one aspect of 106 at least. And the language being proposed by both parties is more factual, like -- almost like a stipulation that one would propose to the jury, than going to the elements of the

offense. That's my observation.

So, I would tentatively disagree with both sides and make it more in line with what the motion for summary judgment -- I mean, the order for summary judgment actually said. Thoughts about that?

MR. GRATZ: Would your Honor like the parties to confer between now and whenever we see each other again and try and, with the Court's guidance, get to language? I think we may be able to do so using the language of the summary judgment.

THE COURT: Yeah, because if you go back to the summary judgment order, the language, the first part of it was there was one sentence that was factual, and then the Court went on to say, "Therefore," and it addressed the actual element in terms of what Plaintiffs must show, and I think when explaining it to the jury, to be consistent in terms of jury instructions, knowing that this is going to be part of the initial jury instructions, to me it makes more sense to couch it in terms of what they have to decide and what they don't have to decide.

MR. KLAUS: I think -- I'm happy to work with Mr. Gratz, and I think we're probably both looking at page nine, lines 11 through 13 of the summary judgment order, and we can come up with language.

THE COURT: Okay.

MR. KLAUS: Thank you, your Honor.

THE COURT: All right. Next there was an objection to the due process defense issue. Upcodes wants to include reference to a due process defense. Plaintiffs do not want that reference in there.

There was reference to due process and First Amendment in the summary judgment motion because it was part of the briefing. But in going through all of the pleadings, I do tend to agree that this was never pled as a affirmative defense, First Amendment and due process.

Upcodes?

MR. GRATZ: Our second affirmative defense, your Honor, is that this material is in the public domain or otherwise not infringed because it is the law, and we have expanded upon that pleading in our -- in our -- in our further submissions with why that is, and the reason why that is as outlined in a number of the cases, including -- including the Practice Management case, is that one of the reasons something might not be infringed because it is the law is an argument based on due process. And I -- I -- I also want to note there is separately a First -- a First Amendment defense that is just like -- that is set forth in the -- in the affirmative defenses.

THE COURT: Okay. NFPA?

MR. KLAUS: Yes, your Honor. There was a First

Amendment defense that was pled in the affirmative defenses. The Court's summary judgment order rejected the First Amendment defense which is out. There was not a due process -- there was not a defense that said that it is a violation of due process. And we think there's good reason for that, which is that Upcodes does not have -- Upcodes does not contend that it was unable to access any of the standards and, so, could not plead for itself. And, so, the -- the defense, as we understand it, appears to be that there might be some person somewhere in the world who would be unable to access the -- any standard that had been incorporated by reference.

There is, I should just add, no evidence that was ever produced in the case. There will be no evidence at trial of that, but it -- there is -- frankly, I can't conceive of how the Court would instruct the jury to determine whether there has been a due process violation.

It ips the case that there are references in the case law to considerations of whether -- and it goes back to Practice Management. There's some -- there's a First Circuit case that your Honor, I know, has read, the so-called Bobit (phonetic) case. It's in one of the Upteam ASTM decisions. There are these references around the margin to a concern about that as potentially being a basis for saying that incorporation by references extinguishes the

copyright, but nothing that is concrete in any of those decisions that says this is somehow a defense that a jury would decide in a copyright infringement trial.

THE COURT: And I thought that Practice Management foreclosed that idea.

MR. KLAUS: I believe that -- I believe that Practice Management says we don't need -- Practice Management took note of the fact that some cases which had tried to make sense of the 19th Century Government Edicts Doctrine cases had said, Well, maybe there is a due process rationale that informs the Government Edicts Doctrine. None of those cases, of course, had the benefit of the Supreme Court's decision in Georgia v. Public Resource, which your Honor did have the benefit of. But in those -- in those cases, there was a -- a consideration that potentially -- potentially saying that if a -- if a -- some -- if a -- if a incorporated standard somehow became inaccessible to the public, that that would be a concern and that there might be a due process concern. And what the D.C. Circuit said in the ASTM case -- I believe your Honor said it in the summary judgment order -- is maybe there is, but let's resolve the case on these other grounds and decide whether we actually have an issue.

And, so, to the extent there -- again, we don't think it's pleaded, but we think if at the end of the trial

the judgment is in favor of NFPA and if Upcodes believes that there is a -- some sort of due process reason that continues to exist for saying that these standards never should have -- the standards should have been deemed not enforceable, certainly, you know, that's -- they can make whatever argument they want. We don't -- again, we think the evidence that will be in the record will show no one was ever unable to access any of these standards and that, certainly, of all people, Upcodes does not have standing to seek to -- to seek to enforce those due process rights.

MR. GRATZ: If I may, your Honor?

THE COURT: Yes.

MR. GRATZ: First of all, Practiced Management expressly couches due process as a potential defense to infringement as opposed to a reason that material would be in the public domain, and that is why we see it as part of our -- part of the affirmative defense that -- that we pleaded and why we see it as not foreclosed by or affected by your Honor's ruling with respect to in the -- in the summary judgment order.

With respect to what the jury's role in all of this ought to be, we do not have a problem with -- in the abstract with the idea that the Court has reserved under the Constitutional Avoidance Canon on the due process question, wants to see what the answer is with respect to fair use

from the jury and could, thereafter, take up the question for whatever taking up the question is worth, after that determination to see whether it was -- is really necessary for the Court to take that up.

The reason that we hesitate is the discussion in the summary judgment order with respect to there being subsidiary factual questions that preclude a legal ruling on that, and it may be that by the end of the trial with all of the evidence in, those go away or it may be that the jury can be asked a factual question that resolves whatever those remaining disputed facts are.

THE COURT: So, it sounds like both parties are in agreement that we have the trial, we see what facts are developed during the trial, and then the issue of due process is something that is addressed after the trial, whether through a special verdict form dealing with some particular fact and the Court then ruling based on the jury's determination or not or just ruling based on what the Court observed during trial. Is that what you're saying, both of you?

(No response.)

THE COURT: No?

MR. KLAUS: We're not -- we are not -- we are not saying that. We don't think there is a -- a special -- there's not a fact that we think the jury would be capable

of finding here.

THE COURT: Okay.

MR. KLAUS: What we think, our view is that if at the end of the case Defendants want to -- and if there is a judgment of infringement and there are damages and the Defendants want to say to your Honor it is a violation of due process for this judgment to stand, then your Honor could make that determination based on the application of standard due process rules, including, in the first instance, whether the Defendants show that they have standing to assert the due process rights of anyone and whether there is anything in the record that would support a violation of due process.

And I --

THE COURT: Okay.

MR. KLAUS: -- should also say, your Honor, that if -- if Mr. Gratz's concern is that what he would like to do is to reserve the ability to argue in a JMOL motion or to say on appeal, Notwithstanding that I don't have -- we don't have standing to assert it, notwithstanding the fact that no one -- there's no evidence of anyone being denied access, there must be a due process violation here somewhere. And, so, let's look under the -- somewhere you can come up with a due -- you can come up with a rationale for saying that due process preempts the application of the Copyright Act.

That's an argument Mr. Gratz can make.

THE COURT: Okay.

MR. KLAUS: And I'm not -- I would not -- I would not -- I would not say that he was -- I would not say he had forfeited his right to make it --

THE COURT: Okay. Fair.

MR. KLAUS: -- to be clear.

THE COURT: And -- and, certainly, the motion for summary judgment order didn't preclude the due process part of it. But are you arguing, Counsel, that it's a question of fact partly, a mixed question, or just a question of law?

MR. GRATZ: So, we think that it is at least primarily a question of law, your Honor. The thing that we are focused on and want to make sure that we do not all end up in a pickle with respect to sometime down the road is your Honor's observation or inclusion in the summary judgment order on page 20 at lines 18 through 21 that genuine dispute -- in -- your Honor's discussion of this issue, that genuine disputes of material fact exist whether Upcodes has published only IBR standards as the law or has also published NFPA standards and have been amended, deleted, or expressly excluded from the law and that we do not end up in the situation where someone is saying, Well, now we need another trial before any determination can be made with respect to due process.

THE COURT: That's not going to happen.

MR. GRATZ: I -- I -- I -- and that won't be us, your Honor.

THE COURT: Um-hmm. Okay. I think there's mostly agreement in terms of how to handle the due process part of it. I think both parties tend to agree -- well, I'll say it this way. I think Plaintiffs agree that there are certain issues that have been preserved, and my original question was do you, in preserving these issues, need to put them in the statement of the case, because due process is referenced in the statement of the case, but it sounds like it is mostly, if not completely, an issue for the Court at the end of the day. But the way it is raised in the statement of the case, it appears as if it is a defense for the jury to decide, and both parties seem to suggest that's not actually true.

MR. KLAUS: I -- I believe, your Honor, I -- I'm looking at Mr. Gratz's -- I apologize. So, I believe the way that the Defendants have phrased it is on page seven, lines 11 through 13. It does not use the words "due process". It says:

"If you find that Defendants sustained their burden of proving that the Plaintiff's material they post is the law, then Defendants are not liable

for copyright infringement."

THE COURT: Um-hmm.

MR. KLAUS: That, I think, is -- that's the wording that they would like to have for due process, and it's not in ours, and our view is that in view of the discussion that we've had and I think the agreement and the preservation of -- of Upcodes' arguments for another day, that the jury should just be told that the determination for them to make is whether Defendants have carried their burden of proving the affirmative defense of fair use.

THE COURT: I tend to agree.

MR. GRATZ: Well, right. We understand. Our view is that -- that in -- that this is a question that the -- that the jury can decide and that a determination that it is the law resolves the -- resolves the case in our favor. But we understand that to be in at least some tension with your Honor's summary judgment ruling --

THE COURT: It's a whole lot of tension.

MR. GRATZ: Indeed, your Honor. And -- and, in flight of that, moving this issue to be one of law for determination following the jury's verdict, we think is a -- is a -- is a good practical option.

THE COURT: Okay. But let me ask you this because the issue of whether Upcodes post the law, et cetera, permeates this case and the Court made, I thought, what was

clear rulings on, you know, the Edicts Doctrine and all of the other issues that the Court dealt with in the summary judgment but yet, you know, the law and who owns the law and that sort of thing keeps popping up throughout the trial documents and not having had either set of attorneys practice before this Court, I have no idea how you plan on or if you plan on trampling all over the Court's motion for a summary judgment ruling. So, don't.

But my concern is that it's all over the jury instructions. It's all over the verdict forms. It finds its way into the motions in limine and, you know, at -- on the eve of trial, with the understanding that Upcodes disagrees with some of the rulings made in the summary -- well, maybe all of it, and are -- and you're trying to preserve your arguments for appeal, yet and still, I need some clean jury instructions and special verdict -- or verdict forms and, you know, a couple of weeks before trial, I need to -- I need to sort of vet out all of the reconsideration arguments, quite frankly, from the trial documents.

So, you know, I'll just put a pin in that. Basically, what I'm going to say is that you're going to have to go back and fix a lot of stuff before I even get to the jury instructions because it's a lot of work to try to work through the language that has been proposed when the

Court made a clear summary judgment order on a lot of that language.

MR. GRATZ: Understood, your Honor.

THE COURT: At least in my opinion.

MR. GRATZ: We -- understood, your Honor. We -- we look forward to being able -- we may be able to separate out preservation issues, which we have tired to do at least in part, from -- from issues that -- that we really think need to be presented to the jury.

We do think that there are some issues that are closely related to these questions that the jury needs to hear about to understand why Upcodes did what it did and why Upcodes thought it was justified in doing what it did.

THE COURT: Agreed. But my concern is that in pursuing those issues, that it will trample on rulings that the Court has already made with respect to the question of whether NFPA owns a valid copyright. There was a whole lot of the summary judgment dedicated to just that issue, and it seems like that issue is perhaps -- well, Upcodes is seeking to relitigate that issue in front of the jury.

MR. GRATZ: Right. And we do not, your Honor, intend or seek to relitigate the question of whether NFPA has a valid copyright.

THE COURT: Okay.

MR. GRATZ: The -- the question -- we think the

question before the jury is whether the Fair Use Doctrine means that those rights extend over or do not extend over what -- what Upcodes did here.

THE COURT: Fair. There's just no back door in fair use to those issues being relitigated again.

So, with that, maybe it makes sense to go over the motions in limine at this point because maybe that will add some clarification to what's going to be at issue.

So, I'm going to start with Plaintiff's motion in limine number one. Let me know when you're ready to proceed.

MS. EHLER: Ready here, your Honor.

THE COURT: Okay. Okay. Upcodes, you ready?

MR. GRATZ: Yes, your Honor.

THE COURT: Okay. So, I'm just going to summarize. I'm not going to reach every argument that -- I -- I've reviewed the papers filed by the parties, and Plaintiff's motion in limine number one is to preclude evidence or argument quoting or characterizing the holding of Georgia v. Public Resources.org or characterizing case law relating to the Government Edict Doctrine applying to nonbinding explanatory legal materials created by a legislative body -- I'm talking about Georgia -- vested with the authority to make the law. And that also related to the Court's discussion of the Banks v. Manchester case regarding

the judiciary.

So, motion in limine number one seeks to preclude enforcement -- strike that.

It seeks to preclude evidence or argument on that Georgia case issue, Government Edicts Doctrine, as well as argument and evidence that the named individual Plaintiffs relied on the advice of counsel referenced in the motion as the sword shield doctrine, and then, finally, it's also based on Rule 403 grounds.

Defendants argue that insofar as Plaintiff is seeking statutory damages based on willfulness, the Defendants need to be able to argue that they relied on case law and had a good faith reliance that their conduct was innocent, et cetera.

This one was tough for me in terms of the motion because I understand the Defense's point insofar as willfulness is an issue, but in looking at the deposition testimony of the Reynolds brothers, a lot of objections based on attorney-client privilege, and it was hard to parcel out to what extent the brothers had independent knowledge of case law. There seems to be some testimony that they had an understanding, however rudimentary, about the cases that govern prior to 2017, and then after 2017, there's some mixture of counsel advice, and it's hard to parcel out in the deposition testimony when they're relying

on counsel versus when they're own independent knowledge and certainly, at this point, you know, the two kind of conflate, and the concern is that they will conflate more during the testimony.

So, why don't I heard from both sides on this particular one.

MS. EHLER: Happy to go first.

THE COURT: It's your motion.

MS. EHLER: So, your Honor's articulated one of our main concerns, which is the sword shield application of that doctrine here where you have legal advice intertwined with what the fact witness wants to testify regarding their belief, their good faith belief in reliance on the law. That's one part of it. And I'll talk about that for a second, and then I will also talk about the other aspect of the sword shield doctrine, which is the can you present one half of the equation even as it relates to what they might independently know if you could segregate that.

And then -- and this might be when your Honor came here right after our prior conversation, but I want to talk about my fears, the -- the risk of the back door and what the -- the potential of this to -- on 403 to elicit a mini trial on these issues and a sort of back door to the copyright ability questions. So, if you'll let me go through each of those.

On the intertwined point, we're all in agreement that Upcodes received legal advice on these issues, and everybody else agrees that they cannot come to trial and testify to assert an advice of counsel defense or testify regarding what their lawyers told them. That would be improper because they asserted privilege at the deposition.

THE COURT: One moment. Agree?

MR. GRATZ: That -- that's right, your Honor. We're not going to be -- we are not going to be offering up what -- what the advice of counsel was.

THE COURT: Okay.

MS. EHLER: But, so, the problem is -- and you see this both in pages two through four of the opposition to the motion in limine, where there's sort of here's what the cases said starting from the -- the earlier ones carrying through, but you also see it in the final pretrial conference order under the heading -- the Key Evidence heading in support of Upcodes' defenses. And this is pages seven through nine of the final pretrial conference order where there's bulleted lists of the cases with, you know, bluebook citation and the cases, and we don't have a fact declaration, and I think that goes to -- and my purpose in referencing that is it goes to this being intertwined.

Mr. Reynolds doesn't have a view of fact today that's independent of what his counsel told him because of

his depo. He didn't remember what he knew in 2017. But what Upcodes is suggesting they'll have him testify at trial in those pages seven through nine of -- I'm sorry. I said final pretrial conference order. I apologize. It's their memorandum of fact -- their memorandum of Vek (phonetic), not the -- not the final pretrial conference order.

But what those bullets say is that he'll come to trial and testify regarding, you know, quotes from Vek like the one that I picked out was, "As law, model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives," and that that quote is his basis for believing that what he did was lawful.

But the issue is that -- I mean, that has to be intertwined with legal advice because he doesn't know he knew in 2017. He knows what he knows today. And, so, that -- that's the -- that's the intertwined piece.

The second argument is the half the equation piece, which is even if that is independent of legal advice, which we don't think it is, but even if it is, the Arista (phonetic) and the Belsarian (phonetic) case and the other cases on the assertion of a good faith defense when it implicates advice of counsel, those cases say because the legal advice could demonstrate the falsity of the claim of good faith belief, waiver becomes a matter of fairness, and then they also say it would be unfair to allow a party to --

to assert a fact that influences the decision maker while denying its adversary access to the privileged material that's capable of rebutting that assertion.

And, so, here, Mr. Gratz completely understood since they're not going to offer what -- they're not -- they're not waiving their -- their legal advice, they're not going to offer that, but what that means is if Mr. Gratz correctly told -- and I'm sorry -- my opposing counsel. I'm not trying to call out my friend on the other side. But if -- but if Upcodes' counsel told their client that Practice Management is controlling in the Ninth Circuit, if Upcodes' counsel told their client informational notes are not binding and Upcodes decided to post them anyways because it's hard to remove them because there are hundreds of them and they -- if that's what happened, then that's the evidence we don't have that we should have had by now, by the time we get to trial, for those issues, and that was a choice that they made. And, so, that's the half of the equation issue and the fairness as it runs towards NFPA.

And then my third and last point on this issue is the risk of this becoming a back door to the legal arguments that were already decided at summary judgment, which is that most of these cases -- there's a number of them, but the vast majority of them address these issues of copyright ability and use words like public domain. The Georgia case

uses "No one can own the law." And this is an invitation, when you have a fact witness describing those cases, quoting from those cases, an invitation for the jury to then think that maybe those are, in fact, the law if the fact witness thought those were the law, and then to be debating in the jury room, you know, what the law on public domain and copyright ability is, which is exactly not the issue that they're here to decide, and I think this gets worse if we're cross examining the Reynolds brothers on Practice Management being controlling law in the Ninth Circuit or your Honor's -- the Court's summary judgment order where presumably the Reynolds brothers disagree with that order. And, so, then you are inviting this mini trial within a trial on, you know, what courts got this right or didn't get this right on copyright ability or perhaps on fair use, but on -- but on the ultimate decisions that the jury needs to decide as a matter of application of the jury instructions and the facts.

THE COURT: Okay.

MR. GRATZ: Here is the problem, your Honor. The defense to willfulness in this case is that the Reynolds brothers have looked at the case law. They've looked at the case law before they had lawyers. They have looked at the case law since they have had lawyers. They have read these documents. They understood those documents. They made

business decisions based on those documents, and those business decisions are the infringement that they are accused of here.

THE COURT: Question?

MR. GRATZ: Yes.

THE COURT: When you say they've read these documents, what documents are you referring to?

MR. GRATZ: The -- the judicial opinions that are -- that -- that my friend was discussing, the -- they read the -- they read the Vek decision. They have -- they have read the -- the decisions that have come up since. And they -- like, they based their conduct on reading those decisions, among -- among others.

THE COURT: What is the Court to do with the deposition testimony where one Reynolds brothers doesn't remember what he read or the nature of what he read from Vek?

MR. GRATZ: There -- there is virtually no questions and answers, your Honor, on the question of their understanding of the case law. The question that your Honor is referring to was -- was a very specific question about something that occurred long ago.

They -- they were ready to testify about their understanding of the case law. They remain ready to testify about their understanding of the case law, without reference

to anything that lawyers told them or any understanding that they have gotten from counsel. And they have to, because the -- the -- this is their defense to willfulness. This is not a willfulness case where they didn't know the conduct was occurring or -- or the conduct -- they didn't understand the nature of the material. This is a willfulness case where the defense to willfulness is that they had an understanding that what they were doing was (indiscernible), and that understanding was based on a number of particular court decisions. And in order for their testimony to be credible, they need to talk about that and whether there are some things that it makes sense for them to just like put as off limits, and that discussion I think is a good conversation to have and one that -- and one that I think it makes sense to have, to avoid, as -- as my friend says and as your Honor says, there being a sense that the -- that they are telling the jury things about the law that the jury is supposed to believe as the law.

But if the question is why did they do what they did and why is it credible that they would have thought that, the answer is -- I mean, they read -- they read Vek, they believed --

THE COURT: Did they actually read Vek or did they read about Vek?

MR. GRATZ: So, the record is -- the record is a

little unclear about whether they read Vek or whether they read about Vek. They've testified about this in a number of different proceedings, and I think they ultimately read Vek, although they initially -- did they ultimately, initially, back in 2017, prior to any attorneys becoming involved, did they read Vek or did they read about Vek in some publication or something?

MR. GRATZ: Well, so, right. And -- and -- and the testimony, if I recall correctly, your Honor, in a previous proceedings was that they read both an -- the -- the Wikipedia article about Vek, which included the description of a number of Law Review articles on the subject, which informed their then understanding of the law. In -- with -- and with -- in some detail, and that was -- that document was presented as -- I think that document was presented as a -- as an exhibit in an earlier deposition.

I want to note it was not the subject of almost any testimony in this case because NFPA did not ask, and had NFPA asked, they would have gotten answers, and NFPA can ask at the trial and get answers and cross examine them on whether their understanding is complete or not, and if they get -- if they get, "I can't tell you that. That's based on my lawyer," that I think will -- I mean, that would be a reason why to -- to impeach their -- their testimony about their unaided understanding, their independent

understanding.

THE COURT: They're not lawyers, correct?

MR. GRATZ: They are not.

THE COURT: They didn't go to law school?

MR. GRATZ: They did not.

THE COURT: So, questions regarding what is your understanding about what Vek says about copyright ability?

MR. GRATZ: So, your Honor, I think we may be able to separate this into issues that relate directly to -- issues that relate to issues that have already been determined by the Court as to which I understand a significant sensitivity to the sense that that testimony would undermine or -- or conflict with -- with the -- the Court's instructions that the -- that they have a valid copyright and other cases that they are aware of and read and that caused them to do what they did, not just in 2017 but later, right. I mean, they -- they've received favorable rulings on fair use from the Southern District of New York before they started the conduct at issue in this case. They -- and -- and since then, they've received favorable rulings on fair use from the Eastern District of Missouri and the Eastern District of Pennsylvania, and that is what caused them to believe that they were not infringing the copyright, and that is why the jury should decide, even if the jury decides that what they did was, in fact,

infringing, that -- that is why the jury should decide that they were not willful, because they did not believe what they were doing was infringing on the basis of the fact that these cases ere decided in this way.

THE COURT: I guess I'm trying to figure out -- I'm -- I'm trying to play out in my mind what that looks like with the Reynolds brothers on the stand, where they asked, you know, Why did you do what you did? Because I read cases and Wikipedia articles that told me that this wasn't unlawful? Or are they getting into the actual facts and decisions of the cases and, you know, espousing their views on what they thought the law was, which I think runs afoul of some ruling or some -- or causes concern? It just kind of depends on what sort of testimony is being elicited here by the Defense and, quite frankly, by the Plaintiffs as well.

MR. GRATZ: Well, right. And -- and our concern, your Honor, is we think that -- I mean, certainly, they -- they have to be able to testify, Why did you think -- why did you do this? Why did -- why did you think this wasn't -- did you think this was infringement? No. Why not? We understood this material to -- we understood posting this material to be permitted by copyright law. Why did you think that it was -- we under -- why -- where did that understanding come from? Why -- why did you think that this

material was okay to post? We understood that because it had been incorporated by reference in the law, like --

THE COURT: Is that -- that's the issue right there. I think the -- the whys can elicit all kinds of mine field testimony, and -- and not to sort of -- if there's a mine field there in a sense that I think the more their testimony becomes -- the more the testimony is factual, this is what we did and, you know, this is what we looked at, without getting into the specifics of case law, then I -- then I think you have a point, because it definitely goes to willfulness. But the more it gets into, And this is what the case said or, This is our understanding of the case, then -- then the questions are calling for legal conclusions. They're not lawyers. They're not judges. They don't know. It's just kind of them spouting off what they think the law was. And, yes, it has some relevant to willfulness, but it's problematic based on the Court's ruling and -- and based on the sword shield issue and the issues -- other issues identified by NFPA counsel.

MR. GRATZ: So, your Honor, two -- two responses. I think the first response is -- the first response is they in -- I mean, they, in fact, like have this is -- in order to testify credibly, in order for jurors sitting over there to believe them when they say, We thought we were acting lawfully, leaving out all the details of what it was that

convinced them I think is problematic to providing credible testimony on that issue.

THE COURT: But --

MR. GRATZ: I think --

THE COURT: -- those details include advice from counsel which NFPA was not allowed to pursue.

MR. GRATZ: Those details -- those details do not include advice from counsel. Those details include their -- their reading of and understanding of the case law, their lay understanding of the case law and what it was about that that caused them to have the belief that what they were doing was lawful.

I do think, your Honor, there may be guardrails that we can put around this and that we may be able to work out. For example, to not say the words "public domain", to not say the words "eliminated their copyright" or -- or things like that, even though, I mean, that is, in fact, one of the things that they believed, but that in light of that that may sort of create discomfort, that we could work with them -- we could -- we could have them not say the words "public domain" or even say the words "No one can own the law," but be able to talk about the fair use rulings in favor of them that were the basis for thinking that what they were doing was fair use.

THE COURT: I mean, that's factual, you know. We

would say we got some good rulings, without getting into the -- you know, the specifics of what the -- the Court said, et cetera.

If you believe that you truly can put some guardrails around this sort of testimony on this issue, then I invite you to do so. I will say this. My tentative is to grant -- it's just a tentative -- because of the sword shield issue, because of how the motion in limine was framed in terms of the Georgia case, et cetera. That's my tentative. It's a tentative. I'm not going to make it final. I would suggest that the parties meet and confer and get some guardrails because this -- this issue is going to keep coming up in other contexts in terms of the testimony that may come out in trial.

So, I'll leave it in terms of Plaintiff's motion in limine number one is a tentative for now.

MR. GRATZ: Thank you, your Honor.

MS. EHLER: Your Honor?

THE COURT: Yes?

MS. EHLER: With apologies, could I get your reaction to -- to one other idea that occurred to me while we were talking, which is while bifurcation may not work for damages that involve economic issues, this question of willfulness is quite specific, right? Their -- what they knew or didn't know and the enhanced damages is quite

specific. And, so, again, just suggesting, but for your reaction as it helps the parties, is there -- I saw my friend shake his head no, but whether there's -- whether there's any -- any of the -- of the sort of Court's indulgence that that might be a narrow issue with only a couple of hours worth of testimony that could be, you know, bitten off separate to avoid the risks that come with guardrails and potentially going over them.

MR. GRATZ: I don't see how that's practical.

THE COURT: It may not be practical, but I'm very concerned about being able to wrap my arms around this case and have control of the case. And, certainly, we do it in other contexts with punitive damages. It's usually just monetary and not particularly -- particular issues, but here it's tough. You know, and I want to be fair to both sides, but there's some real issues with this particular area in the case.

MR. GRATZ: Understood, your Honor. We don't -- we don't think that that will work because this is -- this is fundamentally the damages question, right. This would result in bifurcating all of damages, and we don't -- because -- because willfulness is not an independent determination, it's a determination that goes into the amount of statutory damages.

To be clear, this issue is -- this issue does not

relate solely to willfulness. This relates also to the determination of the amount of non-willful statutory damages because whether the -- whether the Defendant's action was intentional is one of the factors that's in the Model Instructions and that the -- that the jury takes into account in determining that.

And, so, your Honor, we don't think that bifurcating it makes sense. Also because, I mean, why does Upcodes as a company exist is a question that like that's going to be -- you know, the first question on direct is like what -- what do you -- what is this thing? And understanding what the story is and how that -- how they came to the belief that they could form a business based on this that they weren't, you know, just doing something that violated the law, is a central part of that story that you can't break off.

The level of detail that one needs to go into about -- about what particular cases said I think is something that is a -- is a very different question from that and one that I look forward to discussing with -- with my friends.

THE COURT: Assume that the Court's going to come out with they can't go into detail about what the cases said because they're now trampling on my job in terms of what the law says, and it's confusing to the jury under 403 grounds.

So, it's going to be -- if at all allowed, it's going to be some version of factual, I read cases, and I was left with the impression, or something along those lines, as opposed to, Here's what the case said or, Here is my understanding of what the case said. You face an uphill, vertical hill on that particular issue.

MR. GRATZ: Angle understood, your Honor.

THE COURT: Okay. So, tentatively, grant, but without prejudice. We'll talk about it next time, and I encourage the parties to meet and confer. Let's maybe go to something slightly easier.

Plaintiff's motion in limine number two, to exclude users' survey to argue that its users are referring to the law when they reference NFPA's standards.

NFPA argues that the survey should be excluded on hearsay arounds and because it's junk science. I tend to agree.

Upcodes?

MS. DOUDAR: Yes, your Honor. Sara Doudar on behalf of Upcodes.

So, NFPA's motion -- to go into the junk science to start with, NFPA's entire brief rests on the fact that it's very important that this document is called a survey, but that's -- that's not really what's important here. It doesn't matter whether it's called a survey or a

questionnaire or a customer engagement form. And, in fact, we're -- we're happy to call it any of those. Really, what's important here and what we're relying on the survey for is to show that Upcodes asked its users some questions. Those users gave Upcodes feedback, and then Upcodes used that feedback to make a business decision.

THE COURT: Are those users going to be coming in and talking about what they said?

MS. DOUDAR: No, your Honor. The users' statements are -- would be within the survey, but we're not relying on the truth of the -- of what the users stated, just how it affected Upcodes.

THE COURT: Aren't you, though?

MS. DOUDAR: No, because really it doesn't matter whether or not users actually call jurisdictional laws by the Model Code name that they've stated. What matters is that that's what they told Upcodes. So, because that's what they told Upcodes, Upcodes decided to, on one of its web pages, categorize the jurisdictional laws by the Model Code names.

THE COURT: Isn't that truth of the matter asserted, that's what they told Upcodes? Don't -- doesn't the jury have to believe that's true?

MS. DOUDAR: The truth of the matter would be that that's actually what they believe, that the jurisdictional

laws are better off called the Model Code names.

THE COURT: Who believes?

MS. DOUDAR: The users, because it would be the users' statements that are involved in the survey.

THE COURT: Out-of-court statements that --

MS. DOUDAR: Right, but --

THE COURT: -- about what they believe, that the jury is supposed to credit?

MS. DOUDAR: Well, no, your Honor. The jury doesn't have to credit that the users actually believed that. All that matters is that Upcodes heard that and then Upcodes made a decision. Now, the jury could say, for example, We don't think the users were telling the truth. So, Upcodes shouldn't have made that decision.

THE COURT: But doesn't the jurors have to believe that the users said what they said or said what the survey said they said?

MS. DOUDAR: But they don't have to believe that what they said was true, and that -- that's the distinction between offering the statements for the truth of the matter versus offering those statements just for the effect on the listener.

And we'd be happy with a limiting instruction from your Honor that stated that this document should not be used for the truth of the matter asserted and so they shouldn't

immediately believe that what the user stated was true.

THE COURT: So, what should this document be used for? It's not a document that's generated by any sort of expert. There are no guardrails in terms of what questions were asked and what questions were not asked. The motivation for asking these questions isn't quite clear. So, of what relevance or under 403, why should this come in? Why is it probative of anything?

MS. DOUDAR: Yes. So, what it's probative of is it -- it would help explain -- so, NFPA has made an argument throughout this case, including in summary judgment briefing, that the adoptions by publisher web page that Upcodes has on its website is basically there as a means of advertising that Upcodes has NFPA's model codes. But this survey helps rebut that the reason that the adoptions by publisher page exist is not because of that. It's because users told Upcodes that it makes it easier for them to find the law that they're looking for. So, Upcodes made a business decision based on that survey to have a web page that helps -- that helps users find what they're looking for.

THE COURT: How do you get in again, how users told Upcodes that it makes sense, blah, blah, blah, or it helps them to, whatever you just said? How do you get that in?

MS. DOUDAR: Through the survey, your Honor. The survey has the users' statements. Now, we are -- we're happy with the limiting instruction that says you don't have to believe the users' statements were true, and to your 403 position --

THE COURT: It's really -- right now it's a hearsay position or there -- it's NFPA's hearsay position.

MS. DOUDAR: Okay. To the hearsay position then, the users' statements themselves are not being offered for the truth. We're happy to have that limiting instruction, have the jury be told that you don't have to believe that what the user stated was true. All that they have to believe is that Upcodes heard or saw those users state that. So, they made a decision based on that statement. And it's up to the jury to decide whether that was a reasonable or an unreasonable decision to make. But, really, the -- the exception to hearsay here is that it's for the effect on the listener.

THE COURT: Okay. NFPA?

MS. EHLER: Just one factual correction, your Honor. It goes -- but it goes to the effect on the listener. So, Mr. Reynolds' declaration says that they conducted the survey, which was in September of 2022, right in the deposition period, fact depos of this case, to decide whether or not to change this adoptions by publisher page,

which was featured in our complaint. And, so, it's -- it's Docket 35, page 15, which is I believe the amended complaint and the sort of screenshot of the adoption by publisher page. And then they didn't change it, but --

THE COURT: You're talking about it was like read?

MS. EHLER: Yeah, the --

THE COURT: And then it had all the --

MS. EHLER: This one.

THE COURT: Yeah.

MS. EHLER: And, so, the -- so, and my point is just that the -- the idea that this is about a business decision and is not, you know, coming in for litigation and is -- was not done for a litigation purpose, it -- they didn't make business decisions based on it because they didn't change anything based on it, and there -- I have more points I can make on -- on the junk science, but -- but I won't, but that -- but that I wanted to make sure it was clear as to the timing of the facts. The survey was done after this was already on their website. So, it doesn't actually go to a probative issue in the case because they've -- they put NFPA's codes up on adoption by publisher back when they started posting NFPA's codes.

THE COURT: Agreed on timing?

MS. DOUDAR: Agreed on timing, but not agreed that this was done for a litigation purpose. In fact, in Mr.

Reynolds declaration, in paragraph four, it states that at the time of designing and conducting the survey, the Upcodes members were unaware that the survey would be used in litigation and did not create the survey with the intention of using it in litigation. It was, in fact, used for the business decision because the Upcodes members had an internal debate of whether or not this web page was actually aiding the users, and in order to determine whether or not to keep the web page as is, they did what a company would do, and they asked their users whether this was something that helps them, is this how users think of their jurisdictional laws.

And because of the results they got, they made the decision to keep it as is. That's still a business decision, and under PMP Imports, it's -- just because a survey is done after the time litigation starts does not negate the reliability and the relevance of the survey.

THE COURT: Okay. Anything else?

MS. DOUDAR: If you have any further questions on 403, I can expand on that, your Honor.

THE COURT: All right. Make your record.

MS. DOUDAR: Yes. So, under 403 grounds, as Ninth Circuit and District Courts within the Ninth Circuit have repeatedly stated, very rarely should surveys be excluded because a lot of the alleged deficiencies within a survey,

for example, all of the technical adequacies, so, for -- for example, surveys' methodology, how much experience the survey designers had, that all goes to weight, not admissibility.

So, during trial, NFPA will have a chance to get up here and to cross examine Upcodes' witness and to ask all of the things that they mentioned in their brief, because the Ninth Circuit has made it clear that this technical adequacy point is not a point of admissibility. And, for that reason, NFPA's ability to cross examine is sufficient to bring out any alleged deficiencies they think that the survey has, and this is exactly what the fact finder's role is is to hear the side that's -- side both parties have and to determine who they think has the stronger weight of the evidence, and they can decide whether or not this is a strong survey or whether this is a weak survey, but the prejudicial value -- the prejudicial impact to NFPA is not substantially outweighed by the probative value.

THE COURT: Okay. NFPA?

MS. EHLER: Nothing further, your Honor.

THE COURT: Okay. Thank you for your arguments.

For the reasons stated by NFPA, I'm going to grant motion in limine number two.

Moving on. Motion in limine number three, to exclude Defendants -- this is Plaintiff's motion in limine

number three, to exclude Defendant's evidence and argument about the protecting and enhancing public access to Codes Act. My understanding is NFPA asserts as grounds that the evidence is irrelevant to Defendant's fair use defense and their willful misconduct and the evidence under Rule 43 presents all the dangers set forth in Rule 403 and should be excluded.

The Defendants, from what I understand, essentially argue that the evidence of the Pro Codes Act serves to rebut Plaintiff's willfulness allegation by showing Defendants' conduct was reasonable, in good faith -- and had a good fait belief in the innocence of their conduct.

My understanding of how this may be used by the Defense is in two ways. The Defense may use it to -- to sort of explain Plaintiff's conduct in terms of Plaintiff was waiting for the act to be adopted or to go into law, and also to show the Defense conduct in terms of, you know, to say, Hey, see, our conduct wasn't so unreasonable. It was in good faith. Look at this clarification that's being provided in the law.

Is that fair?

MS. JIAM: Your Honor, I would say likely less of the first and more of the second. I think both parties agree that a Defendant has a defense to willfulness by

establishing it had a reasonable and good faith defense -- belief that what it was doing was not infringing. And, you know, this slightly kind of covers with what my colleague, Mr. Gratz, was discussing with respect to the state of the law, but it relates to both codes that existed before the introduction of the Pro Codes Act and laws adopting NFPA codes that my client posted after a Pro Codes Act, and it goes to both the subjective and objective prongs that NFPA was referring to.

And, so, yes, it -- it is directly relevant to our willfulness defense, and it's -- we're not trying to say to the jury like, Believe us, the law said X or the law was this position. It's showing that this is what the Reynolds and Upcodes believed and that they -- the fact that the law was introduced establishes that there's at least some ambiguity that -- that Upcodes' position and the Reynolds' position could have been reasonable.

THE COURT: Okay. Plaintiffs?

MR. KLAUS: Thank you, your Honor. As far as objective reasonableness, there are two -- there are two components to -- sorry -- objective good faith and subjective good faith. I understand Upcodes to be saying that they think evidence related to the Pro Codes Act is -- is relevant solely to the -- to rebut a showing of willfulness. And on both objective and subjective good

faith, Upcodes started posting the standards here in 2021, and the Pro Codes Act was not introduced until 2022. So, it's just a metaphysical impossibility for the Pro Codes Act to have had any influence on that decision.

Upcodes concedes as much on page four of its opposition, says it is fair to say the Pro Codes Act could not have influenced their decision before its passage, but they said there are some standards that we posted after the Pro Codes Act was considered, and maybe that went into the decision.

There is actually nothing in the opposition that cites any evidence that either of the Reynolds will say, Oh, once I saw the Pro Codes Act being considered, I knew that I had a defense to -- I knew that I had a defense to -- to copyright infringement. They didn't say that at their depositions, which were after the Pro Codes Act was introduced. They don't say it in their brief, that they've got any evidence of this, and there is a huge danger we think, your Honor, under 403, first of all, of having the jury hear about legislation that was not enacted and being invited to speculate that the reason that it was not enacted was because maybe Congress thinks that standards, once they are incorporated by reference, should not be protected by copyright.

Is that -- and then it becomes also a sideshow to

explain what happened with respect to the introduction of the bill, like in the past, get into a -- an area that really is -- that -- you know, that sort of level of explanation, it invites, frankly, we think a lot of mischief that your Honor has alluded to with respect to trying to relitigate the underlying -- the -- the underlying summary judgment motion here.

Since a lot of the testimony about the Pro Codes Act has to do with how to square that with a number of the legal decisions that -- that Upcodes obviously I think would like to talk about, would like to come in and explain to the jury but that are inconsistent with the law of the case here.

And we'd say in all events, your Honor, that the -- even if you put all of that to one -- all of those problems, Upcodes also wants to introduce evidence of what NFPA thought about the Pro Codes Act, which can have no conceivable evidence --

THE COURT: Less so.

MR. KLAUS: -- to what they did.

THE COURT: Right.

MR. KLAUS: That's it.

THE COURT: Less so according to counsel. And I think to the extent that Upcodes wants to do that, I'm inclined to grant the motion in limine because it's really

speculating in terms of what Plaintiff's view of the act was and I think it's more problematic for the reasons set forth in NFPA's motion.

To the extent that -- well, let me ask, you agree that in terms of evidence presented to the Court in opposition, that there's nothing stating that the Reynolds relied on this particular proposed code?

MS. JIAM: Just to clarify, your Honor, when you're saying nothing presented to the Court, do you mean in the -- in the briefing or are you stating --

THE COURT: Deposition testimony --

MS. JIAM: -- working with the deposition?

THE COURT: -- any -- any sort of the evidence that has been presented for these motions in limine. There wasn't really anything in opposition saying, We, the Reynolds brothers relied on not just Vek but this proposed act in doing X, in -- in deciding that we could do X.

MS. JIAM: Your Honor, if you're asking whether we submitted a declaration in -- in our opposition brief with the Reynolds saying that we relied on this, that's correct. But I'll note with respect to their deposition, Mr. Klaus says, you know, they never said they relied on the Pro Codes Act, but that's because NFPA's counsel never asked the Reynolds brothers any questions about the Pro Codes Act. And, so, it's up to them to ask those questions, and that

doesn't mean that that limits the Reynolds brothers testimony about why they had a subjective good faith belief.

THE COURT: Is it really a subjective good faith belief to -- to rely on something that is not actually enacted into law and something that, I mean, in terms of timing wise came later --

MS. JIAM: Yes.

THE COURT: -- than the alleged infringement in this case?

MS. JIAM: Yes. So, I wanted to hit on that. So, one just small nit. I noticed that Mr. Klaus mentioned object -- there's two, there's like an objective and a subjective standard for good faith. I don't think that's actually quite the standard. I just don't think that's what NFPA represented in its briefing. I think NFPA's position is a subjective good faith belief and then an objective -- objectively reasonable.

With respect to the subjective good faith belief, we aren't arguing that the Reynolds brothers relied on legis -- like proposed legislation that came after for posting codes before. That obviously doesn't temporally make sense.

With respect to codes that were posted before, we're saying that this evidence about the Pro Codes Act is relevant because it reenforces our evidence showing that what we believed was the state of the law was at least

somewhat reasonable because the fact that any legislation was introduced was there's some ambiguity on the position.

For codes that were --

THE COURT: To the Reynolds brother?

MS. JIAM: To the Reynolds brothers, that's correct.

THE COURT: So, their testimony would be, "We knew all about this, and it just kind of affirmed what we believed all along"?

MS. JIAM: I don't think it would say it affirmed that this is what the law says because we understand that the parties have to talk about these guardrails, about what they can say. But it would -- it would establish that in terms of what they can say, we can -- we can submit it and then maybe you can look at it and decide on how to rule.

THE COURT: I have some huge 403 concerns in terms of it -- it's along the lines of there's going to be a lot of discussion perhaps by witnesses and attorneys about the state of the law, what the law was, what the law should have been, what the law could have been, what they hoped it was, what they relied on, that sort of thing.

MS. JIAM: Yeah, I --

THE COURT: And I'm really trying to take back my role in terms of the law, and this to me is yet another example of where it could go awry. And, so, for me the real

concern, aside from what I've already articulated and what's articulated in the opposition -- I mean, strike me -- strike that, the motion in limine, is the 403 concern about confusing the jury and an act that was not enacted into law, and who knows why the legislature didn't enact it into law, and we'd be speculating about that and, you know, it's just -- it's -- it's a side show.

MS. JIAM: I understand, your Honor. I understand wanting to make sure that we keep the jury on track and not confusing them with issues. Perhaps then Upcodes can make a proffer after meeting and conferring with the other side, and then your Honor can take a look at that before ruling on this motion.

THE COURT: Sure. Uphill battle. Tentative grant.

MS. JIAM: We -- we understand.

THE COURT: Okay. Moving on, Plaintiff's motion in limine number four, to exclude Defendants' argument and proffered testimony that -- of the two distinct markets existing, one market for the law and another market for Model Codes.

Plaintiff argues that Defendants do not have any expert or lay witness who can testify that two distinct markets exist. And, of course, the Court's motion for summary judgment touched on this with the discussion

regarding no one can own the law argument, which Plaintiffs, I believe, argue forecloses Defendants' presentation of this.

Defendants argue that it disclosed the two market theory and the Kidder rebuttal to the McLean -- Plaintiff's McLean expert theory of one market, and that the Court's motion does not, on the four theories factors, doesn't foreclose this position.

Plaintiffs?

MR. KLAUS: Your Honor summarized our position correctly. We don't think that Mr. Kidder discussed there being two markets, even in his rebuttal report. He did by the time of his -- it is true by the time of his deposition, he -- he had discovered that there were two separate markets that he wanted to -- to give some description to, but they had said very little about it.

The more fundamental problem with the two markets theory is that it's simply a restatement of the argument that Upcodes made in multiple forms and lost at summary judgment, that once something becomes -- once something is -- a standard is incorporated by reference into law, that there can't be as a matter -- as a matter of law, there can be no market harm because the -- whatever happens to the underlying standard that was incorporated by reference, there is -- as a policy matter, there is no basis for

finding that that caught -- there is any harm from the -- the Plaintiff not being able to enforce its copyright in those circumstances.

THE COURT: Let's assume that's correct. I would agree with you that then the motion should be granted. But what about the fair use argument as to the factor number four in terms of whether what Upcodes is doing is a substitute for what NFPA codes is doing?

Okay. Let me be more clear. I'm tired at this point. But what about the argument that this -- that the two market issue is relevant to the fourth factor under fair use?

MR. KLAUS: Well, I think that's the -- the argument that Upcodes is making is that even if we substitute 100 percent for your sales because anybody who might have gone to NFPA in order to understand what they were required to do to comply with a particular public safety requirement, instead went to Upcodes, that -- and got exactly the same thing, that there is -- as a matter of law, there can be no market harm to your market. In other words, that these -- that the substitution that has taken place, the same -- same exact work, the exact same customers are coming to Upcodes instead of NFPA. Even if you lose 100 percent of your sales, as a matter of law, there can be no market harm because that type of harm is not cognizable.

That is, again, I think a restatement under the fourth fair use factor of the argument that was made and lost at summary judgment, that once something is IBR'd, it loses its copyright protection.

THE COURT: Okay. Going back to something that you said in terms of the expert reports, didn't McLean at one point say that there --

MR. KLAUS: Mr. -- Mr. McLean in his opening report rebutted -- and I -- this was an argument that was made first by Garrett Reynolds way back when the case first started.

THE COURT: Um-hmm.

MR. KLAUS: He filed a declaration in opposition to our motion for a preliminary injunction, and he said, We can't by definition hurt NFPA's market because our purpose is to post the law, and the law is not a -- and there -- there -- you know, I believe there can be no market harm where what's being posted is the law.

By the way, that was not -- to go back to the -- the first motion in limine, he didn't say he got that idea from reading the Vek case. That was through -- that was a -- a lawyer assisted declaration, but that was -- that was what he said, and that was a legal argument that had been made from the beginning of the case.

THE COURT: I'm going in a different direction

now.

MR. KLAUS: Yeah.

THE COURT: I'm focusing on sort of the -- I'm trying to remember it like the Daubert issues early on in the case. McLean said that NFPA -- well, Upcodes does not operate in a different market.

MR. KLAUS: Correct.

THE COURT: In the same market as NFPA. So, there's just one market, to which the Defense expert, my understanding, came back and said, you know -- or opened the door to, you know, this two market argument perhaps based on something that Reynolds had said earlier, but it was kind of a line that --

MR. KLAUS: I believe that what Mr. Kidder said in his -- in his rebuttal report was that -- that when a standard has been incorporated by references, that increases its sales.

THE COURT: Okay.

MR. KLAUS: And that that's what is -- that's what is responsible for the value of the standard. He did not anywhere in his report say there are two distinct markets. He did not say as a matter of law, I, Mr. Kidder, understand there can be no market harm so that even if there is a perfect substitute, it is taken away. He didn't say there are two different markets in his report.

THE COURT: Okay. Fair.

MR. KLAUS: As I say, at his deposition, he did -- at his deposition, he then came in and said, Oh, well, I think maybe there are multiple markets.

THE COURT: Okay. In terms of the report, Upcodes, do you agree?

MR. GRATZ: No, your Honor. As -- as we say in our papers -- and this is quoted on page -- PDF page five of our opposition, like Mr. McLean opined -- this is a quote from Mr. Kidder, but quoting this from McLean, Mr. McLean opines that there are not two markets for the text of NFPA's standards.

That is an opinion to which Mr. Kidder then responds saying, in fact, there are. And he -- and he -- and he applies economic theory explain why that is based on the differences in demand and -- and bases those differences in demand on what it is that -- that NFPA's witnesses themselves testified that -- that the -- that adoption effects demand.

THE COURT: So, at the end of the day, this argument goes to the IBR issue as opposed to the fair use --

MR. GRATZ: This --

THE COURT: No, wait. Strike that.

MR. GRATZ: This argument solely, your Honor, goes to the fourth fair use factor. This argument solely goes to

the fourth fair use actor, and a -- because it shows that there is -- there is a market for NFPA's publications as models of what to do when you are -- when you are engaging in building a building, and that generates one set of demands, and that ips what their witness testified to, and there is a separate set of demands that comes from these things being mandatory rules. And those -- and -- and that matters to whether we are substituting for demand for -- for the original -- for its original purpose, as opposed to some other purpose.

THE COURT: I just remember in the summary judgment motion, though, that there was some evidence out there from Upcodes where Upcodes made clear who they were marketing to, and it wasn't different from who NFPA was marketing to under the same market, i.e., the professionals as opposed to the people, the -- the architects, the engineers, the builders, and that was something that the -- that I specifically addressed in the motion for summary judgment.

MR. GRATZ: So, understood and agreed, your Honor, that as to -- as to the -- the issue separate from fair use, the -- that -- that is right, and what -- this is one of the things that is happening in the conversation between these two experts. One is saying, Well, look they're targeting the same customers. So, you can't say that the markets are

different, and Mr. Kidder has, based on economic theory, a rebuttal to that that says, in fact, here is why that -- that fact as a matter of the fourth factor and the matter of the fourth factor substitution, isn't right. And the jury should be able -- will be able to sort of hear those disagreements and the reasons for them and weigh them.

MR. KLAUS: Your Honor, there is -- in Mr. Kidder's rebuttal report, there is no economic analysis of there being two different markets. There is a critique of what it is that Mr. McLean said and what -- what Mr. Kidder says is that Mr. McLean opines there are not two markets because they target the same customers and the two codes are substitutes.

Mr. Kidder says just because you target the same customers doesn't mean the markets are the same. Under this criteria, any two products that were sold to architects or engineers or construction workers would be in the same market, meaning hard hats and tape measurers would be -- could be in the same market as laws that were sold to the AEC.

There's no economic -- of course, he's ignoring the fact that the products that are being purportedly sold to the new customers are perfect substitutes, but there is no economic analysis. There's nothing that says in Mr. Kidder's rebuttal, this is how I as an economist define a

market. A market is defined as a product market, if you look at the customer, he says nothing about that. None of that is -- none of that is disclosed.

And what they want him to testify to in the case is to say that there are indeed two separate markets and I, Mr. Kidder, believe that there is a -- if something is in the law market, there can be no substitution. There's no cognizable substitution. There's no suppression of demand under the fourth fair use factor, which, again, is a restatement of -- of the Upcodes' position that was rejected at summary judgment.

THE COURT: Is that why you're trying to offer it? Is that the point of offering?

MR. GRATZ: No. The point of offering it is -- the point of offering it is not that -- is not to show that there is no copyright here. The point of offering it is that one of the things that is considered under the fourth factor is the degree to which there is substitution for, the demand for the original, for its original purpose or whether the Defendant's work -- what the Defendant is doing is fulfilling in whole or in part some other set of demand. That is -- and -- and this is all a matter of degree, right. This is -- this is not an all or nothing question. And to -- like the -- the degree to which there is market harm is lessened by the fact that some of this demand is for the

original purpose, the purpose for which these things were written, according to NFPA, and some of this demand is for another purpose, and we think we are fulfilling that second set of demands. The jury will be --

THE COURT: Where does that come from, though? Without revealing your strategy, where does that second set of demand come from? Is it just expert testimony? Is it the survey that is no longer here or how -- how are you showing that this demand exists that doesn't run afoul of the motion for summary judgment order?

MR. GRATZ: Right. So, our -- our -- so, I think -- let me consider -- let me consider this question two ways. Our principal way of showing that the demand that's -- that this separate demand exists in terms of the market for Plaintiff's publications is with Plaintiff's testimony, right. That is, they say that the -- that demand for their publications is different among those publications that are -- that are in one category versus another, that is, adopted versus not adopted. And that -- and analyzing how big that difference is is something that Mr. Kidder does, and Mr. Kidder is doing that in order to inform the question to what degree is there substitution versus there not being substitution.

I think there -- there will certainly also be testimony that -- from Upcodes that -- for what purpose is

its services and how they understand that people use its service, that is, people are coming to its service for one purpose and not for another.

THE COURT: Okay. My tentative is to deny. I'm on the fence on this one. It's pretty close, but my tentative is to deny the motion in limine number four.

To the extent that it goes to the law issue that's already addressed in the order, don't do it. To the extent that it's this kind of niche argument that counsel is making -- maybe not niche, but I see a way forward. So, I'm going to deny it without prejudice.

MR. KLAUS: Thank you, your Honor.

THE COURT: Okay. Let's go to motion in limine number five. My -- my goal is to end at 5:00. I don't want to keep anybody. So, we'll have to pick it up at some other time.

Plaintiff's motion in limine number -- number five to exclude Defendant's use of the term "monopoly" and "due process" on the grounds that the terminology is irrelevant, unfairly prejudicial, et cetera.

Plaintiff is concerned that the anticipated term would be used in the context of, you know -- I'm sorry. The -- you know what I'm saying -- in terms of monopoly, market share, et cetera, as opposed to in the copyright context where there is some use for the term.

I'm inclined to allow it in the copyright context as opposed to using the term to imply that it's unfair that they have this monopoly in the market of codes, et cetera.

Does that make sense?

(No response.)

THE COURT: Probably not. All right. Let me try again.

(Pause.)

THE COURT: There -- there's case law out there that describes copyright in terms of exclusive use to works in the monopoly context versus not, and then there is the other type of monopoly.

To the extent that Upcodes is trying to use the term for the unfairness of monopoly and in terms of the other type, which I -- for -- I don't know why it's escaping me at this hour.

MS. EHLER: Antitrust, your Honor.

THE COURT: Thank you. Thank you. That's where I was going with it. Thank you so much. Then that's out of bounds, and I would grant the motion in that context, deny the motion in the copyright context. So, just be very careful of how you use the term. That's my tentative.

Make sense?

(No response.)

THE COURT: Okay. I think that's it for

Plaintiffs.

Let's go to Defense. Some of these are relatively -- I think Defense motion in limine number one, there's agreement from what I can see in terms of certain language. It's to exclude certain pejorative language such as pirates, criminals, Napster or anything like Napster, which Plaintiffs have agreed that that shouldn't be used.

So, what's left are the terms "infringer" or "infringing", which Plaintiffs have pointed out the Court uses a lot, "free rider" or "free riding" and "stealing", and similar to the monopoly, I think there are ways to use the terminology that are appropriate here and that we can't necessarily get away from, and then there are ways to use the terminology that are not appropriate.

NFPA, wish to be heard?

MS. AMINIRAD: Yes, your Honor. For -- on -- on the point of infringer and infringement, just to add to our papers that those are also used in the parties' agreed upon jury instructions.

THE COURT: Yes.

MS. AMINIRAD: So, those need to be used.

On free riding, the -- this is describing an economic concept that has to do with directly relevant to fair use factor number four, and then with respect to stealing, NFPA's position is that this is a colloquial term.

So, we've drawn a distinction between words like "criminal" or "theft" whereas stealing you'd say something like stealing home base, and, so, this doesn't have the same connotation or weight that some of the terms at issue that we all agree will not be used.

THE COURT: Okay. To a certain extent, the Court's relying on the parties in these last two motions that we've discussed, the parties acting in good faith in terms of their use of the language. So, I'm not going to belabor the point. I'm going to grant it to the extent that we agree that pirating and stuff like that, those terms that Plaintiffs have already agreed they're not going to use, I'll grant it to the extent that those terms are at issue.

But for infringing, infringer and the -- I think there's three categories specifically that -- that Plaintiffs had discussed in their opposition. I think it's -- it's fair to use those, but -- but be mindful of when you're using them and don't use them unfairly. Same with monopoly.

So, it's granted in part. It's denied in part based on that.

Any questions about that issue?

MS. AMINIRAD: One question for clarification, your Honor.

THE COURT: Sure.

MS. AMINIRAD: The -- Upcodes' motion focused on uses of those terms to describe Upcodes or its conduct. There may be instances -- for example, one of the issues is whether NFPA's free access allows downloading or printing, and the reason that NFPA doesn't allow those functions is because of concerns of piracy or counterfeiting. So, in that particular context, our witnesses might refer to those terms but not in connection with Upcodes or its context, which we understood was the -- the scope of the motion in limine.

THE COURT: Any objection to that?

MS. SAJJAN: Your Honor, if NFPA is limiting their use of piracy and counterfeiting to distinctly NFPA's products, Upcodes understands NFPA's position, but I think Upcodes would still like state for the record that these terms are -- they can be taken in a negative context, and if NFPA were to use them in connection with Upcodes, then Upcodes opposes that, because --

THE COURT: Okay.

MS. SAJJAN: -- of the -- the presumptions of criminality.

THE COURT: It sounds like it's going to be used in a limited context with particular witnesses and beyond that, it should not be used. So, again, good faith.

Quite frankly, try not to have your witnesses use

it, but if it comes out, it's not going to be the end of the world, and Upcodes has their objection in the moment if necessary. So, again, tentatively, granted with respect to the words we all agree on. Piracy is one of them, but in the limited context, the witness may testify to it if necessary, hopefully not. But with respect to the other infringer and free riding and I forgot the third one, stealing, I will allow it. So, it's overruled -- I mean, sorry -- denied with respect to those words.

MS. SAJJAN: Your Honor, may Upcodes be heard for the record?

THE COURT: Briefly.

MS. SAJJAN: Okay.

THE COURT: Although you have your brief that I read.

MS. SAJJAN: Understood, your Honor. Upcodes would like to clarify its position on infringer. Upcodes' position is not that NFPA should be precluded from using the word "infringe" or "infringement" but, rather, that NFPA not be able to say that this Court has already found Upcodes to be an infringer, and the reason for that is because NFPA has proposed jury instructions in which they would contradict saying that Upcodes has been found an infringer already. I'm specifically thinking about NFPA's proposed jury instruction number three, which is their preliminary

instruction on copyrights. And that instruction reads that:

"There is no copyright infringement when the Defendant has made fair use of the copyrighted work."

So, Upcodes' concern is that if the jury were to hear that the issue of infringement has already been decided --

THE COURT: They're not going to hear that. The parties are going to submit a new statement that deals with that particular issue and tracks the language of the motion for summary judgment. So, it has not already been decided that Upcodes is an infringer. I didn't decide that.

MS. SAJJAN: Understood, your Honor.

THE COURT: Okay.

MS. SAJJAN: That is -- that was Upcodes' concern with infringement, infringer as --

THE COURT: Fair enough.

MS. SAJJAN: -- it was sort of drawn out, the legal conclusion.

And with respect to free rider and stealing, Upcodes is concerned about the criminality implications of the use of stealing. NFPA does not oppose precluding thieves but insists on using stealing, and Upcodes does not see where the limine is given that to a layperson, stealing evokes thoughts of criminal conduct, and this is a case

about copyright. And because of that potential confusion, courts have granted motions in limine to include both theft and stealing, and specifically thinking about the court in Oracle v. SIP. In that case, the Court went on to express its concern about how stealing would inflame the jury because of the potential association with criminal conduct.

THE COURT: District Court?

MS. SAJJAN: Yes, your Honor.

THE COURT: Not binding?

MS. SAJJAN: Not bind, your Honor

THE COURT: Okay. I -- I bristle at stealing, thievery, that sort of thing. But I also struggle with how NFPA tells its narrative in terms of what happened here, and there has to be some sort of room in order to describe the conduct, free riding --

MS. SAJJAN: Your Honor --

THE COURT: -- within case law, within the bounds of case law that's binding and case law that's persuasive. I'm asking both parties to act in good faith. Stealing, I'm -- I'm on the fence on. I don't like it because I do understand the criminality aspect of it, but without having the testimony and hearing the entire story put on by Upcodes, I'm not quite sure how they tell the story without using some terminology that suggests that Upcodes was allegedly taking stuff or using stuff that they weren't

entitled to without permission.

MS. SAJJAN: Your Honor, if I may briefly respond.

THE COURT: Uh, very briefly.

MS. SAJJAN: We -- we would just suggest that NFPA may use the language that it uses in its jury instructions, which is that Upcodes copied without authorization.

THE COURT: That's great for lawyers, but when you have lay people take the stand, what will they say? That's my concern. And, you know, copied without authorization, it's probably not going to come out from a layperson. So, we'll see. But, like I said, stealing I'm bristling on. And you have your objections. When it's happening, I understand -- I mean, it probably doesn't need a limiting instruction at that point, but I would ask the parties to meet and confer and maybe come up with some agreement, and then if you can come up with something that -- that works, tell your witnesses, and we'll see if they abide by what you say.

I think I need to end it there given the hour. We need to get together again, and the question is do we do so in one week or two weeks, because the next time we get together, I would love to see a statement that addresses the Court's concerns, and I would like to see new jury instructions. And to the extent that there has been any sort of clarity provided by the Court in terms of what's at

issue, the -- the jury instructions and the verdict form should reflect that the next time so that we can have a meaningful discussion about that.

We, of course, will have a jury instruction conference, but there's not a whole lot of time, and sometimes the timing doesn't quite work out in terms of how much we can spend time talking about it. So, I'd like to deal with the bigger picture so that you have some guidance in terms of what statements and evidence you're going to be presenting to the jury.

So, one week or two? My preference is one.

MS. EHLER: One's fine, your Honor.

MR. GRATZ: That's our preference too.

THE COURT: Let me see if it's the Court's preference officially. Ms. Gomez?

THE CLERK: Yes, your Honor.

(Pause to confer with clerk.)

THE COURT: Okay. March 5th, 3:00 o'clock. And let me say this. For the remainder of the Defense's motions in limine, my tentative is to deny them. In terms of sweat of the brow, it has some relevance to fair use. In terms of excluding evidence of investments as revenue, Plaintiffs may be able to link that to Defendants' investment capital to their infringement works issue and then, finally, in terms of excluding evidence of avoided licensing, I think the

parties have reached an agreement on that. So, it's probably denied as moot, but we can discuss more fully next week. By then, though, it doesn't give you much time to give me new jury instructions. So, Friday of -- no, that's impossible.

MR. GRATZ: I'm afraid, your Honor, that that is impossible.

MR. KLAUS: Your Honor, when would you like to have the jury instruction conference?

THE COURT: Tomorrow. Oh, the jury instruction conference happens after all of the evidenced is -- I try to anticipate like the last witness, and then we have the conference. Ideally it sets up so that we can take the afternoon or I have the jury come back in the afternoon and we take the morning, but it's not meant to be some three to four-day ordeal. So, I want to at a high level address it before the trial and then, during the trial, once we have all the evidence, you know, address sort of the fine tuning of the jury instructions. That's the goal.

So, you know, you should spend some meaningful time on it, and I am now questioning the wisdom of whether we meet in one week or two, because, you know, ideally, that would be done before we meet again.

MR. KLAUS: We will -- if your Honor would like us to do it in a week, we will do it -- both sides will do it

in a week.

THE COURT: Okay.

MR. KLAUS: If -- if --

THE COURT: So, why don't we --

MR. KLAUS: I -- I confess that I think that with the benefit of some additional time, we could probably narrow the jury instruction disputes.

THE COURT: Okay. So, why don't we meet in two weeks.

THE CLERK: March 12th.

THE COURT: March 12th, 3:00 o'clock. And have the disputed jury instructions and any agreed upon instructions that have been affected by what we've talked about today as well as the statement of the case, have that to me by March 5th.

MS. EHLER: Um-hmm.

MR. KLAUS: Absolutely.

THE COURT: Okay. And try to narrow the dispute. Your objections are preserved.

MR. GRATZ: Thank you, your Honor.

THE COURT: Okay. All right. Anything else?

(No response.)

THE COURT: All right. Thank you for your time. Thank you, Court Staff, for staying late. I'm so sorry. And have a good evening.

ALL: Thank you, your Honor.

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty — Transcriber

2/28/2025 — Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco

L.L. Francisco, President

Echo Reporting, Inc.